# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| TEXAS PACIFIC LAND TRUST and, solely in their respective capacities as trustees for Texas Pacific Land Trust, DAVID E. BARRY and JOHN R. NORRIS III, §§§§ | Case No. 3:19-cv-01224-B |
| Plaintiffs, §§§§ | |
| – against – §§§ | |
| ERIC L. OLIVER, §§§§ | |
| Defendant. § | |

## AMENDED COMPLAINT

Plaintiffs Texas Pacific Land Trust (the "Trust") and, solely in their respective capacities as trustees for the Trust, David E. Barry and John R. Norris III (collectively, the "Trustees"), for their amended complaint against defendant Eric L. Oliver ("Defendant"), respectfully allege as follows:

## I.        NATURE OF THE ACTION

1.        This is an action for declaratory, injunctive, and other relief against Defendant for disclosure abuses relating to a proxy contest, including violations of Section 13(d) and Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.        The Trust was created in 1888 and is among the largest private landowners in Texas, holding approximately 900,000 acres of land.  The Trust has been a model of stability and value creation for its shareholders and has outperformed 99% of its fellow S&P 500 members for the last five years.  The Trust is managed by three Trustees who serve until death, resignation, or disqualification, pursuant to the Declaration of Trust, the Trust's governing document (the

"Declaration of Trust").  This action concerns an election to fill a vacancy on the Trust's Board of Trustees due to a death.

3.      Two parties—the Trust and a group of dissident shareholders—are vying to fill this trustee vacancy.  Shareholders will ultimately have the opportunity to vote for their preferred candidate.  The Trust is compelled to bring this action because one of those candidates— Defendant—has made misstatements and omitted from his public disclosures material information, which, if not corrected, would deprive shareholders of the opportunity to vote for a trustee on a fully informed basis.

4.      Indeed, Defendant has provided virtually no meaningful information to the Trust or its shareholders despite repeated requests that he do so.  Defendant ***has refused to answer even a single question*** in the Trust's form of trustee questionnaire—a questionnaire that seeks to obtain information regarding the candidate's background, business interests, and potential or actual conflicts, which two other trustee candidates filled out completely.

5.      It is a fundamental principle that shareholders of public companies should receive accurate and complete information from, and regarding, candidates so that shareholders can make a fully informed vote.  But Defendant has left critical, material questions unanswered, many of which address his integrity and capacity to act as a trustee and fiduciary, and all of which are detailed herein.  By this action, the Trust seeks complete and accurate answers to these questions and to enjoin Defendant's candidacy until he provides answers to the satisfaction of the Trust in accordance with the Trustees' own fiduciary duties to the Trust and its shareholders. The other candidate has completed the Trust's form trustee questionnaire.

6.      Defendant and his group of dissident shareholders have also distorted the election process by issuing innumerable solicitation materials in the form of proxy statements, press

releases, presentations, blog articles, videos and letters that are replete with actionable misstatements and omissions that violate Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  These statements are material to shareholders and concern, among other things, the election process, the Trust's interactions with Defendant and his group, and the structure and activities of the Trust itself.

7.      Defendant and his group of dissident shareholders have also violated Section 13(d) of the Exchange Act by failing to disclose the formation of a "group" with each of Santa Monica Partners, L.P. ("Santa Monica") and Universal Guaranty Life Insurance Company ("UGLIC"), each of whom has longstanding relationships with Defendant and dissident shareholder Horizon Kinetics LLC, respectively.  Both Santa Monica and UGLIC are operating as hidden participants in the Dissident Group's (as defined below) proxy solicitation.

8.      The Trust seeks, among other things, to enjoin Defendant's candidacy until he issues corrective disclosures with respect to his and the Dissident Group's collective misstatements and omissions.

9.      Shareholders are entitled to a fully informed vote with respect to the future stewardship of the Trust.  This action, and the relief sought herein, seeks to provide shareholders that opportunity.

## II.      THE PARTIES

10.      The Trust.  Plaintiff Texas Pacific Land Trust is a publicly traded entity established in 1888 with its principal place of business in Dallas, Texas.  The Trust is governed by the Declaration of Trust, pursuant to which three trustees are elected until death, resignation, or disqualification.  The Trust has been listed on the New York Stock Exchange since 1927 under the ticker symbol "TPL."

11.    <u>Trustee Barry</u>.  Plaintiff David E. Barry brings this suit solely in his capacity as a Trustee of the Trust.  Mr. Barry is a New York citizen, who resides in New York, New York.

12.    <u>Trustee Norris</u>.  Plaintiff John R. Norris III brings this suit solely in his capacity as a Trustee of the Trust.  Mr. Norris is a Texas citizen, who resides in Dallas, Texas.

13.    <u>Defendant</u>.  Mr. Oliver is the Founder and President of SoftVest, L.P., a hedge fund specializing in the ownership of oil and gas minerals and royalties with its principal place of business in Abilene, Texas.  Defendant is a Texas citizen who, upon information and belief, resides at 1452 Tanglewood Road, Abilene, TX 79605.  SoftVest, L.P.'s address is 400 Pine Street, #1010, Abilene, TX 79601.

### III.    <u>JURISDICTION AND VENUE</u>

14.    <u>Subject Matter Jurisdiction</u>.  This Court has jurisdiction over this matter pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d); Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) (and the rules promulgated thereunder); and 28 U.S.C. § 1331.

15.    <u>Personal Jurisdiction</u>.  The Court has jurisdiction over Defendant, a Texas resident.  He has been served in compliance with the Federal Rules of Civil Procedure.

16.    <u>Venue</u>.  Venue is proper in this District for the Plaintiffs pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because it is the district in which the business at issue—the Trust—resides and is subject to personal jurisdiction.  The Trust's principal place of business and primary administrative offices are located in Dallas, Texas.  Its mailing address, as listed by the Texas Comptroller of Public Accounts, is located in Dallas, Texas.  In addition, Mr. Norris, resides and works in Dallas, Texas.  Moreover, venue is proper in this District for the Defendant pursuant to 28 U.S.C. § 1391(b)(2) as the actions "may be brought" in the District because "a substantial part of the events or omissions giving rise to the claim occurred" in the

Northern District of Texas.  Here, Defendant is seeking to become a trustee over the Trust, which operates out of Dallas, Texas.  His March 28, 2019 letter in response to the Trust's questionnaire was delivered to the Trust's offices in Dallas, Texas.  Additionally, the Trust's special meeting of holders of sub-share certificates[1] (the "Special Meeting") is to be held in Dallas, Texas.  Finally, most of the witnesses and evidence are located in Dallas, Texas, which makes it a convenient and just venue for all the parties involved.

### IV.   FACTUAL BACKGROUND

#### The Trust

17.    The Trust was born out of the bankruptcy of Texas Pacific Railway Co.  In 1871, Texas Pacific Railway Co. was granted 3.5 million acres of land in Texas under federal charter.  After the bankruptcy of the railway enterprise, the bondholders who had financed the failed venture were awarded the land and created the Trust to receive and exploit the land to their benefit.

18.    The Trust is governed by the Declaration of Trust dated February 1, 1888, and signed by its three original trustees.  A copy is attached hereto as Exhibit A and is incorporated herein by reference.  Under the Declaration of Trust, three trustees are elected "by a majority in the amount of the certificate holders present in person or by proxy at [a special] meeting [of certificate holders] whose names shall have been registered in the books of the trustees at least fifteen days before such meeting."  (Decl. of Trust at THIRD.)  Upon election, trustees serve until "death, resignation or disqualification."  (*Id*.)  The trustees "hold [the lands, premises and property conveyed under the Declaration of Trust] . . . and any and all income and proceeds thereof or of any part thereof, in trust . . . for the benefit of the . . . owners and holders of the . . .

---

[1] While the Declaration of Trust (*see* Paragraph 18) refers to certificate holders, the certificates were divided into sub-shares years ago.  The holders of sub-share certificates are herein referred to as shareholders.

certificates of proprietary interest" and, in doing so, have "all the powers in respect of said property of an absolute owner."  (*Id.* at FIRST)

19.      The Trust currently is managed by two trustees:  Mr. Barry and Mr. Norris.  A third trustee, Maurice Meyer III, resigned on February 25, 2019, and passed away on March 24, 2019, creating a trustee vacancy as the Declaration of Trust requires three Trustees.  This has resulted in an election.

20.      To this date, the Trust remains one of the largest landowners in Texas with approximately 900,000 acres of land.  Much of the Trust's land is located in the Permian Basin, which is currently at the center of the country's oil and gas exploration and production.  In addition to the administration and exploitation of the land held, the Trust has recently invested in the business of providing full-service water offerings to oil and gas exploiting companies.

21.      For much of its 131-year history, the Trust has outperformed its peers in earnings and regularly returns massive profits to shareholders in the form of annual dividends and share repurchases.  For example, the Trust has returned about $200 million to shareholders through dividends and share repurchases since 2016.  Over the 5- and 10-year periods preceding the Dissident Group's campaign, the Trust generated total shareholder returns of 475% and 3,856%, respectively, far outperforming the overall stock market and its peers.

### The Trustees' Obligation To Evaluate Nominees

22.      The Trustees have a fiduciary duty to ensure that trustee candidates have the experience, integrity and capabilities necessary to serve as trustee.  The Trustees also have a fiduciary duty to ensure that shareholders are provided with the information necessary to enable them to vote on trustee nominees on a fully informed basis.

23.     Pursuant to the Declaration of Trust, trustees are subject to "disqualification" if they are not qualified to serve as trustee.  It is therefore the duty of the Trustees to ensure that trustee nominees are not disqualified.

24.     Indeed, long before the events giving rise to this action, the Trust established the Nominating, Compensation and Governance Committee "to assist the Trustees in discharging and performing the duties and responsibilities of the Trustees with respect to" the nomination of trustee candidates and various aspects of corporate governance, including the assessment of whether nominees are qualified, or disqualified, to serve as trustee.  The charter for the Nominating, Compensation and Governance Committee, provides that the Trustees' "duties and responsibilities" include "[t]he identification and recommendation . . . of individuals qualified to become or continue as Trustees . . ."  A copy is attached hereto as Exhibit B (amended as of February 26, 2013) and is incorporated herein by reference.  In performing this function, the Trustees have "the authority to conduct any and all investigations [they] deem[] necessary or appropriate . . . ." *Id.*

### The Contested Trustee Election

25.     On February 25, 2019, Mr. Meyer resigned as Trustee for medical reasons.  He subsequently passed away on March 24, 2019.  Following Mr. Meyer's resignation, Allan Tessler, a member of Defendant's Dissident Group, suggested to Mr. Barry, one of the current Trustees, that Defendant be considered as a nominee to replace Mr. Meyer.

26.     In accordance with their obligations under the charter for the Nominating, Compensation and Governance Committee, the Trustees reviewed Defendant's résumé, credentials and past interactions with the Trust in good faith.  Based on their review, the Trustees determined that it would not be in the best interests of the Trust or its shareholders to nominate

Defendant, and instead chose to nominate another candidate for Trustee, Preston Young.  The Trust announced this in a Form 8-K filed on March 4, 2019.

27.     On March 15, 2019, a group of shareholders consisting of SoftVest, L.P., ART-FGT Family Partners Limited, Mr. Tessler, the Tessler Family Limited Partnership, and Horizon Kinetics LLC (together, the "Dissident Group") filed a Schedule 13D with the Securities and Exchange Commission (the "SEC"), disclosing that SoftVest intended to nominate Defendant for election as Trustee.  The Trustees were not given advanced notice of this filing or the Dissident Group's stated intention to nominate Defendant for election as Trustee.  On March 19, 2019, SoftVest delivered to the Trust a formal notice to nominate Defendant.

28.     On March 18 and March 20, 2019, the Trust spoke to Murray Stahl, the CEO and Chairman of Horizon Kinetics, the largest shareholder of the Dissident Group.  During the conversations, Mr. Stahl indicated that he was very pleased with the Trust's performance but wanted the Trust to review its corporate governance policies.

29.     The Trust subsequently engaged Spencer Stuart, Inc., one of the world's leading global executive and board director search firms, and began a process in which the Trust considered more than 15 candidates whom Spencer Stuart identified.  In addition, the Trustees asked the Trust's financial and legal advisors for recommendations, with a particular focus on candidates with extensive corporate governance experience.

30.     On March 25, 2019, the Dissident Group submitted a preliminary proxy statement to the SEC with respect to Defendant's candidacy and that Defendant seeks to be appointed a lifetime trustee.

31.     In two conversations on March 27, 2019 and April 5, 2019, in light of concerns raised about Defendant's qualifications, the Trustees discussed with Mr. Stahl the selection of a

mutually agreeable, compromise candidate.  Mr. Stahl stated that he was open to considering an alternative to Defendant and would give a compromise candidate prompt consideration.

32.      On April 6, 2019, the Trustees received an email from the General Counsel of Horizon Kinetics stating that the Dissident Group would refuse to consider other candidates or to vote for anyone other than Defendant.

33.      On April 7, 2019, following a thorough review of potential candidates, based in part on concerns expressed by the Dissident Group and other shareholders about Mr. Young, the Trustees chose to replace Mr. Young as a candidate with General Donald G. Cook, a retired four-star General of the United States Air Force.  The Trustees did not know and had no prior relationship with General Cook; one of the Trust's advisors introduced General Cook to the Trustees.

34.      General Cook's board experience is extensive.  He currently serves on the board of Crane Corporation, where he chairs the nominating and governance committee and is also a member of the compensation and the executive committees.  He also serves on the board of Cybernance, Inc.  General Cook previously served on the boards of USAA Federal Savings Bank (from 2007 to 2018); U.S. Security Associates Inc., a Goldman Sachs portfolio company (from 2011 to 2018); and Beechcraft LLC, formerly known as Hawker Beechcraft Inc. (from 2007 to 2014).  Moreover, General Cook served on the board of Burlington Northern Santa Fe Railroad for almost five years until it was sold to Berkshire Hathaway in 2010 in a transaction valued at $44 billion.  In addition to his extensive corporate governance experience, General Cook has been the Chairman of the San Antonio chapter of the National Association of Corporate Directors (NACD), a group recognized as the authority on best practices in corporate governance.

35.     To aid the Trustees' assessment of his qualifications, General Cook provided substantial disclosures and responses to the same trustee questionnaire provided to Defendant (also completed by the prior candidate, Mr. Young).  The Trustees, upon the recommendation of the Nominating, Compensation and Governance Committee, determined that General Cook meets the standards for trustee qualifications.

36.     All three of the independent proxy advisory firms—ISS, Glass Lewis, and Egan-Jones—have recommended that the Trust's shareholders vote for General Cook over Defendant. To help sort through the many claims and counterclaims of a contested election like this one, institutional investors (such as mutual, pension and retirement funds) rely on the recommendations from these proxy advisory firms because they provide the perspective of a neutral, independent expert.  Egan-Jones has noted, "the current Board and management are the best in class in terms of qualifications, experience, expertise and independence, ***contrary to Defendant who lacks public company experience***."  A copy of the Egan-Jones Opinion is attached hereto as Exhibit C and is incorporated herein by reference.  Egan-Jones advised that "General Cook brings to [the Trust] exemplary leadership and corporate governance skills and the Trust will benefit greatly from his extensive experience."  *Id*.  ISS advised that "[General Cook has] a public track record that seems to reflect direct efforts to improve the governance of the companies on whose boards he has served."  A copy of the ISS Opinion is attached hereto as Exhibit D and is incorporated herein by reference.  Glass Lewis advised that "General Cook is capable and willing to act as an agent of change on the [Trust] board, including in response to any concerns and demands expressed across [the Trust's] shareholder base—including most of those vocalized by the Dissidents during this campaign."  A copy of the Glass Lewis Opinion is attached hereto as Exhibit E and is incorporated herein by reference.

37.     The Special Meeting of the shareholders to vote to fill the trustee vacancy was originally scheduled for May 8, 2019.  Upon receiving notice of Defendant's nomination and the commencement of an unannounced campaign by the Dissident Group, however, the Trust postponed the date of the Special Meeting until May 22, 2019, in order to be able to meet the newly expected, longer time period for preparing and mailing proxy materials in a contested situation.  The Dissident Group did not object to that postponement at the time.

38.     On April 30, 2019, General Cook announced his willingness to resign as Trustee, if elected, after no more than three years following his election. He subsequently delivered a formal letter of resignation to that effect.  General Cook made this commitment to address concerns by shareholders regarding the life tenure of trustees.  Defendant has not made the same commitment.

39.     The staff of the SEC subsequently advised the Trust that General Cook's commitment may constitute a "fundamental change" in the meaning of Note 1 to Rule 14a-6(a) of the Rules promulgated under Section 14 of the Exchange Act, which would require the filing and mailing of a supplement to the Trust's proxy statement.  The staff of the SEC asked the Trust's counsel for an analysis of this legal issue.  After analyzing this issue, the Trust's counsel was unable to come to a conclusive answer.  Therefore, the Trust determined it would be prudent and in the best interests of shareholders to prepare, file, and mail a proxy supplement to all shareholders.

40.     To provide the shareholders with sufficient time to receive by mail and review the proxy supplement in order to be able to cast their votes on a fully informed basis, the Trust publicly announced that it would convene and then adjourn, without conducting any business, the Special Meeting to be reconvened on June 6, 2019.  The right to adjourn the meeting is

clearly within the Trustees' powers under the Declaration of Trust, and the Trustees' decision to adjourn the meeting is consistent with their fiduciary duties to the Trust and its shareholders.

### Defendant Has Refused To Provide Meaningful Disclosure
### About His Background, Business Dealings And Potential or Actual Conflicts Of Interest

41.     In striking contrast to General Cook, Defendant has provided virtually no meaningful disclosure to the Trust or its shareholders.  On March 28, 2019, the Trustees provided Defendant with the same questionnaire provided to, and completed by, General Cook and Mr. Young.  A copy is attached hereto as Exhibit F and is incorporated herein by reference. Given the potential for trustees to serve life terms and to carry with them liabilities that could expose the Trust and its shareholders to significant harm, the questionnaire sought to explore Defendant's background, business interests, and potential or actual conflicts, including questions such as: (i) "Do you hold a position with any other entity (including companies, partnerships, trusts, charitable organizations, etc.), besides the Trust in which you are a director, trustee, partner, or officer, regardless of ownership in that entity?"; (ii) "Is there any undisclosed fact about you, your past conduct or your background that, if it became public, would be embarrassing or otherwise negatively reflect upon you or any institution on whose board you are sitting?"; and (iii) "Have you ever been, formally or informally, the subject of any allegations of sexual harassment, sexual misconduct or any other unethical conduct?"  That same day, Defendant *explicitly refused to respond to even a single question within the questionnaire*.

42.     The only information that Defendant provided to the Trustees was a résumé.  This minimal disclosure left the Trustees (and shareholders) with more questions than answers, especially in light of information previously received concerning conflicts of interest and other issues regarding Defendant's background and business dealings.  Indeed, Egan-Jones, in recommending that the Trust's shareholders vote for General Cook rather than Defendant, noted

its concern that *Defendant's* "*election to the Board poses potential conflict of interests, [and] non-independent judgment due to Mr. Oliver's undisclosed affiliations, which are detrimental to the best interests of the Company and its shareholders*."

43.    Notwithstanding Defendant's prior refusals to respond to the Trustee's questionnaire, on May 16, 2019, in an effort to discharge their duties as Trustees and to secure a fully informed shareholder vote, the Trustees sent a letter to Defendant stating that they wanted to "give [him] every opportunity to provide the requested disclosure" (the "May 16 Letter").  A copy of the May 16 Letter is attached hereto as Exhibit G and is incorporated herein by reference.  The May 16 Letter again requested that Defendant "[p]lease respond to the questionnaire and certify the accuracy of [his] responses."  The May 16 Letter asked Defendant to ensure that he addresses several concerns relating to his qualifications that were omitted from the Dissident Group's solicitation materials so that the Trustees could ensure that Defendant was not disqualified from serving as a trustee. The Trustees' concerns include, among other things, Defendant's background and experience and potential improper dealings relating to his business interests.  The May 16 Letter told Defendant that, "[b]y providing truthful and fulsome responses to the questionnaire, [he has] the opportunity to put those concerns to rest and to provide shareholders with the information necessary for an informed vote."  Specifically, in addition to a renewed request that Defendant answer the questionnaire truthfully and completely, the May 16 Letter asked Defendant to address the following concerns:

a.    For several years, in the quarterly and annual reports of AMEN Properties, Inc. ("AMEN"), a company for which Defendant serves as Chairman, Defendant was described as serving on the board of the "First National Bank of Midland." Defendant has likewise touted this purported corporate governance experience to

Trust shareholders.  As explained in the May 16 Letter, the Trustees had been "unable to confirm that any such bank exists," a concern that also had previously been raised by an AMEN shareholder in a letter from 2012, which was shared with the Trust a few days earlier.  The May 16 Letter asked Defendant to provide "an explanation of this apparent discrepancy."  Defendant has sought to justify this misstatement by reference to a "clerical error."

b.  In a campaign video released on April 16, 2019, Defendant claimed that the Trust's former General Agent and Chief Executive Officer Roy Thomas entrusted Defendant over ten years ago with confidential surface maps of the Trust.  The Trust considered these surface maps material nonpublic information at the time it provided this information to Defendant.  Defendant was asked to address whether he had used these confidential surface maps "to acquire any assets, trade any securities (or options), or pursue any commercial or financial ventures, whether personally or through any entity under [his] direction."  (Exhibit G.)  Defendant has asserted that such information is publicly available, but while that may be true now, it was not true for many years after Defendant obtained such information.

c.  AMEN, of which Defendant serves as Chairman, committed in its governing documents to donate ten percent of its earnings to Christian charitable organizations. The May 16 Letter expressed concern that, as early as 2015, AMEN had stopped making these donations and instead began paying a "tithing" dividend to its shareholders with no obligation to make a donation, without any shareholder vote to change the governing documents of AMEN.  (Exhibit G.)  This change is particularly concerning because Defendant and his family are among AMEN's largest

shareholders.  (*Id*.)  The May 16 Letter asked Defendant for "an explanation of the apparent discrepancy with respect to the AMEN governing documents as well as an explanation of this apparent conflict of interest."  (*Id*.)  Defendant has not satisfactorily responded to this inquiry.

d.  Santa Monica filed a Schedule 13D in enthusiastic support of Defendant's candidacy on April 8, 2019.  Schedule 13D filings are permitted only by shareholders owning 5% or more of an issuer's shares, so Santa Monica's filing generated the false impression that a major shareholder, unrelated to the Dissident Group, was supporting Defendant.  In fact, Santa Monica owned only 0.2% of the shares and acquired shares shortly after the Dissident Group launched its proxy contest.  Moreover, Santa Monica has a longstanding relationship with Horizon Kinetics and its co-founder Murray Stahl.  The May 16 Letter expressed concern that Santa Monica is an undisclosed member of the Dissident Group and a hidden participant in the Dissident Group's proxy solicitation, in violation of Regulation 13D and Regulation 14A promulgated under the Exchange Act.  The May 16 Letter requested that Defendant explain these relationships and why they were not disclosed.  Defendant has not satisfactorily responded to this inquiry.

e.  UGLIC, a holder of 39,000 shares of the Trust, issued a press release in "enthusiastic support" of Defendant on April 16, 2019. The press release tried to create the impression that a neutral shareholder is supporting Defendant.  In fact, UGLIC has a longstanding relationship with Defendant.   The May 16 Letter expressed concern that UGLIC is an undisclosed member of the Dissident Group and a hidden participant in the Dissident Group's proxy solicitation, in violation of Regulation 13D and

Regulation 14A promulgated under the Exchange Act. (Exhibit G.) The May 16 Letter requested that Defendant explain these relationships and why they were not disclosed. (*Id.*) Defendant has not satisfactorily responded to this inquiry, and instead has avoided the question.

f.  During Defendant's tenure as AMEN's Chairman and CEO, SoftVest provided AMEN with a preferred promissory note that financed a royalty acquisition. The May 16 Letter requested that Defendant explain the efforts that were taken to ensure that this related party transaction was negotiated on an arms-length basis such that it did not constitute unlawful self-dealing. Defendant has not satisfactorily responded to this inquiry, vaguely stating that he "recalls" recusing himself from consideration of this transaction and providing no other details.

g.  There is reason to believe that the Dissident Group has engaged in undisclosed proxy solicitation using various online sources, including forums, paid investment discussion websites and blogs. The May 16 Letter asked Defendant to explain whether the Dissident Group, or others at the Dissident Group's direction or in consultation with it, have engaged in such undisclosed proxy solicitation in connection with his candidacy. Defendant has not satisfactorily responded to this inquiry, and instead has avoided the question.

h.  There is reason to believe that Defendant, directly or indirectly, owns a significant number of oil and gas interests, at least some of which are located in the Permian Basin through various entities, including AMEN, SoftVest and affiliated entities, and that Defendant's family members, including his brother and sons, own similar interests. The May 16 Letter asked Defendant to describe those interests and explain

whether they do business with or compete with the Trust, or are in a position to profit from the activities of the Trust.  Defendant has neither satisfactorily responded to this inquiry, nor provided any other information concerning his potential or actual conflicts of interest.

44.     On May 20, 2019, Defendant provided purported responses to the questions posed in the May 16 Letter but, upon information and belief, the answers were inaccurate.  They were also incomplete.  He also continues to refuse to complete and certify the Trust's standard questionnaire.[2]

**The Trust's Postponement Of The Special Meeting**

45.     On May 21, 2019, in light of Defendant's refusal to provide the information necessary for the Trustees and shareholders to ensure Defendant is not disqualified from serving as a trustee and, in light of the Dissident Group's numerous material misstatements and omissions in its solicitation materials (detailed below), the Trust and Trustees filed the Original Complaint in this action. That same day, the Trust notified shareholders that the Special Meeting would be postponed until further notice.

46.     As was the case with the prior adjournment of the Special Meeting – in light of the Trust's need to submit a supplemental proxy statement – the Trustees' authority to postpone the meeting derives from the Declaration of Trust and the decision to postpone the meeting is consistent with the Trustees' fiduciary duties to the Trust and its shareholders.  Under Article SIXTH of the Declaration of Trust, meetings may only be called by the Trustees, whether on

---

[2] Notably, Defendant is represented by Gibson, Dunn & Crutcher LLP, who appeared at the Invalid Meeting and attempted to run the Invalid Meeting.  The Trust's counsel provided by email a copy of the May 16 Letter to Eduardo Gallardo of Gibson, Dunn & Crutcher LLP, the same day that it was transmitted to Defendant, and asked if Mr. Gallardo could "speak in the morning."  Mr. Gallardo never responded to that email. This email is attached hereto as Exhibit H and is incorporated herein by reference.  He also did not respond to two other emails from the Trust's counsel.

their own accord or upon request of shareholders, and the ability to call a meeting include the ability to set time and place, as well as to postpone.  (Decl. of Trust at SIXTH.)

### The Dissident Group Holds An Unnoticed and Invalid "Meeting"

47.     At 6:19 p.m. Central on May 21, 2019, notwithstanding the Trustees' postponement of the Special Meeting and the efforts by the Trustees and the Trust's counsel to reach out to Defendant's counsel, the Dissidents announced via press release that they would "proceed to attend the special meeting scheduled tomorrow morning in Dallas."  A copy of the May 21, 2019 press release is attached hereto as Exhibit I and is incorporated herein by reference.

48.     The Trust had noticed the Special Meeting, pursuant to the Declaration of Trust, to take place at the offices of Sidley Austin LLP in Dallas, Texas.  The Dissident Group did *not* attend the Special Meeting on May 22, 2019, however, because that meeting had been postponed.  Instead, the Dissident Group and a few dozen shareholders gathered on a different floor of the office building in which Sidley Austin LLP's offices are located (the "Invalid Meeting").  The Dissident Group did not provide any formal notice that it would be holding the Invalid Meeting at that location.  Even though the Trust's counsel corresponded with Defendant, his counsel, and his proxy solicitor approximately 90 minutes prior to the Invalid Meeting, the Dissident Group did not inform the Trustees or the Trust's counsel about their plan to hold the Invalid Meeting.  Prominently displayed in the lobby of the building in which the Invalid Meeting occurred was a sign informing shareholders that the actual Special Meeting had been postponed.  Attorneys for Defendant were re-directing shareholders to attend the Invalid Meeting on another floor of the office building.

49.     The Declaration of Trust requires that notice of shareholder meetings "shall be given by publication in at least two daily newspapers published in the City of New York once in each week for four weeks." (Decl. of Trust at SIXTH).  The Dissident Group did not provide valid notice of Invalid Meeting, whether in its May 21, 2019 press release or otherwise.  Nor would they have the authority to notice a meeting.

50.     The Declaration of Trust provides that "[t]he chairman of the trustees shall, if present, preside at all meetings of the certificate holders." (Decl. of Trust at SIXTH.)  The Co-Chairmen of the Trustees were not present at the Invalid Meeting because it was not duly called and noticed.  In fact, the Co-Chairmen of the Trustees did not learn about the Invalid Meeting until after it was concluded.

51.     Defendant conducted the Invalid Meeting as the purported "Chairman" and held a sham vote to be elected a purported lifetime trustee, even though at least one shareholder asked for an adjournment and another to ask questions before the vote.

52.     The Invalid Meeting failed to meet the quorum requirement.  (*See* Definitive Proxy Statement filed April 8, 2019 ("For purposes of the Special Meeting, there will be a quorum if the Holders of a majority of the outstanding Sub-share Certificates are present in person or by proxy.").)  In fact, Defendant and his agents represented at the Invalid Meeting that approximately 3.7 million shares were present at the meeting, which constitutes less than half of the Trust's outstanding shares.

53.     At the Invalid Meeting, a number of shareholders sought to pose questions to Defendant, but they were told by Defendant's counsel that they could not ask any questions until after a "vote" was taken by those present at the Invalid Meeting and a chair elected.  One

attending shareholder even asked that the Invalid Meeting be adjourned.  Another asked why Defendant had not filled out the form trustee questionnaire.

54.     Over the course of an approximately ten-minute period, certain individuals present at the Invalid Meeting then purported to undertake a vote for the election of Defendant as trustee.  Defendant then declared himself to be a trustee and subsequently publicly announced in a press release the sham voting tallies from the Invalid Meeting.  As discussed further below, this was conduct in violation of Rule 14a-9.

55.     Based on this unlawful and improper conduct, Plaintiffs seek a declaration that (i) the "notice" provided by Defendant and his Dissident Group was invalid and ineffective; (ii) the Invalid Meeting led by Defendant and the Dissident Group on May 22, 2019 was not a lawful Special Meeting of the Texas Pacific Land Trust; (iii) and any votes cast at the Invalid Meeting conducted by Defendant and the Dissident Group on May 22, 2019 are invalid, null, and void.

**The Dissident Group's Material Misstatements And Omissions In Violation Of Rule 14a-9**

56.     Beyond the potential conflicts of interest and business dealings that were the subject of the May 16 Letter, the Dissident Group (of which Defendant is a member) has made repeated material misstatements and omissions in its proxy materials in support of Defendant's candidacy.  The Dissident Group's misstatements and omissions include its definitive proxy statement (the "proxy"), as well as numerous press releases, videos, presentations, and letters, all of which have been publicly filed as proxy solicitation materials.  These material misstatements and omissions violate Exchange Act Rule 14a-9 and must be corrected to ensure that all of the Trust's shareholders have the opportunity vote for a trustee at the Special Meeting on a fully informed basis.

**Misstatements And/Or Omissions Concerning**
**The Trust's Interactions With The Dissident Group**

57.     The Dissident Group's solicitation materials include material misstatements and

omissions relating to the Trust's interactions with Defendant and his Dissident Group.

58.     First, the Dissident Group omits material facts regarding discussions between

Horizon Kinetics' Chairman and Chief Investment Officer, Murray Stahl, and the Trust with

respect to proposals made by Mr. Stahl, which were thoroughly considered by the Trust.  For

instance, the Dissident Group's proxy materials portray the Trust as having not engaged in good

faith with Mr. Stahl and other members of the Dissident Group, or having not fully and fairly

assessed the advantages and disadvantages of the Dissident Group's proposed measures.  The

Dissident Group's proxy materials omitted, however, the following material information: (i) on

March 6, 2019, Mr. Stahl spoke with a representative of the Trust and suggested the formation of

an advisory board of shareholders that would, among other things, propose governance,

organizational and operational improvements and that the Trust signaled its willingness to

consider such proposal; (ii) on March 20, 2019, Mr. Stahl spoke with a representative of the

Trust again and indicated that he wanted the Trust to review certain of its corporate governance

policies, which the Trustees ensured Mr. Stahl would be made a part of the Trust's continuous

review of its policies and procedures; and (iii) on March 27, 2019 and then again on April 5,

2019, Mr. Stahl spoke with representatives of the Trust yet again, in which conversation the

Trust and Mr. Stahl, on behalf of the Dissident Group, engaged in preliminary settlement

discussions in order to avoid a contested election at the Special Meeting.

59.     Second, the Dissident Group states that it repeatedly proposed that the Trust

should convert into a master limited partnership ("MLP"), but the Dissident Group omitted

material information concerning its reasons for abandoning this proposal.  The Dissident Group

falsely and misleadingly states that its position regarding a conversion into an MLP structure changed due to changes in U.S. tax laws, but in fact, the Trust considered the Dissident Group's proposals thoroughly and commissioned expert advice from both its financial advisor and two law firms (the second one at the additional request of the Dissident Group) on the advantages and disadvantages of the suggested conversion.  The advisors unanimously recommended against the conversion, citing, among other things, the significant negative tax implications of conversion and the significant debt that the Trust would have to incur to pay the tax liabilities as a result of such conversion.  The Trust informed the Dissident Group of these findings, but the Dissident Group fails to disclose that it abandoned its proposals upon learning about the adverse tax consequences identified by the Trust's advisors and falsely implies that it came to the conclusion on its own.

60.     Third, the Dissident Group's April 15, 2019 press release falsely accuses the Trust of being "unwilling to provide" a list of the non-objecting beneficial owners of shares of the Trust (the "NOBO List"), and instead "stonewall[ing]" Defendant in the face of his request.  This is a material mischaracterization of the facts.  In fact, the Trust explicitly stated that it was "willing to provide such materials, provided that the Trust has the legal authority to share such information," and requested Defendant to provide a legal basis for his demand.  Sharing the NOBO List without any legal basis to do so would have breached the privacy rights of thousands of shareholders, and to characterize this reasonable request as "stonewall[ing]" is misleading and violates Rule 14a-9.  The Dissident Group's later comments, in its April 22 and 23, 2019 press releases—that "[w]e trust that you already know that there is no legal impediment in providing to Mr. Oliver a NOBO list," that the "tone and content" of the Trust's communication makes "clear to us that at this time you do not intend to provide Mr. Oliver with a NOBO list," that "the Trust

refuses to give us their NOBO list"—violate Rule 14a-9 for the same reason.  The Dissident

Group even asserted in its April 22, 2019 press release that "[y]our argument boils down to

saying that [the Trust] will not provide the NOBO list unless it is legally mandated to do so,"

which is materially misleading because the Trust's request to Defendant pertained to

understanding whether it was legally *permitted* to reveal the NOBO, not whether it was legally

*mandated* to do so.[3]  In response to the misrepresentations made by the Dissident Group, the

Trust, in a letter to the Dissident Group dated April 23, 2019, reiterated and explained its

position for a second time.  Still, in a subsequent letter sent by SoftVest LP to shareholders on

April 23, 2019, as well as in a press release made available by SoftVest LP on May 13, 2019, the

Dissident Group kept falsely claiming that the Trust is unwilling to share the NOBO list.

      61.    Fourth, the Dissident Group's April 23, 2019 press release asserts that the Trust

has exhibited a "total disregard for investors' views and rights, as evidenced by the conduct of

incumbent trustees during this proxy campaign."  This misleading statement omits that the Trust

promptly changed its nominee—from Mr. Young to General Cook—in direct response to the

input of shareholders, and that it also protected shareholders' personal information by not

providing the NOBO list to the Dissident Group in the absence of clear legal authority to do so.

Moreover, certain shareholders, including the Dissident Group, have shared their views that the

Trust lacks robust modern corporate governance policies.  As a result of this feedback, the Trust

nominated an expert on corporate governance, a fact that the Dissident Group wrongfully omits.

      62.    Fifth, the Trustees reached out to the Dissident Group on May 8, 2019 in a

confidential email labeled "Subject to Settlement Privilege/Confidential."  In response, the

---

[3] Similar material misstatements are contained in the Dissident Group's publicly-filed April 23, 2019 letter.  *See*
Sched. 14A filed by Dissident Group on April 24, 2019 at
https://www.sec.gov/Archives/edgar/data/97517/000114036119007508/s001762x16_dfan14a.htm.

Dissident Group issued a press release on the same day, in which it purported to have "reprinted" the email.  The purported "reprint" is materially misleading because it omits the very first sentence of the email, which expressly states that "[t]his email is confidential and subject to settlement privilege."  By omitting this sentence, the Dissident Group sought to minimize the nature and extent of its violation of ethical rules and norms governing settlement discussions. This purported "reprint" plainly violates Rule 14a-9.

**Misstatements And/Or Omissions Concerning The Trust's Activities**

63.    The Dissident Group's solicitation materials include material misstatements and omissions relating to the Trust's business and activities.

64.    First, the Dissident Group's April 9, 2019 press release asserts that "wells drilled between 2014-2018 . . . have increased the Trust's oil production over 600% and its gas production close to 1,000%."  This is grossly misleading, given that the Trust does not engage in any oil and gas production whatsoever.  If uncorrected, this statement could lead shareholders to misunderstand the Trust's business model, management needs and strategic decisions and actions.

65.    Second, the Dissident Group's proxy sets forth misleading purported risk factors concerning the operations of the Trust's wholly-owned subsidiary, Texas Pacific Water Resources LLC ("TPWR").  The Dissident Group has argued that the Trust should consider a sale of TPWR, so it has drummed up highly speculative risk factors (including "risks related to workers compensation, leaks or rupturing of pipelines (including surface damage) and injection well casings (including potential acquifer [sic] contamination")) intended to paint an overly-precarious picture of TPWR.

66.     Third, the Dissident Group's April 23, 2019 press release asserts that a presentation by the Trust highlighted several wells "in the wrong location, some by more than 20 miles, with one well listed in the wrong county."  This is a materially false statement and is presented without any factual foundation that the Trust's presentation included erroneously-marked wells.  This misleading statement is intended to question the competency of the Trust's current leadership, and it must be corrected.

**Misstatements And/Or Omissions Concerning The Proxy Vote**

67.     As expressly set out under item (d) under the "notes" paragraph of Rule 14a-9, "[c]laims made prior to a meeting regarding the results of a solicitation" are considered to be examples of "misleading" information.  The Dissident Group has thrice violated this aspect of Rule 14a-9.

68.     First, Defendant plainly and egregiously violated this prohibition in a May 21, 2019 interview with Bloomberg, in which he asserted that the Dissident Group "***has sufficient votes to win the trustee seat, based on preliminary tallies***."  A copy of the Bloomberg interview is attached hereto as Exhibit J and is incorporated herein by reference.  This interview took place only one day before the Dissident Group's Invalid Meeting in which they purported to elect Defendant as a trustee.  As federal courts have stressed, claims regarding a vote outcome are strictly prohibited because such disclosures can poison the electorate through a "bandwagon effect."  This "bandwagon effect" is precisely what the Dissident Group tried to generate here in order to distract shareholders from carefully considering the merits of the nominees' arguments on the basis that the result of the election is a foregone conclusion.

69.     Second, the very next day – following the sham election held at the invalid and unnoticed Invalid Meeting conducted by the Dissident Group – ***the Dissident Group***

*"announced" in a press release the precise "results" of the sham "vote*," which in fact only served to prematurely make a claim as to the results of the Dissident Group's solicitation.  A copy of the Dissident Group's May 22, 2019 press release is attached hereto as Exhibit K and is incorporated herein by reference.  Because the actual Special Meeting has been postponed, these comments plainly were made "prior to a meeting" as prohibited by Rule 14a-9.  Specifically, the Dissident Group "announced" that:  "Out of the 7,756,156 shares outstanding on the record date, a total of 3,660,812 shares voted for the election of Eric Oliver" and "a total of 1,994,267 shares were voted in favor of the election of General Donald Cook."  The Dissident Group misleadingly omitted that the Invalid Meeting was not properly noticed to all shareholders, there was no quorum, the proxies solicited by the Trust were not present, holders of millions of shares have not submitted *any* proxies yet, and no valid vote was conducted.  This was a bold attempt by the Dissident Group to disenfranchise the shareholders who disagree with them and to improperly influence the results of the forthcoming and valid election.

70.    Third, even before this week's events, the Dissident Group had violated the prohibition on "[c]laims made prior to a meeting regarding the results of a solicitation" in a May 8, 2019 press release that annotated the following sentence contained in a confidential email provided to the Dissident Group by the Trustees: "While we are pleased to receive the recommendation from ISS yesterday, we understand that this will remain a close election."[4]  The Dissident Group added a footnote to that sentence and stated: "SoftVest, L.P., Horizon Kinetics LLC and ART-FGT Family Partners disagree with this statement."  By adding the text in this footnote, the Dissident Group was making a claim as to the voting result of the solicitation—that

---

[4] Notably, the Trust itself has not violated the cited prohibition because its email communication was intended to remain confidential and did not constitute a "solicitation" under the Proxy Rules.

the voting result will not be a close election and, by inference, the solicitation outcome will result in the Dissident Group's favor.

71.     The Dissident Group also has separately violated Rule 14a-9 by arranging for emails to shareholders with proxy voting instructions with email headings that falsely imply that brokerage firms are soliciting votes on behalf of the Dissident Group and encouraging shareholders to vote on the Dissident Group's white proxy card.  These misrepresentations are materially misleading because a substantial majority of shareholders are retail investors, who are generally more easily misled than sophisticated institutional investors and may thus be unduly influenced by purported endorsements of brokerage firms.

**Misstatements And/Or Omissions Concerning The Trust's Structure**

72.     The Dissident Group's solicitation materials include material misstatements and omissions relating to the structure of the Trust itself, including the plain language of the Declaration of Trust.

73.     First, the Dissident Group asserts in its proxy statement that "Meetings of holders of Shares only occur when a new trustee needs to be elected to fill a vacancy of one of the three trustee positions."  This is a materially false statement regarding the Declaration of Trust.  In fact, the Declaration of Trust provides that "Meetings of the certificate holders may be called by the trustees whenever said trustees shall deem it necessary, and also whenever they shall have been requested thereunto by instrument in writing specifying the object of the proposed meeting . . . ." (Decl. of Trust at SIXTH).

74.     Second, the Dissident Group's April 9, 2019 press release asserts that the Trust "has only held four shareholder meetings in thirty years," and that "[t]he upcoming special meeting therefore is a unique opportunity for the [Trust] investors to participate in the future

direction of [the Trust]." The Dissident Group omits that, pursuant to the Declaration of Trust, *shareholders themselves* have had the power to request shareholder meetings since 1888 – and in those 131 years, no shareholder ever requested a shareholder meeting.

75. Third, the Dissident Group's April 23, 2019 press release asserts that "there is no precedent whatsoever for a company engaged in these active business activities [in reference to activities of the Trust] to be structured as a business trust . . . ." The Dissident Group provides no basis for this assertion, which may mislead shareholders to believe falsely that the Trust is the only entity ever to have functioned as a trust while carrying out business.

76. Fourth, the Dissident Group's April 23, 2019 press release asserts that "[t]he sole intended purpose of the formation of [the Trust] as a trust was to provide an orderly liquidation of the land that secured defaulted bonds at the T&P Railway" and, "[s]ince then, [the Trust] deviated from this long held mandate with the creation of a water operating company, followed by complex land and royalty 'trading' transactions." This is demonstrably false through a simple review of the Declaration of Trust, which states that the Trustees "shall have all the powers in respect of said property of an absolute owner, as to selling, granting, *leasing, alienating, improving, encumbering, or otherwise disposing* of the same or any part or parcel thereof, and they may, whenever they shall deem it necessary or advisable for the protection or benefit of the property, *purchase other lands and premises* . . . ." (Decl. of Trust at FIRST (emphasis added)). It could not be more plain that the Trust did not have a "sole intended purpose" of "liquidat[ion]." This material misstatement must be corrected.

77. Fifth, the Dissident Group's April 23, 2019 press release asserts that the Trust's "inside ownership level is [in] a dramatic decline and the lowest level over the past 30 years." This statement is made for the purpose of touting Defendant as a significant shareholder who

would increase the Trust's inside ownership if he were elected Trustee.  It is a misleading statement, however, because it omits that there are only two incumbent Trustees at this time. Comparing the total ownership of two Trustees to the same owned by three trustees is not a fair comparison.  The press release also omits that one of the Trustees has only served as such for two years and that he previously represented the Trust as its attorney and had a policy of not purchasing shares of his clients.[5]

**Misstatements And/Or Omissions Concerning The Selection Of General Cook**

78.     The Dissident Group's solicitation materials include material misstatements and omissions relating to the selection of General Cook as a nominee.  Specifically, the Dissident Group's May 7, 2019 press release asserts that General Cook "was hand-picked by the two incumbent trustees at the suggestion of their outside legal advisor . . . as seems to indicate that the incumbent trustees have decided to outsource to outside counsel . . . the role of the nominating committee."  This statement is materially false and misleading because it does not accurately describe the nomination process that the Trustees undertook to identify and nominate General Cook.  The use of the word "hand-picked" misleadingly implies that the Trustees selected General Cook without undergoing an unbiased formal search process.  The Trustees retained Spencer Stuart, a specialist director search firm, to provide more than 15 highly-qualified candidates and additionally requested its financial and legal advisors to provide recommendations.  Even though the Trustees ultimately chose General Cook, a candidate suggested by a legal advisor, the selection was only after a thorough search and review process. Moreover, the Dissident Group omits that the charter for the Nominating, Compensation and

---

[5] The Dissident Group's publicly-filed May 1, 2019 presentation contains a similar misstatement.  It misleadingly compares the shares held by SoftVest and Horizon Kinetics to those of the Trustees, which is mixing apples and oranges since the capital at an investment fund's disposal is far superior to that of these individuals.

Governance Committee expressly provides that the Trustees' "duties and responsibilities" include "[t]he identification and recommendation . . . of individuals qualified to become or continue as Trustees." (Exhibit B at 1.)

### Misstatements That Improperly Impugn The Character, Integrity And Personal Reputation Of The Trustees And Trust Management

79.     Rule 14a-9 requires that solicitation materials avoid statements that directly or indirectly impugn the character, integrity or personal reputation, or that make charges of illegal, improper or immoral conduct without factual foundation. The Dissident Group's solicitation materials violate this rule numerous times.

80.     First, the Dissident Group's proxy asserts that (i) "[y]our advisors appear to be confused or misinformed," without any basis to suggest that the Trust is not well-advised by its advisory team; (ii) that the Trust is trying "to re-write history" merely by sending Defendant the standard trustee questionnaire filled out by other trustee candidates; (iii) the Dissident Group "hope[s] that you make all proper disclosures regarding Mr. Young," which suggests that the Trustees and the Trust have a motive to provide less than full disclosures; (iv) the Dissident Group "question[s] the wisdom" of the Trustees in hiring a standard group of advisors for issuers facing contested elections; (v) the Trustees have "mount[ed] an attack" on the Dissident Group, when in fact they have merely retained advisors to assist in fulfilling their fiduciary duties; and (vi) the Trustees are "trying to construct a narrative" to "portray . . . members of the Dissident Group as 'activists' looking for a 'short-term profit,'" when the Trustees have done no such thing. These statements have no factual basis and needlessly and falsely impugn the integrity of the Trustees.

81.     Second, the Dissident Group's April 23, 2019 press release contains additional examples of statements that improperly impugn the integrity and character of the Trustees,

including assertions that the Trust has "poor governance and lack of accountability," which has resulted in "questionable business decisions," and that "[m]anagement's lack of disclosure prevents us from determining the actual returns . . . increase in salaries . . . [and] expenses related to the formation of the company." These assertions imply improper conduct without any factual basis.

82.     Third, the Dissident Group's April 23, 2019 press release asserts that "[t]he General Agents [of the Trust] are incentivized to continue to earn their annual large cash salaries and bonuses (which are tied to short-term profits); unlike shareholders, they have little to gain by way to long-term stock price appreciation." The press release further asserts that the "Trustees recently increased their own pay 52x." These statements are materially false and misleading on numerous fronts. The Dissident Group neglects to disclose that the Trust has seen unprecedented value maximization for five straight years under the General Agents' leadership but that the compensation of the General Agents was first substantially increased only in 2017. The use of "52x" is likely to mislead shareholders because it omits that the increase is solely an inflation adjustment from the Trust's long-standing compensation, which had been set at $2,000 *since 1888*. Furthermore, the compensation paid to the Trustees is still below the average retainer for S&P 500 directors.[6] Moreover, there is no basis whatsoever for the assertion that the General Agents are incentivized to earn large compensation packages without pursuing long-term value for the Trust.

83.     Fourth, the Dissident Group's April 23, 2019 press release states that "[w]e believe poor governance record and lack of accountability has resulted in rampant conflicts of

---

[6] *See* 2018 U.S. Spencer Stuart Board Index at 28, available at https://www.spencerstuart.com/-/media/2018/october/ssbi-2018-final.pdf (last accessed May 21, 2019) (reporting $124,306 as the average annual retainer for S&P 500 directors).

interest."  This statement is false and misleading because no factual basis is presented for the

opinion.  The Dissident Group does not provide any examples where the Trust engaged in

conflicted transactions or demonstrated poor governance, and such sweeping and inflammatory

accusations may improperly influence shareholders.

### Misstatements And/Or Omissions Concerning
### The Dissident Group's Background, Conduct And Future Plans

84.     The Dissident Group's solicitation materials include material misstatements and

omissions relating to the Dissident Group's background, actions, and plans for the Trust.

85.     First, the Dissident Group's April 16, 2019 publicly-released video states that the

Dissident Group is "spending our own money in this election and [is] trying to be frugal."  This

is false and misleading because it misleads investors into believing that the Dissident Group

intends to fund all of its expenditures with money belonging solely to the Dissident Group when,

in fact, the Dissident Group previously stated that it intends to seek reimbursement from the

Trust for the costs of its solicitation if the election of Defendant is successful.  The Dissident

Group's April 11, 2019 press release is similarly misleading in that it criticizes Trust

management for not "paying out of their own pocket," but then buries in a footnote the statement

that "We note that part of your campaign highlights that we have reserved our right to seek

reimbursement of our expenses if Mr. Oliver is elected by shareholders."  This is intended to

create an illusion that the Trust's management is wrongfully advantaged by utilizing the Trust's

funds—as the Trustees and officers are required to do in the course of their duties to the Trust

and all shareholders—when the Dissident Group seeks to do the same.

86.     Second, the Dissident Group's April 16, 2019 publicly-released video states that

Defendant is "not a dissident."  This is false and misleading because it implies that the Dissident

Group is not in opposition to the Trust with respect to the nomination of trustees.  The use of the

term "dissident" is used in the context of contested board elections to describe a shareholder of an issuer who has nominated a nominee to the board that is not supported by the issuer.  The Dissident Group has taken a course of action that fits exactly within the understanding of the term "dissident" (i.e., "a person who opposes"), and it is false and misleading to assert otherwise.

87.    Third, the Dissident Group's publicly-filed May 2, 2019 presentation contains a slide that implies that it is fully committed to keeping the Trust's water business a part of its operations for the long-term future.  It creates this impression by stating, among other examples, that "the water services business has the potential to be even larger than [the Trust's] existing oil royalty and land segments," and that it would "assess various types of water ventures to limit risk and maximize long term growth."  The Dissident Group omits that it had previously disclosed in its proxy that Defendant would encourage the Trust to evaluate the existing water business and, with the assistance of outside consultants, determine whether it is advisable to grow operations internally, partner with a strategic partner, or *sell the water rights to a third party*.  The Dissident Group omits that, in its March 15, 2019 Schedule 13D/A, it disclosed that its plans for the Trust include *a potential separation or sale of the water business to a third party with a retained royalty*.  If the Dissident Group has changed its views in this regard, it has not accurately presented that information to shareholders.

**Schedule 14A Misstatements And Omissions**

88.    Schedule 14A provides a list of items that are required to be disclosed by participants in a proxy statement pursuant to Section 14(a) of the Exchange Act.  The Dissident Group's proxy contains material misstatements and omissions with respect to items required by Schedule 14A.

89.     First, with regard to all Dissident Group members except for Defendant, the Dissident Preliminary Proxy Statement violates Item 5(b)(iii) under Exchange Act Rule 14a-101 by omitting to state, for every participant, whether or not, during the past ten years, the participant has been convicted in any criminal proceeding (excluding traffic violations or similar misdemeanors) and, if so, the dates, nature of conviction, name and location of court, and penalty imposed or other disposition of the case.

90.     Second, Item 4(b)(2) of Schedule 14A requires a discussion of whether "regular employees of any other participant in a solicitation have been or are to be employed to solicit security holders" and a description of "the class or classes of employees to be so employed, and the manner and nature of their employment for such purpose." The Dissident Group proxy omits this required discussion.

### Schedule 13D Omissions

91.     Schedule 13D requires the disclosure of any person acquiring beneficial ownership of more than 5% of the registered securities of a corporation. Section 13(d)(3) includes within the definition of "person" a "group" formed to acquire, hold, or dispose of securities. The Dissident Group filed its Schedule 13D on March 15, 2019, and identified only SoftVest LP, SoftVest Advisors LLC, Defendant, ART-FGT Family Partners Limited, the Tessler Family Limited Partnership, and Allan Tessler as members of the "group" for purposes of Section 13(d). However, it failed to disclose that Santa Monica and UGLIC had formed a "group" under Section 13(d) and were operating as hidden participants in the proxy solicitation.

92.     First, Santa Monica bought shares immediately after the Dissident Group launched the proxy contest on March 15, 2019 and issued a Schedule 13D in support of Defendant's candidacy, discussed more below. Santa Monica also has a longstanding

relationship with Horizon Kinetics and Murray Stahl.  For example, Santa Monica's principal,

Lawrence J. Goldstein, is a member of the Board of Directors of FRMO Corp., a company that

trades on the OTC Market under the ticker symbol "FRMO".  Horizon Kinetics' co-founders,

Murray Stahl and Steve Bregman, founded FRMO and Mr. Stahl serves as its CEO and

Chairman, while Mr. Bregman is President, CFO, and Director of FRMO.

93.     Second, UGLIC, which holds 39,000 shares of the Trust, issued a press release on

April 16, 2019 in "enthusiastic support" of Defendant and the Dissident Group.  Defendant was

an 8.2% shareholder of UGLIC as recently as 2016.

94.     UGLIC also has a longstanding relationship with Defendant.  Jesse Correll has

been the Chairman and CEO of UGLIC since 2000.  Correll was a member of the Board of

Directors of AMEN from December 2008 until at least September 2010 (the specific date is

publicly unknown).  Correll is also connected to SFF Royalty, LLC through his involvement

with UGLIC, which was a member of SFF Royalty, LLC from 2010 through at least 2014.  SFF

Royalty, LLC is an entity through which AMEN owns oil and gas interests.

95.     Consequently, UGLIC is an undisclosed member and hidden participant in the

Dissident Group's proxy solicitation.  Therefore, the Dissident Group should be compelled to

make corrective disclosures to its Schedule 13D filing.

### V.     COUNT I – VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT

96.     Plaintiffs repeat and incorporate the allegations in Paragraphs 1 through 95 as if

fully set forth herein.

97.     Section 14(a) of the Exchange Act provides, "It shall be unlawful for any person

in contravention of such rules and regulations as the Commission may prescribe as necessary or

appropriate in the public interest or for the protection of investors, to solicit or to permit the use

of his name to solicit any proxy … ." 15 U.S.C. § 78n(a).  Rule 14a-9, promulgated thereunder,

provides that no solicitation shall be made that is "false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

98.     Defendant issued, and caused to be issued, and participated in the issuance of materially false and misleading statements to Trust shareholders.

99.     Defendant had a duty in his solicitation of Trust shareholders to provide truthful disclosures.

100.    Defendant knew, or in the exercise of reasonable care should have known, that the statements contained in the solicitation materials were materially false and misleading.

101.    If left uncorrected, the materially misleading statements and omissions in the solicitation materials will deprive the Trust's shareholders of the opportunity to make decisions on the future of the Trust based on the full and accurate information to which they are entitled, and both the Trust and its shareholders will be irreparably harmed.

102.    The Trust was damaged, and continues to be damaged, as a result of the material misrepresentations and omissions in Defendant's solicitation materials.

## VI.   COUNT II – VIOLATION OF SECTION 13(d) OF THE EXCHANGE ACT

103.    Plaintiffs repeat and incorporate the allegations in Paragraphs 1 through 102 as if fully set forth herein.

104.    Section 13(d) of the Exchange Act provides, "When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of" the "beneficial owner" inquiry.  15 U.S.C. § 78m(d)(3).

105.    Defendant and the Dissident Group failed to disclose in their Schedule 13D filing that Santa Monica and UGLIC are acting as a "group" for purposes of Section 13(d) of the

Exchange Act and that they are hidden participants in the Dissident Group's proxy solicitation in violation of Rule 14a-101 (Schedule 14A), Item 4.

106.    Defendant had a duty in his solicitation of Trust shareholders to provide truthful disclosures.

107.    Defendant knew, or in the exercise of reasonable care should have known, that the omissions in the solicitation materials would mislead Trust shareholders.

108.    If left uncorrected, the materially misleading omissions in the solicitation materials will deprive Trust shareholders of the opportunity to make decisions on the future of their investment based on the full and accurate information to which they are entitled, and both the Trust and its shareholders will be irreparably harmed.

109.    The Trust was damaged, and continues to be damaged, as a result of the material omissions in Defendant's solicitation materials.

## VII.    COUNT III – DECLARATORY JUDGMENT

110.    Plaintiffs repeat and incorporate the allegations in Paragraphs 1 through 109 as if fully set forth herein.

111.    Pursuant to 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

112.    As set forth above, the Dissident Group's proxy solicitation violated the SEC's proxy rules.

113.    In addition to the misstatements and omissions contained within Defendant's solicitation materials, Defendant has refused to provide sufficient information for the Trustees to determine whether Defendant is qualified, or disqualified, to serve as a trustee.

114.    The Trustees have fiduciary duties, and duties pursuant to the Trust's governing documents, to ensure that trustee nominees are not disqualified, both with respect to capabilities and personal character and integrity.

115.    Defendant's refusal to provide the requested disclosures prevents the Trustees, and the shareholders, from being able to determine whether Defendant is qualified, or disqualified, to serve as a trustee of the Trust.

116.    In addition, Defendant is now purporting to have been elected as a trustee of the Trust at the Invalid Meeting based upon the sham "vote" that occurred on May 22, 2019.  The Invalid Meeting at which that "vote" occurred was not properly noticed, did not have a quorum, and was otherwise invalid.

117.    Plaintiffs therefore seek a declaration that (i) Defendant is ineligible to be considered for election as a trustee until 60 days after he provides full and accurate disclosures requested by the Trustees, and is thereafter found by the Trustees not to be disqualified to serve as a trustee, and issues and mails corrective disclosures to all shareholders with respect to the misstatements and omissions contained within his solicitation materials; (ii) the Dissident Group's proxies solicited to date by the Dissident Group are invalid, null, and void; (iii) the notice provided by Defendant and his Dissident Group with respect to the May 22, 2019 Invalid Meeting was invalid and ineffective; (iv) the Invalid Meeting conducted by Defendant and the Dissident Group on May 22, 2019 was not a lawful Special Meeting; and (v) any votes cast at the Invalid Meeting conducted by Defendant and the Dissident Group on May 22, 2019 are invalid, null, and void.

## VIII.  <u>REQUESTED RELIEF</u>

WHEREFORE, Plaintiffs respectfully request entry of a judgment in their favor and

against Defendant as follows:

a.  Ordering Defendant to issue corrective disclosures with respect to the misstatements and omissions contained within his solicitation materials;

b.  Declaring that Defendant is ineligible to be considered for election as a trustee until 60 days after he provides full and accurate disclosures requested by the Trustees and is thereafter found by the Trustees not to be disqualified to serve as a trustee;

c.  Declaring that the proxies solicited to date by the Dissident Group are invalid, null, and void;

d.  Declaring that (i) the notice provided by Defendant and his Dissident Group with respect to the May 22, 2019 Invalid Meeting was invalid and ineffective; (ii) the Invalid Meeting conducted by Defendant as a purported "chairman" and the Dissident Group on May 22, 2019 was not a lawful Special Meeting of the Texas Pacific Land Trust; and (iii) any votes cast at the Invalid Meeting conducted by Defendant and the Dissident Group on May 22, 2019 are invalid, null, and void;

e.  Enjoining Defendant from running for election as a trustee until 60 days after he provides full and accurate disclosures requested by the Trustees and is thereafter found by the Trustees not to be disqualified from serving as a trustee, and Defendant issues and mails corrective disclosures to all shareholders with respect to the misstatements and omissions contained within his proxy materials;

f.  Attorneys' fees, expenses, and costs of suit; and

g.  Such other and further relief as may be proper.

Respectfully submitted on May 22, 2019,   SIDLEY AUSTIN LLP

*s/ Yvette Ostolaza*

Yvette Ostolaza
Texas Bar No. 00784703
Yvette.ostolaza@sidley.com
Yolanda C. Garcia
Texas Bar No. 24012457
ygarcia@sidley.com
Tiffanie N. Limbrick
Texas Bar No. 24087928
tlimbrick@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Tel.: 214-981-3300
Fax: 214-981-3400

and

Andrew W. Stern
NY Bar No. 2480465 (*admitted pro hac vice application*)
astern@sidley.com
Alex J. Kaplan
NY Bar No. 4160370 (*admitted pro hac vice application*)
ajkaplan@sidley.com
Jon W. Muenz
NY Bar No. 4705968 (*admitted pro hac vice application*)
jmuenz@sidley.com
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019
Tel.: 212-839-5300
Fax: 212-839-5599

*Attorneys for Plaintiffs*

# EXHIBIT A

| | | | | |
|---|---|---|---|---|
| Income | $ 4,005,369 | $ 1,849,690 | $ 1,744,395 | $ 1,522,644 |
| Income before Federal income taxes | $ 3,350,995 | $ 1,427,982 | $ 1,301,961 | $ 1,012,682 |
| Net income | $ 2,276,937 | $ 998,235 | $ 914,524 | $ 711,090 |
| Net income per Sub-share Certificate | $ 0.98 | $ 0.43 | $ 0.38 | $ 0.30 |

<caption>

| | QUARTER ENDED | | | |
|---|---|---|---|---|
| | DECEMBER 31, 2001 | SEPTEMBER 30, 2001 | JUNE 30, 2001 | MARCH 31, 2001 |
| Income | $ 1,983,122 | $ 7,889,591 | $ 1,908,926 | $ 1,647,729 |
| Income before Federal income taxes | $ 1,541,917 | $ 5,970,540 | $ 1,445,004 | $ 1,086,560 |
| Net income | $ 1,071,906 | $ 4,002,627 | $ 1,025,249 | $ 786,731 |
| Net income per Sub-share Certificate | $ 0.45 | $ 1.62 | $ 0.41 | $ 0.31 |

**F- 12**

INDEX OF EXHIBITS

EXHIBIT
NUMBER      DESCRIPTION
3.1         Texas Pacific Land Trust, Declaration of Trust, dated February 1,
            1888, by Charles J. Canda, Simeon J. Drake, and William Strauss,
            Trustees.

99.1 Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes- Oxley Act of 2002.

99.2 Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes- Oxley Act of 2002

Exhibit 3.1

## TEXAS PACIFIC LAND TRUST.

## DECLARATION OF TRUST

### BY

### CHARLES J. CANDA, SIMEON J. DRAKE AND

### WILLIAM STRAUSS, TRUSTEES.

### DATED, FEBRUARY 1, 1888

**TO ALL TO WHOM THESE PRESENTS SHALL COME, GREETING:**

WHEREAS, the TEXAS AND PACIFIC RAILWAY COMPANY; CHARLES E. SATTERLEE and GEORGE J. GOULD, Trustees of the Income and Land Grant Mortgage executed by said Company, May 15, 1875, and of the Supplemental Mortgage executed March 23, 1876; and JOHN C. BROWN and LIONEL A. SHELDON, Receivers of the property of the Texas and Pacific Railway Company, have heretofore by deeds granted, bargained, sold and conveyed unto Charles J. Canda, Simeon J. Drake and William Strauss, and their heirs and assigns and the survivors and survivor of them, and the heirs and assigns of such survivors and survivor, the lands, premises and property described as follows, that is to say:

All those certain tracts, pieces or parcels of land situate, lying and being in the Counties of Bowie, Red River, Lamar, Collin, Rains, Van Zandt, Denton, Wise, Parker, Jack, Palo Pinto, Shackelford, Stephens, Callahan, Jones, Taylor, Scurry, Fisher, Borden, Edwards, Dimmit, Nolan, Mitchell, Howard, Martin, Tom Green, Glasscock, Midland, Andrews, Upton, Ector, Winkler, Crane, Loving, Foley, Presidio, Pecos, Jeff Davis, Reeves and El Paso, in the State of Texas, particularly described in thirty- nine certain deeds or instruments of conveyance, bearing date the 4th day of August, 1887, made by the said Texas and Pacific Railway Company, Charles E. Satterlee and George J. Gould, trustees of the Income and Land Grant mortgage, executed by said company May 15, 1875, and of the Supplemental Mortgage, executed March 23, 1876, and John C. Brown and Lionel A. Sheldon, Receivers of the property of the Texas and Pacific Railway Company, to said Charles J. Canda, Simeon J. Drake and William Strauss.

Also, all those certain unpaid contract obligations heretofore received by Charles E. Satterlee and George J. Gould, as trustees as aforesaid, or by their predecessors in the trust, for the purchase price of land embraced in the said income and land grant mortgage, said contract obligations covering lands situate in the several Counties of Denton, Wise, Tarrant, Parker, Palo

Pinto, Stephens, Callahan, Taylor, Nolan, Jones, Mitchell, Fisher, Scurry, Kent, Edwards, Howard, Martin, Midland, Tom Green, Glasscock, Dawson and Ector, in the State of Texas, particularly mentioned and described in twenty- two certain deeds or instruments of transfer, bearing date the 28th day of September, 1887, made by said Texas and Pacific Railway Company, Satterlee and Gould, as trustees as aforesaid, and Brown and Sheldon, as Receivers as aforesaid, to said Canda, Drake and Strauss, subject to the terms and provisions of a certain agreement between said Satterlee and Gould, as trustees, said Canda, Drake and Strauss, and the Texas and Pacific Railway Company, dated May 1st, 1888.

Also, all the land certificates and unlocated balances of land certificates issued to the Texas and Pacific Railway Company by the State of Texas, numbered, dated and particularly described in a certain deed or instrument of conveyance, bearing date the 4th day of August, 1887, and numbered 1241, made by said Railway Company, trustees, and Receivers to said Canda, Drake and Strauss, together with all and singular the rights, claims and interests in, to or in respect of lands or land certificates embraced in and covered by said last- mentioned deed.

AND WHEREAS, the said Charles J. Canda, Simeon J. Drake and William Strauss, have made, executed and delivered, or are about to make, execute and deliver, as hereinafter expressly provided, certificates in such amount, not exceeding in the aggregate the sum of ten million three hundred and seventy thousand dollars, as may be required to carry out the provisions of a certain agreement bearing date the sixth day of April, 1887, made and entered into between Isaac J. Wistar, John Markoe, Robert Fleming, Charles M. McGhee, Jacob H. Schiff, William D. Winsor and John N. Hutchinson acting as a committee of the bond and stockholders of the Texas and Pacific Railway Company, and Simeon J. Drake, Christopher Meyer, W.C. Hall, Charles J. Canda and William Strauss acting as a committee representing the holders of the Income and

Land Grant bonds and scrip of said Railway Company; said certificates being in the form or substantially the form following, that is to say:

No. - - - - - - - - - - - - - - - - - Shares- - - - - - - - - - - - - - - - - - - - -

**TEXAS PACIFIC LAND TRUST.**

**CERTIFICATE OF PROPRIETARY INTEREST.**

This is to certify, That

entitled to shares of one hundred dollars each of proprietary interest in the lands and property in the State of Texas heretofore conveyed by the Texas and Pacific Railway Company and other grantors to Charles J. Canda, Simeon J. Drake and William Strauss, such proprietary interest being particularly described and set forth in the declaration and indenture of trust made by said Canda, Drake and Strauss, dated February 1st, 1888, and deposited with the Central Trust Company of New York.

These shares, which are of the par value of one hundred dollars each, are subject to the terms and provisions of said declaration and indenture of trust and are transferable only on the books of the said trust on the surrender of this certificate and are not valid unless countersigned by the said Central Trust Company of New York as Registrar.

```
     IN WITNESS WHEREOF, the said Trustees have caused these presents to be
signed by their Chairman and Secretary at New York the          day of
          1888.
                         Secretary.          Chairman.
```

Now Know Ye, that the said Charles J. Canda, Simeon J. Drake and William Strauss, for themselves, their heirs and assigns, and the survivors and survivor of them and the heirs and assigns of such survivors and survivor, do, by these presents, make known, admit and declare that the said lands, premises and property were so conveyed to them and that they now hold and

shall and will continue to hold the same, and any and all income and proceeds thereof or of any part thereof, in trust as hereinafter provided for the benefit of the several persons, firms and corporations who are or shall be or become the owners and holders of the said certificates of proprietary interest, or any of them, and upon the trusts and for the purposes hereinafter expressed, only that is to say:

FIRST. The said Charles J. Canda, Simeon J. Drake and William Strauss and the survivors and survivor of them, and their successors or successor in the trust (hereinafter, for brevity, styled "the Trustees"), shall have and exercise the management, control and ownership (both legal and equitable) of the said lands, premises and property. They shall have all the powers in respect of said property of an absolute owner, as to selling, granting, leasing, alienating, improving, encumbering or otherwise disposing of the same or of any part or parcel thereof, and they may, whenever they shall deem it necessary or advisable for the protection or benefit of the property or any part thereof, purchase other lands and premises, and when purchased such other lands and premises shall be held and managed by the said trustees under the terms and provisions of this declaration of trust in the same manner as the lands and premises hereinbefore described are held and managed.

The lands may be sold for cash, or partly for cash and partly on credit, and the trustees may, in their discretion, accept in payment, in lieu of money, certificates of proprietary interest issued under the terms hereof, at their current market price, not exceeding par, and the same when so received shall be canceled; provided, however, that nothing herein contained shall be construed to require the trustees to accept such certificates in payment for lands.

The trustees shall have power to purchase and acquire, in their discretion, any of the outstanding Income and Land Grant bonds and scrip of the Texas and Pacific Railway Company

for the benefit of the trust, and they shall have full power and authority to borrow from time to time such sums of money as they shall deem necessary to enable them to purchase such bonds and scrip and also to pay taxes and other expenses connected with the trust, and to secure repayment of the sums so borrowed by a pledge or mortgage of the trust property or any part thereof. In case of such purchase or acquisition the certificate or certificates of proprietary interest under this trust representing the securities so purchased or acquired shall be canceled by the trustees, or, in their discretion, sold and disposed of for the benefit of the trust; and any and all second mortgage bonds of the Texas and Pacific Railway Company which said trustees may receive or acquire as holders of any Income and Land Grant bonds so purchased shall be held or disposed of by the trustees in their discretion for the benefit of the trust.

The trustees shall have power to employ such agents, attorneys and servants as they may think necessary and proper in the execution of their trust, and they shall not be liable for the default or misconduct or any act or omission whatsoever of any such agent, attorney or servant, provided said trustees are not guilty of willful carelessness and negligence in their selection or in providing for their selection; nor shall any of said trustees be liable for the default, negligence, misconduct or any act or omission whatsoever of any other of said trustees, but only for his own willful default, negligence or omission. The said trustees shall receive as compensation for their services, the sum of four thousand dollars per annum to be paid to the chairman and two thousand dollars per annum to be paid to each of the other two trustees.

All the powers of the trustees under this declaration of trust may be executed by a majority of the trustees. Any trustee may, by power of attorney, confer upon the other two trustees or either of them full power and authority to make, execute, acknowledge and deliver on

his behalf deeds of conveyance of any of the trust property and any and all other instruments in writing relating thereto or any part thereof.

SECOND. The interests of the registered owners and holders of said certificates of proprietary interest shall consist in the right of participation in any division of the net profits derived from the use of the said lands, premises and property or of any part thereof which may be at any time ordered or directed by the trustees in pursuance of the powers hereinafter conferred and in the proceeds of sale of said lands, premises and property or any part thereof realized, collected and directed to be divided by said trustees. The said certificates shall be held and considered in all respects as personal property, and shall in nowise pass to or vest in heirs or devisees of any owner or holder thereof as real estate, it being expressly agreed between the said certificate holders and their assigns and the trustees that the legal and equitable title to said property is and shall be vested in the trustees and that the beneficial interests of the holders of such certificates shall be solely and exclusively personal estate. Such certificates shall be transferable by the holders, their executors or administrators, or by their duly authorized representatives, only on the books of the trust at its office in the City of New York and on the surrender of the original certificates, each share being of the par value of one hundred dollars; and the trustees shall not be required to recognize any other interest or ownership than are thus evidenced. No certificate shall be valid unless signed by the chairman of the trustees and countersigned by the said Central Trust Company as Registrar. In the event of a certificate being lost the trustees, upon being satisfied thereof and indemnified, may under such reasonable regulations as they may prescribe, issue a duplicate certificate in the place of the one that has been lost and the said Trust Company shall countersign the same when presented for that purpose.

THIRD. The trustees shall choose one of their number as chairman and they may choose another as vice- chairman, and may by resolution from time to time authorize such chairman and vice- chairman, or either of them, to do and perform any and all acts which the said trustees are entitled to do or perform. They shall also choose a secretary. The said officers shall hold their offices at the pleasure of the trustees and until their successors are chosen by the trustees. In the event of the death, resignation or disqualification of any of the trustees a successor shall be elected at a special meeting of the certificate holders by a majority in the amount of the certificate holders present in person or by proxy at such meeting whose names shall have been registered in the books of the trustees at least fifteen days before such meeting, and the remaining trustees and the trustee so resigning, or the executor or executors of any deceased trustee, shall make, execute and deliver to the successor so elected such proper deeds or instruments of conveyance as shall be necessary in order to vest in him the same title which his predecessor had in and to the lands and premises aforesaid.

FOURTH. The trustees shall cause books to be kept showing the lands held by them and the sales and leases made, their receipts and disbursements and all other matters relating to the financial affairs and business of the trust, also showing the names of the respective certificate holders and the amount of the certificates issued, and all transfers of shares and all such books shall be open to the inspection of the registered certificate holders under such reasonable regulations as the trustees shall prescribe.

FIFTH. The trustees shall in the month of February in each year, make and deposit with the Central Trust Company of New York, a report showing the condition of the trust property, the receipts and disbursements of the trust, and such other matters as they may deem requisite for the information of the certificate holders.

SIXTH. Meetings of the certificate holders may be called by the trustees whenever said trustees shall deem it necessary, and also whenever they shall have been requested thereunto by instrument in writing specifying the object of the proposed meeting and signed by registered certificate holders to the amount of not less than five hundred thousand dollars at the par value. Notice of such meeting shall be given by publication in at least two daily newspapers published in the City of New York once in each week for four weeks. The chairman of the trustees shall, if present, preside at all meetings of the certificate holders.

SEVENTH. Dividends to the certificate holders out of moneys derived from royalties for coal and minerals, and from the net rents, issues and profits derived from the use of the said lands, premises and property, and proceeds of sale of said lands, premises and property, or of any part thereof, shall be made by the trustees in their discretion whenever such moneys, net profits and proceeds shall be sufficient for that purpose after providing for all taxes, expenses, liabilities and engagements of the trust; but the trustees shall have power in their discretion whenever it shall appear to them for the interests of the certificate holders, to apply such parts of the funds derived as aforesaid, which would otherwise be

applicable to dividends as they may think fit, to the purchase of outstanding certificates under such proper regulations as they may prescribe, and all certificates purchased under this power shall be forthwith canceled. Dividends shall be payable only to the persons who are by the books of the trustees shown to be certificate holders at the time the dividend shall be payable and the books may be closed by the trustees for a reasonable time for the payment of such dividend.

EIGHTH. It shall be lawful for the certificate holders at any meeting duly called for the purpose, but not otherwise, to order and direct a sale or disposition of the property held by the trustees as aforesaid, and a winding up of the trust, provided that such sale and winding up must

be authorized by a vote recorded in writing of at least three- fourths in amount of all the registered certificate holders; and provided further that no such order or direction shall be given, unless notice of the intention to take action in reference to such sale and winding up shall have been specified in the notice of the meeting, and such notice shall have been given by letter to each certificate holder at the address of such certificate holder kept on the books of the trustees mailed at least thirty days before such meeting.

NINTH. The trustees may in their discretion take such action as they may deem advisable under any general or special law of any State, to form a corporation for carrying out the purposes declared in this instrument, and to this end the trustees may convey to such corporation all the lands and property held by them or which they may be entitled as herein before provided, and thereupon the registered certificate holders at the time of the formation of such corporation shall be entitled, as stockholders, to the same rights which they then have as owners of the certificates issued under this instrument, and such certificates shall be exchangeable for stock in such corporation in the proportion that the capital of said corporation shall bear to the amount of certificates outstanding.

TENTH. Any trustee shall have the right to resign his trust by written instrument, duly acknowledged or proved, and delivered to the remaining trustees, and upon the death or resignation of any trustee who shall have properly performed and discharged the duties of his trust, said trustee, his heirs, executors and administrators shall be fully, finally and forever released and discharged of and from any and all liability or responsibility whatsoever respecting said trust or in any manner arising therefrom, upon the execution and delivery of the deeds or instruments mentioned in the third article hereof, and the remaining trustees shall, if required, make, execute and deliver to him, or in case of his death, to his personal representatives, an

instrument in proper form which shall be effective for the purposes of such release and discharge.

IN WITNESS WHEREOF, the said Charles J. Canda, Simeon J. Drake and William Strauss have hereunto set their respective hands and seals this first day of February, in the year one thousand eight hundred and eighty- eight.

**C.J. CANDA. [L.S.]**
**SIM. J. DRAKE. [L.S.]**

```
                                    WILLIAM STRAUSS. [L.S.]
Sealed and delivered                }
   in presence of                   }
      Frederick Hudson and
      Adrian H. Larkin,
```

As to C.J. Canda and William Strauss.

```
STATE OF NEW YORK,                  }
                                    }   ss.:
CITY AND COUNTY OF NEW YORK,        }
```

On this 28th day of May, in the year one thousand eight hundred and eighty- eight, before me, a Notary Public, in and for the State of New York, duly commissioned and sworn, dwelling in the City of Brooklyn, County of Kings, in said State, and with certificate filed in the City and County of New York, personally came and appeared Charles J. Canda, and on this 31st day of May, 1888, personally came and appeared William Strauss, to me personally known, and known to me to be two of the persons whose names are subscribed to the foregoing instrument, and who are described in and who executed the same, and severally acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal this 31st day of May, A.D. 1888.

ADRIAN H. LARKIN, [L.S.]
Notary Public,
Kings Co.

Cert. filed in N.Y. Co.

STATE OF NEW YORK,　　　　　　　}
　　　　　　　　　　　　　　　　} ss.:
COUNTY OF FRANKLIN,　　　　　　}

On this 29th day of May, in the year one thousand eight hundred and eighty- eight, before me, Henry B. L. Smith, personally came and appeared Simeon J. Drake, to me personally known and known to me to be one of the persons whose names are subscribed to the foregoing instrument, and who is described in and who executed the same, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal this 29th day of May, A.D. 1888.

**HENRY B.L. SMITH, [L.S.]**
Notary Public,
Franklin Co., N.Y.
[20485]

Exhibit 99.1

## CERTIFICATION PURSUANT TO

## 18 U.S.C. SECTION 1350,

## AS ADOPTED PURSUANT TO

## SECTION 906 OF THE SARBANES- OXLEY ACT OF 2002

In connection with the Annual Report of Texas Pacific Land Trust (the "Trust") on Form 10- K for the year ended December 31, 2002 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Roy Thomas, Chief Executive Officer of the Trust, certifies, to the best of his knowledge, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes- Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Trust.

TEXAS PACIFIC LAND TRUST
(Registrant)
By  /s/  Roy Thomas
Roy Thomas, General Agent and
Date:    March 27, 2003        Chief Executive Officer

Exhibit 99.2

## CERTIFICATION PURSUANT TO

## 18 U.S.C. SECTION 1350,

**AS ADOPTED PURSUANT TO**

**SECTION 906 OF THE SARBANES- OXLEY ACT OF 2002**

In connection with the Annual Report of Texas Pacific Land Trust (the "Trust") on Form 10- K for the year ended December 31, 2002 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), David M. Peterson, Chief Financial Officer of the Trust, certifies, to the best of his knowledge, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes- Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Trust.

```
                          TEXAS PACIFIC LAND TRUST
                              (Registrant)
                   By  /s/  David M. Peterson
                   David M. Peterson, Assistant General
                   Agent and Chief Financial Officer
Date:    March 27, 2003
```

EXHIBIT B

Amended and Restated: February 26, 2013

# NOMINATING, COMPENSATION AND GOVERNANCE COMMITTEE

## OF THE TRUSTEES

## OF

## TEXAS PACIFIC LAND TRUST

## CHARTER

## I. Purpose and Power

The Committee has been established by the Trustees to assist the Trustees in discharging and performing the duties and responsibilities of the Trustees with respect to corporate governance, management compensation, succession planning and employee benefits, including:

- The identification and recommendation to the Trustees of individuals qualified to become or continue as Trustees, subject to the provisions of the Declaration of Trust dated February 1, 1888 (the "Trust Instrument").

- The continuous improvement in corporate governance policies and practices.

- The annual self-assessment of the performance of the Trustees.

- The assessment and compensation of the General Agent (chief executive officer) and Assistant General Agent (chief financial officer).

- The assessment of compensation arrangements, plans, policies and programs, and benefit and welfare plans and programs.

- The assessment of organizational systems and plans, including those relating to management development and succession planning.

- The review and discussion of any Compensation Discussion and Analysis to be included in the Trust's annual proxy statement or Form 10-K.

- The production of any compensation committee report on executive compensation required by the Securities and Exchange Commission to be included in the proxy statement or Form 10-K.

The Committee has the right to exercise any and all power and authority of the Trustees with respect to matters within the scope of this Charter, subject to the ultimate power and authority of the Trustees, subject to the provisions of the Trust Instrument. The Trustees shall continue to have the ultimate duty and responsibility to manage or direct the management of the business and affairs of the Trust.

The Committee has the authority to conduct any and all investigations it deems necessary or appropriate, to contact directly officers, employees and advisors and require them to provide

Amended and Restated:  February 26, 2013

any and all information and advice it deems necessary or appropriate, and to retain executive search, legal, accounting, compensation, human resource or other advisors it deems necessary or appropriate.

The Committee has the authority to set aside for payment, pay and direct the payment of such executive search, legal, accounting, compensation, human resource and other advisors.

The advisors retained by the Committee shall report directly to the Committee, and shall be accountable to the Committee and the Trustees, for their services.

## II. Composition

The Committee shall be comprised of the Trustees.  Each member of the Committee shall be a Trustee that qualifies as a "non-employee director" within the meaning of Rule 16b-3 under the Securities Exchange Act of 1934 and an "outside director" within the meaning of Section 162(m) of the Internal Revenue Code of 1986.  Each member of the Committee also shall be a Trustee that qualifies as "independent" within the meaning of the rules of the New York Stock Exchange.

In affirmatively determining the independence of any member of the Committee, the Trustees shall consider all factors relevant to determining whether such member has a relationship to the Trust which is material to that member's ability to be independent from management in connection with the duties of a Committee member, including, but not limited to, (i) the source of compensation of such member, including any consulting, advisory or other compensatory fee paid by the Trust to such member, and (ii) whether such member is an affiliate of the Trust, or any subsidiary of the Trust

Each member of the Committee shall serve until the earlier of his or her termination as a member of the Committee by the Trustees, the election of his or her successor as a member of the Committee or his or her death, resignation or removal.  Unless a Chair is elected by the Trustees, the members of the Committee may designate a Chair by a majority vote.

## III. Meetings

The Committee shall meet in regular sessions at least two times annually and in special sessions as circumstances warrant.  Committee members are expected to attend meetings and to spend the time needed to properly discharge their responsibilities.

A majority of the members of the Committee shall constitute a quorum for the transaction of business.  The act of a majority of the members present at any meeting at which there is a quorum shall be the act of the Committee.

The Committee shall keep minutes of its meetings and other proceedings.  Committee members may participate in any meeting by means of conference telephone or similar communication equipment by means by which all person participating in the meeting can hear each other.

Amended and Restated:  February 26, 2013

## IV. <u>Procedures</u>

The Committee shall determine its meeting schedule, the agenda for each meeting, the information to be provided to it before or at each meeting and all other matters relating to the conduct of its meetings and other activities.

The Chair of the Committee shall establish and distribute (or request the Secretary to distribute) to each Committee member prior to each meeting an agenda for the meeting.  Each Committee member is free to raise at any meeting subjects that are not on the agenda for that meeting.

Information that is important to understanding the business to be conducted at a meeting should generally be distributed to the Committee members as soon as practicable before the meeting, and Committee members should review these materials before the meeting.

It is the sense of the Trustees that, subject to Section V below, the activities and procedures of the Committee should remain flexible so that it may appropriately respond to changing circumstances.

## V. <u>Primary Activities</u>

Without limiting the scope of its responsibilities, duties and authority set forth above, the Committee shall:

*General*

1.  Periodically review and assess the adequacy of this Charter, and submit suggested changes to this Charter, if any, to the Trustees for approval.

2.  Conduct a periodic self-assessment to determine whether the Committee is functioning effectively, including evaluating the Committee's contributions to the Trust, with a specific emphasis on areas in which such contributions could be improved.

3.  Report on its meetings, proceedings and other activities at each meeting of the Trustees (or periodically or whenever requested to do so).

*Nominations*

4.  When necessary to fill a vacancy, identify individuals who are qualified and available to serve as Trustees, as applicable (including whether such individuals are independent under the rules of the New York Stock Exchange, the Securities and Exchange Commission and the Sarbanes-Oxley Act of 2002, and deemed "non-employee directors" under Rule 16b-3 under the Securities Exchange Act of 1934 and "outside directors" under Section 162(m) of the Internal Revenue Code of 1986), and recommend to the Trustees nominees for election as Trustees to fill such vacancy on the Trustees, with the goal of submitting the recommendation to the Trust's equityholders, all subject to the provisions of the Trust Instrument.  The Committee may also consider the

appropriateness of considering diversity in identifying nominees for election as Trustees and how to define diversity for this purpose.

5.     Review candidates for nomination for election as Trustees and consider and evaluate the particular experience, qualifications, attributes and skills possessed by each candidate that make the candidate an appropriate choice for nomination as a Trustee.

6.     Review periodically whether the existing Trustees are independent and considered "non-employee directors" and "outside directors" within the meanings specified in Item 4 above.

7.     Select, retain, evaluate and, as appropriate, terminate and replace any executive search firm with respect to the identification of candidates for nomination for election as Trustees (and the Committee shall have the sole authority to take any such actions).

8.     Coordinate with management the planning for development and succession of management.

*Compensation*

9.     Review and discuss any Compensation Discussion and Analysis to be included in the Trust's annual proxy statement or Form 10-K.  The Committee shall also prepare any compensation committee report to equityholders on compensation then required by the rules of the SEC to be included in the Trust's annual proxy statement or Form 10-K.

10.    Review and approve annually the goals and objectives relevant to compensation of the General Agent (chief executive officer), evaluate his or her performance in light of those goals and objectives and set his or her compensation based on such evaluation (and the Committee shall have the sole authority to determine the compensation of the General Agent (chief executive officer) based on its evaluation of such performance in light of such goals and objectives).

11.    Review and approve, as appropriate, annually the compensation of the other executive officers and review compensation of other employees generally, it being understood that the Trustees' compensation is fixed by the Trust Instrument.

12.    Review and approve, as appropriate, the bonus and incentive compensation arrangements, plans, policies and programs, as applicable.

13.    Obtain recommendations from the General Agent and review and approve, as appropriate, specific annual individual awards for officers and the aggregate amount of annual awards under such arrangements, plans, policies and programs.

14.    Review periodically and approve, as appropriate, policies on management perquisites. Where necessary, review management's determination of whether particular perquisites are business-related or personal.  Advise the Audit Committee as to such policies.

Amended and Restated:  February 26, 2013

15. Review compliance with prohibitions on personal loans to Trustees and executive officers.

16. Review any compensation or other benefit received by any Trustee or executive officer from any affiliated entities to confirm compliance with the Trust's Code of Conduct and Ethics and applicable law.

17. Select, retain, evaluate and, as appropriate, terminate and replace any executive search firm or compensation consulting firm with respect to the selection and compensation of the General Agent (chief executive officer); and the Committee shall have the sole authority to take any such action.  Consider the need for, and review, any disclosure of fees paid to compensation consultants then required by the rules of the SEC to be included in the Trust's annual proxy statement or Form 10-K.

18. Before retaining a compensation consultant, legal counsel or other advisor, the Committee shall consider all factors relevant to that person's independence from management, including:

    • The provision of other services to the Trust by the consultant, counsel or other advisor (including any employer of such person);

    • The amount of fees received from the Trust by the consultant, counsel or other advisor as a percentage of total revenue of the employer of such person;

    • The policies and procedures of the employer of such consultant, counsel or other advisor that are designed to prevent conflicts of interest;

    • Any business or personal relationship of the consultant, counsel or other advisor with a member of the Committee;

    • Any participating interests in the Trust owned by the consultant, counsel or other advisor; and

    • Any business or personal relationship of the consultant, counsel or other advisor, or the employer of such person, with an executive officer of the Trust.

    Nothing herein requires that a compensation consultant, legal counsel or other advisor selected by the Committee be independent, only that the Committee consider the foregoing factors before selecting or receiving advice from a compensation advisor.

19. Administer all such programs as may be designated by the Trustees, subject to any limitations prescribed by the Trustees.

20. Review compliance with laws governing retirement and benefit plans.

21. Review creation, modification, termination and funding of compensation, retirement, benefit and welfare arrangements, plans, policies and programs for management and other employees generally.

22. Search for, select and review annually the performance of investment managers for qualified and non-qualified retirement and benefit plans.

23. Review recommendations relating to actuarial assumptions applicable to and funding for retirement and benefit plans, as applicable.

24. Review periodically financial and investment policies and objectives of qualified and non-qualified retirement and benefit plans.

25. Foster continuous improvement in those systems, plans, arrangements, policies and practices at all levels within the enterprise to attract and retain qualified employees, align interests of equityholders and employees, incent employees to improve performance and reward employees for improvements in performance.

26. Provide for open communication among management and the Trustees.

27. Conduct periodic reviews of the process of establishing salaries and wages of the Trust's employees.

28. Review periodically employee relations policies generally.

29. Review periodically equal opportunity employment and sexual harassment prevention policies.  Monitor compliance with such policies and applicable laws.

*Governance*

30. Review periodically the quality, sufficiency and timeliness of information furnished by management to the Trustees in connection with meetings of the Trustees and its committees and other activities of the Trustees.

31. Review periodically policies and procedures relating to document retention.

32. Review periodically "directors and officers" insurance policies (including so called "Side-A" coverage for Trustees and officers individually) and indemnification agreements, if any.  Direct changes as appropriate.

33. Except to the extent that such advancement and indemnification is required by law, by the Declaration of Trust or by contract, review and, as appropriate, determine whether costs and expenses (including attorneys' fees) should be advanced and indemnification should be provided to Trustees and senior management in connection with claims and litigation arising out of their activities on behalf of the Trust.

Amended and Restated:  February 26, 2013

## VI. <u>Disclosure as to Availability of Charter</u>

The Trust will cause this Charter to be made available on or through the Trust's website and include in the Trust's annual proxy statement or, if it does not file an annual proxy statement, in its annual report on Form 10-K, a disclosure that this Charter is available on or through the Trust's website, which disclosure shall include the website address.

## VII. <u>Trust Instrument to Prevail</u>

This Charter is subject to the provisions of the Trust Instrument, and in the event of any conflict between this Charter and the Trust Instrument, the provisions of the Trust Instrument shall prevail.

# EXHIBIT C

**STANDARD GUIDELINE**

*(delivered to most major institutional investors and parties interested in proxy matters)*

**Meeting Information**

| Company | TEXAS PACIFIC LAND TRUST |
|---|---|
| Ticker | TPL |
| CUSIP | 882610108 |
| Meeting Type | Special |
| Meeting Date | 05/22/19 |
| Record Date | 03/28/19 |

**Items & Recommendations**

We recommend that clients holding shares of TEXAS PACIFIC LAND TRUST vote:

| Item | Egan-Jones Recommendation | Management Recommendation |
|---|---|---|
| **1 – Election of Trustees** | FOR ALL | FOR ALL |

**Considerations and Recommendations**

Egan-Jones' review centered on the Proposals in the context of maximizing shareholder value, based on publicly available information.

**Governance Rating Score Summary**

| Ticker | **TPL** |
|---|---|
| Company name | **Texas Pacific Land Trust** |

**Board Rating**

| Item | TRUE/FALSE |
|---|---|
| CEO and Chairman Separate | TRUE |
| Annual Director Elections | FALSE |
| All Classes of Stock Have Equal Voting Rights | TRUE |
| Compensation Committee with All Independents | FALSE |
| Audit Committee with All Independents | FALSE |
| Nominating Committee with All Independents | FALSE |
| Non-binding Compensation Vote on Agenda | TRUE |
| Majority Independent Directors on Board | TRUE |
| Over-boarded CEO Director | FALSE |
| Over-boarded Board Chair | FALSE |
| Over-boarded Non-CEO Director | FALSE |
| Major cyber security breach | FALSE |
| Failure to implement sufficient carbon risk plan | FALSE |

| | |
|---|---|
| Other financial or operational risk control failure | FALSE |
| Other serious... | FALSE |
| Version | VER 2.10 12/15/2017 |
| Sub Total | 50.00 |
| Performance Adjustment | 55.33 |
| Total | 105.33 |
| **Final Board Score** | **Superior** |

### Compensation Rating

| | |
|---|---|
| CEO Total Comp($) | 2,312,025 |
| CEO Salary ($) | 480,167 |
| TSR (%) | 115.67 |
| Market Capitalization ($M) | 6,717.62 |
| Wealth Creation ($M) | 7770.19 |
| Wealth Creation/CEOPAY | 3360.77 |
| Raw Score (pre adjustments) | Superior |
| **Final Score** | **Superior** |
| Rating Model Version | VER 3.10 12/15/2017 |
| High CEO Total Compensation | Not Relevant |
| CEO Salary Under $1 Million Limit | Positive Adjustment |
| Other Adjustments: | No Adjustment |

### Audit Rating

| | |
|---|---|
| Audit Fees | 174,250 |
| Total Fees | 174,250 |
| Non-Audit Fees exceed 50% | FALSE |
| Auditor has served for seven or more years | TRUE |
| Raw Score | Needs Attention |
| Version | VER 1.11 12/15/2017 |
| **Final Score** | **Neutral** |

### Governance Rating

| | |
|---|---|
| **Overall Score** | **Neutral** |

### Item 1

Election of Trustees

**NOTE THAT THE AGENDA ITEMS AND RECOMMENDATIONS PROVIDED IN THIS REPORT PERTAIN TO THE AGENDA ON THE BLUE PROXY CARD PROVIDED BY THE MANAGEMENT. WE RECOMMEND VOTING FOR THE BLUE PROXY CARD.**

This solicitation is being made on behalf of Texas Pacific Land Trust (the Trust) in connection with the proxy fight initiated by SoftVest, Tessler, Horizon and Mr. Eric Oliver  to nominate its own principal, Eric L. Oliver ("Mr. Oliver"), as a trustee candidate at the Special Meeting in opposition to the Trustees' nominee, General Cook.

**ANALYSIS AND EVALUATION:**

Based on our review of publicly available information, we believe that voting **FOR the MANAGEMENT nominee** is in the best interest of the Company and its shareholders. In arriving at that conclusion, we have considered the following factors:

- We commend the exploration and continued maximization of Permian Basin and the strengthening of the Company's operational segments, which resulted to favorable superior returns and stable cash flow for the Company and its shareholders. This achievement, in our view, is attributable to the unprecedented hard work of the Board and management over the years.

- We believe that TPL is well-positioned for growth as the Board and management continue to deploy strategies to maximize the potential, not only of its core assets but also TPL's non-core assets, and such efforts have translated into revenues over the years.

-  In our view, the current Board and management are the best in class in terms of qualifications, experience, expertise and independence, contrary to Mr. Oliver who lacks public company experience. Further, we believe that his election to the Board poses

potential conflict of interests, non-independent judgment due to Mr. Oliver's undisclosed affiliations, which are detrimental to the best interests of the Company and its shareholders.

**Given the slate of nominees, we recommend that shareholders vote for the management nominees on the BLUE Proxy Card.**

**MANAGEMENT NOMINEES (BLUE PROXY CARD):**

*GENERAL DONALD G. COOK, USAF (RETIRED)*

Age: 72

Business Experience: General Don Cook, 72, is a retired four-star General of the United States Air Force.

General Cook currently serves on the board of Crane Corporation (since 2005), where he chairs the nominating & governance committee and is a member of the compensation and the executive committee, and of Cybernance, Inc. (since 2016). General Cook previously served on the boards of USAA Federal Savings Bank (from 2007 to 2018), U.S. Security Associates Inc., a Goldman Sachs portfolio company (from 2011 to 2018), and Beechcraft LLC, formerly known as Hawker Beechcraft Inc. (from 2007 to 2014). Moreover, General Cook served on the board of Burlington Northern Santa Fe Railroad for almost five years until it was sold to Berkshire Hathaway in 2010 in a transaction valued at $44 billion. He is also consults for Lockheed Martin Corporation. In addition to his extensive corporate governance experience, General Cook has been the Chairman of the San Antonio chapter of the National Association of Corporate Directors (NACD), a group recognized as the authority on leading boardroom practices.

General Cook had numerous additional command and high-level staff assignments during his 36-year career with the Air Force and retired as a four-star General. He commanded a flying training wing and two space wings, the 20th Air Force (the nation's nuclear Intercontinental Ballistic Missile force), and was Commander of Air Combat Command during Sept. 11. General Cook served as the Chief of the Senate Liaison Office and on the staff of the House Armed Services Committee in the U.S. House of Representatives. Prior to his retirement from the Air Force in August 2005, General Cook's culminating assignment was Commander, Air Education and Training Command at Randolph Air Force Base in Texas, where he was responsible for executing the $8 billion annual budget to recruit, train and educate Air Force personnel, safely implementing the 500,000 hour annual flying hour program and providing for the leadership, welfare and oversight of 90,000 military and civilian personnel in the command. He was twice awarded the Distinguished Service Medal for exceptional leadership.

General Cook holds a master of business administration (MBA) from Southern Illinois University, as well as a bachelor's degree from Michigan State University. He is active with several civic organizations in the San Antonio, Texas, community.

Skills and Qualifications: General Cook brings to TPL exemplary leadership and corporate governance skills and the Trust will benefit greatly from his extensive experience.

*JOHN R. NORRIS, III*

Age: 65

Trustee since: June 2000

Committee(s): Audit Committee; Nominating, Compensation and Governance Committee

Business Experience: Mr. Norris is a member with the law firm Norris & Weber, PLLC ("Norris & Weber") in Dallas, Texas. Mr. Norris began working with a predecessor firm of Norris & Weber in 1979 and has stayed with the firm throughout the past 40 years. He has been continuously certified as a legal specialist in estate planning and probate law by the Texas Board of Legal Specialization since 1989. In 1995, he was elected as a Fellow of the American College of Trusts and Estate Counsel, a professional association of lawyers throughout the United States who have been recognized as outstanding practitioners in the laws of wills, trusts, estate planning and administration, and related tax planning.

Mr. Norris is a member of the State Bar of Texas and the Dallas Bar Association, where he served as chairman of the Probate, Trust & Estate section in 1995. Mr. Norris was a member of the District 6A Grievance Committee of the State Bar of Texas between 1995 and 2001, serving as its chairperson between 1998 and 2000. Mr. Norris has served as a Trustee of Texas Pacific since 2000.

Mr. Norris attended Washington & Lee University and graduated from the University of Texas with a Bachelors of Business Administration degree in 1976. He then attended Southern Methodist University School of Law and graduated with a juris doctor degree in 1979.

Skills and Qualifications: Mr. Norris' qualifications to serve as a Trustee include his specialist knowledge of trust law, and extensive background as a practicing attorney in Dallas, Texas. In addition to his 18 years of experience as a Trustee, Mr. Norris advised and represented the Trust on legal matters for more than 17 years prior to his election as a Trustee.

*DAVID E. BARRY*

Age: 73

Trustee since: January 2017

Committee(s): Audit Committee; Nominating, Compensation and Governance Committee

Business Experience: Mr. Barry is President of Tarka Resources, Inc., which is engaged in oil and gas exploration in Texas, Oklahoma and Louisiana. He has served as President of Tarka Resources, Inc. and Tarka, Inc. since 2012 and 2014, respectively, continuing through their merger in 2016.

Mr. Barry practiced real estate, employee benefits and compensation law at the law firm of Kelley Drye & Warren LLP ("Kelley Drye") from 1969, becoming a partner in 1978, until 2012. Mr. Barry represented Texas Pacific for many years as a partner at Kelley Drye. Beginning in 2007 and then full-time starting in 2012, Mr. Barry worked as President of Sidra Real Estate, Inc., an entity with commercial real estate

holdings throughout the United States. Mr. Barry has served as a Trustee of Texas Pacific since 2017.

Mr. Barry is a member of the bar of New York State and a retired member of the bar of the State of Connecticut. He is a graduate of the College of the Holy Cross (B.A., 1966) and a cum laude graduate of Harvard Law School where he obtained his J.D. in 1969.

Skills and Qualifications: Mr. Barry's qualifications to serve as a Trustee include his legal expertise and knowledge gained over a 49-year career at Kelley Drye, including representing the Trust for many years prior to his election as a Trustee, as well as his experience in commercial real estate including in Texas.

**KEY COMMITTEES OF THE BOARD:**

***Audit Committee***

The current members of the Audit Committee are Messrs. Norris and Barry.

***Nominating, Compensation and Governance Committee***

The current members of the Nominating and Compensation Committee are Messrs. Norris and Barry.

**CERTAIN RELATED TRANSACTIONS:**

None

**DISSIDENT SHAREHOLDERS' NOMINEES (WHITE PROXY CARD):**

*Eric L. Oliver*

Mr. Oliver is 60 years old and his principal business address is 400 Pine Street, Suite 1010, Abilene, Texas 79601.

Mr. Oliver currently serves as the President of SoftVest Advisors, a registered investment adviser that acts as an investment manager for clients, including funds and managed accounts, with investments in oil and gas minerals and royalties; was President of Midland Map Company, LLC, a Permian Basin oil and gas lease and ownership map producer since 1997 and recently sold in January of this year to Drilling Info; Principal of Geologic Research Centers LLC, a log library providing geological data to the oil and gas industry with a library in Abilene, Texas; and Principal of TenTex Music LLC, a private music royalty partnership. Additionally, Mr. Oliver has served on the Board of Directors of Texas Mutual Insurance Company since 2009, where he currently also serves as Chairman of the Investment Committee, with over $6,500,000,000 of total assets. He has also served as a director on the Board of Directors of AMEN Properties, Inc. since July 2001 and was appointed Chairman of the Board in September 2002. AMEN Properites directly or indirectly, owns certain oil and gas royalty and working interest properties. In 2007, through certain affiliated entities, Mr. Oliver led a team to successfully acquire the assets of the Santa Fe Energy Trust (formerly NYSE ticker SFF), which consisted of over 12,000 royalty and working interest properties in at least seven states. Furthermore, Mr. Oliver serves on the Board of Abilene Christian Investment Management Company, Abilene Christian University's endowment management company, and is a former member of the Abilene Community Foundation's investment committee. Mr. Oliver received a B.A. in Chemistry from Abilene Christian University in 1981.

Mr. Oliver is an experienced oil and gas investor with over 22 years of experience buying and selling properties (which includes his experience as a Controlling Person of SoftVest LP which he founded in 1998) and over 35 years of experience managing investments with an emphasis in the energy market. For these reasons, we believe Mr. Oliver is exceptionally well-qualified to serve as a trustee of the Trust.

If elected, Mr. Oliver would receive such fees as may be payable by the Trust to trustees in accordance with its practice at the time and its governing documentation. Except as described below, there are no understandings or arrangements between Mr. Oliver or any other person pursuant to which Mr. Oliver's nomination as a trustee is to be made by the Participants.

**PARTICIPANTS IN THE SOLICITATION:**

Texas Pacific Land Trust owns tracts of land in Texas, previously the property of the Texas and Pacific Railway Company. The Trust issues transferable certificates of proprietary interest pro rata to the holders of certain debt securities of the Texas and Pacific Railway Company. Texas's income is derived from land sales, oil and gas royalties, grazing leases, and interest. As of the record date for the Special Meeting, 7,756,156 outstanding Sub-share Certificates, par value of $0.03-1/3 ("Sub-share Certificates"), were outstanding.

This solicitation is being conducted by SoftVest LP, SoftVest Advisors, LLC ("SoftVest Advisors"), Eric L. Oliver ("Mr. Oliver", and together with SoftVest LP and SoftVest Advisors, the "SoftVest Participants"), ART-FGT Family Partners Limited ("ART-FGT LP"), Tessler Family Limited Partnership ("Tessler Family LP"), Allen R. Tessler ("Mr. Tessler", and together with ART-FGT LP and Tessler Family LP, the "Tessler Participants"), Horizon Asset Management LLC ("HAM"), Kinetics Advisers, LLC ("KA"), Kinetics Asset Management LLC ("KAM", together with HAM and KA, the "HK Advisers"), Horizon Kinetics LLC ("Horizon", and together with the HK Advisers, the "Horizon Entities") and Murray Stahl ("Mr. Stahl", and, together with the Horizon Entities, the "Horizon Participants"). The SoftVest Participants, the Horizon Participants and the Tessler Participants are referred to collectively as the "Participants".

SoftVest LP is a hedge fund specializing in the ownership of oil and gas minerals and royalties. The general partner of SoftVest LP is SoftVest GP I, LLC, a Delaware limited liability company ("SV GP"). Mr. Oliver is the managing member of SV GP. The principal business SV GP is to act as general partner to SoftVest LP. The principal business of SoftVest Advisors is to serve as investment manager of SoftVest LP.

The principal business of each of ART-FGT LP and Tessler Family LP is to invest in private and public securities. The general partner of ART-FGT LP is Tessler FMC, LLC, a Wyoming limited liability company ("Tessler LLC"). Mr. Tessler and his spouse, Frances G. Tessler, are the members of Tessler LLC. Andrea Tessler and Karla Tessler, daughters of Mr. Tessler, are the managers of Tessler LLC. The general partner of Tessler Family LP is Apres Vous, LLC, a Wyoming limited liability company ("Apres LLC"). Andrea Tessler, Karla Tessler and Christopher Tessler, the children of Mr. Tessler, are the members of Apres LLC. Andrea Tessler and Karla Tessler are the managers of

Apres LLC. The principal business of Tessler LLC and Apres LLC is to act as general partner to ART-FGT LP and Tessler Family LP, respectively. Mr. Tessler's principal occupation is serving as Chairman of the Board and Chief Executive Officer of International Financial Group, Inc., an international merchant banking firm.

Horizon's principal business is to act as a parent company of the HK Advisers, who are each a registered investment adviser. The principal business of the Horizon Entities is, through its registered investment advisers, to act as a discretionary investment manager on behalf of its clients. Mr. Stahl's principal occupation is serving as Chairman, Chief Executive Officer and Chief Investment Officer of Horizon.

## BACKGROUND OF THE SOLICITATION:

On March 8, 2016, Horizon Kinetics LLC ("Horizon"), Kinetics Asset Management, LLC ("Kinetics"), Horizon Asset Management LLC ("HAM") and Kinetics Advisors, LLC ("Horizon Advisors" and, together with Horizon, Kinetics and HAM, "Horizon Kinetics") filed a Schedule 13D (the "Horizon Schedule 13D") with the SEC, disclosing ownership of 20.3% of the outstanding Sub-share Certificates and indicating that the Sub-share Certificates were purchased for investment purposes only.

On June 29, 2016, SoftVest and ART-FGT Family Partners Limited ("ART-FGT") submitted a restructuring proposal to the Trust, which proposal contemplated converting the Trust into a master limited partnership (the "MLP Proposal").

On September 29, 2016, the Trust provided a written response to SoftVest regarding the MLP Proposal.

On October 25, 2016, SoftVest and ART-FGT submitted a second restructuring proposal to the Trust, revising the MLP Proposal.

On November 16, 2016, trustee David E. Barry ("Mr. Barry") met with Allan R. Tessler ("Mr. Tessler") in Naples, Florida.

On December 8, 2016, Horizon Kinetics filed Amendment No. 1 to the Horizon Schedule 13D with the SEC, disclosing ownership of 21.4% of the outstanding Sub-share Certificates and again indicating that the Sub-share Certificates were purchased for investment purposes only.

On December 15, 2016, SoftVest and ART-FGT submitted a third restructuring proposal to the Trust, which proposal contemplated converting the Trust into a corporation and, thereafter, possibly into a master limited partnership ("MLP").

On December 19, 2016, the Trust's General Agent and Chief Financial Officer, Robert J. Packer ("Mr. Packer"), sent a letter to SoftVest and ART-FGT stating that the third restructuring proposal was under review.

On June 2, 2017, Kelley Drye & Warren LLP, on behalf of the Trust, responded to Gibson Dunn & Crutcher LLP, legal counsel to SoftVest and ART-FGT, regarding the third proposal.

On June 14, 2017, the Trustees and officers met John Goff ("Mr. Goff") and his representative.

On July 10, 2017, Mr. Packer and Stifel met Mr. Oliver and a representative of Goff Capital Partners in person, and Mr. Goff dialed in on a conference call.

On August 16, 2017, Horizon Kinetics filed Amendment No. 2 to the Horizon Schedule 13D with the SEC, disclosing ownership of 22.5% of the outstanding Sub-share Certificates and again indicating that the Sub-share Certificates were purchased for investment purposes only.

On September 15, 2017, a large global law firm provided a memo to the Trust indicating the negative tax implications of the converting to an MLP.

On October 24, 2017, after the Trust's careful review and deliberation with external advisors of the proposals submitted to the Trust by SoftVest and ART-FGT, the Trust sent a letter to Mr. Oliver detailing that the Trust had completed its review of the various proposed structures and had determined that it was not in the best interests of the Trust and its Holders to undertake any of the suggested restructuring proposals, primarily due to the prohibitive tax cost of such a transition and the uncertainty of the desired tax treatment, among other considerations as so determined by the Trustees.

On November 14, 2017, Stifel indicated it recommended against converting the Trust to the MLP structure contemplated by the MLP Proposal, and the Trust accepted this recommendation.

On July 23, 2018, Horizon Kinetics filed Amendment No. 3 to the Horizon Schedule 13D with the SEC, disclosing ownership of 23.5% of the outstanding Sub-share Certificates and again indicating that the Sub-share Certificates were purchased for investment purposes only.

On November 28, 2018, Mr. Tessler called Mr. Barry to discuss a possible acquisition of the Trust by a certain oil and gas company. In January 2019, Mr. Barry notified Mr. Tessler that he would be willing to meet with this company, but Mr. Tessler did not respond.

On January 22, 2019, Mr. Tessler sent an email to Mr. Barry regarding a potential transaction between the Trust and a different oil and gas company than the one discussed on November 28, 2018.

On February 25, 2019, Maurice Meyer, III ("Mr. Meyer") resigned as Trustee and as Chairman of the Trustees for medical reasons.

On February 26, 2019, Mr. Tessler spoke with Mr. Barry and suggested Mr. Oliver as a nominee to replace Mr. Meyer following the resignation of Mr. Meyer on February 25, 2019 due to sudden health concerns.

On February 28, 2019, Mr. Oliver delivered his résumé to Mr. Packer, and the Trustees reviewed Mr. Oliver's qualifications to serve as a candidate for Trustee for election at the Special Meeting.

On March 4, 2019, Mr. Barry notified Mr. Oliver of the Trust's intention to nominate Preston Young as a candidate for Trustee for election at the Special Meeting.

On March 6, 2019, Mr. Barry spoke with Murray Stahl, CEO and Chairman of the board of Horizon Kinetics ("Mr. Stahl"). Mr. Stahl indicated that he was pleased with the performance of the Trust and proposed the formation of an advisory board of shareholders. Mr. Barry indicated that the Trustees would seriously consider this proposal.

On March 7, 2019, Mr. Barry spoke with Mr. Oliver and planned a meeting for March 25, 2019 with Mr. Norris to discuss Mr. Oliver's perspectives on the future of the Trust.

On March 15, 2019, without any prior communication to the Trustees, SoftVest and ART-FGT filed a Schedule 13D (the "SoftVest Schedule 13D") with the SEC, disclosing that SoftVest intended to nominate Mr. Oliver for election as a Trustee at the Special Meeting. The SoftVest Schedule 13D also disclosed that SoftVest, Horizon, Tessler Family Limited Partnership ("Tessler Family") and ART-FGT entered into a cooperation agreement on March 15, 2019, which requires each group member to vote all of its Sub-share Certificates in favor of Mr. Oliver and provides for certain procedural actions and matters (the "Cooperation Agreement").

Also on March 15, 2019, Horizon Kinetics filed Amendment No. 4 to the Horizon Schedule 13D with the SEC disclosing a change of investment intent by indicating that it will engage with the Trustees and other representatives of the Trust, investors and other industry participants to discuss Horizon Kinetics' plans for the Trust in order to "maximize the value of TPL," including (1) the conversion of the Trust into a Delaware corporation, (2) changing the team running the Trust's new water business, (3) a potential separation or sale of the water business to a third party with a retained royalty, and (4) the election of Mr. Oliver as a Trustee of the Trust.

On March 18, 2019, Tyler Glover, General Agent, Secretary and CEO of the Trust ("Mr. Glover") and Robert Packer, General Agent and CFO of the Trust ("Mr. Packer") spoke with Mr. Stahl, who reiterated his view that he was pleased with the performance of the Trust.

Also on March 18, 2019, Horizon Kinetics filed Amendment No. 4/A to correct a typo under Item 4 with respect to the date on which Horizon Kinetic's investment intent changed from passive to active.

On March 19, 2019, SoftVest delivered to the Trust a formal notice of its intent to nominate Mr. Oliver for election as a Trustee of the Trust at the Special Meeting (the "Nomination Notice"). Such Nomination Notice was dated March 15, 2019, four days prior to its actual delivery to the Trust. Following receipt of the Nomination Notice, the Trustees engaged Spencer Stuart, one of the world's leading global executive and board director search firms, and began a process in which they considered more than 15 candidates that Spencer Stuart identified as an alternate to the candidate originally chosen.

On March 20, 2019, Mr. Glover and Mr. Packer engaged in a telephone conversation with Mr. Stahl during which Mr. Stahl indicated that he was pleased with the Trust's performance but wanted the Trust to review certain corporate governance policies.

On March 25, 2019, the Trust filed a Current Report on Form 8-K confirming the Trust's receipt of the Nomination Notice and postponement of the Special Meeting, which was originally scheduled to be held on May 8, 2019, until May 22, 2019, in order to provide the Trustees with sufficient time to consider the Nomination Notice and give shareholders the opportunity to fully consider the changed circumstances in order to make an informed voting decision.

Also on March 25, 2019, SoftVest, SoftVest Advisors LLC, Mr. Oliver, Horizon, Tessler Family, Mr. Tessler and ART-FGT filed a preliminary proxy statement with the SEC.

On March 27, 2019, Mr. Glover and Mr. Packer engaged in a telephone conversation with Mr. Stahl in which Mr. Glover and Mr. Packer offered to identify a mutually agreeable compromise candidate. Mr. Stahl stated that he would be open to this concept.

On March 28, 2019, the Trust filed a preliminary proxy statement with the SEC.

Also on March 28, 2019, Mr. Packer received a telephone call from Jay Kesslen, General Counsel of Horizon ("Mr. Kesslen"), requesting that the Trust have a conversation with Mr. Oliver.

On April 1, 2019, Mr. Packer contacted Mr. Oliver to arrange a telephone call between Mr. Oliver and the Trustees on April 2, 2019.

On April 2, 2019, the Trustees had a telephone call with Mr. Oliver during which the parties discussed Mr. Oliver's intention to be elected as Trustee, as well as related matters.

On April 5, 2019, SoftVest, SoftVest Advisors LLC, Mr. Oliver, Horizon, Tessler Family, Mr. Tessler and ART-FGT filed amendment number one to their preliminary proxy statement with the SEC.

Also on April 5, 2019, the Trustees had a telephone call with Mr. Stahl during which the Trustees offered to find a mutually agreeable compromise candidate to serve as the new Trustee and referenced their list of candidates provided by Spencer Stuart. Mr. Stahl agreed to give such potential compromise candidate prompt consideration.

On April 6, 2019, Mr. Packer received an email from Mr. Kesslen,. In the email, Mr. Stahl reneged on his promise to consider alternative candidates and indicated Horizon Kinetics would not consider any candidates other than Mr. Oliver as the trustee nominee as required by the terms of their Cooperation Agreement, and mistated the Trust's willingness to proceed with Mr. Young's nomination at the time.

On April 7, 2019, following a thorough review of over 15 alternative candidates identified by outside advisors, including Spencer Stuart, the Trustees chose to nominate General Cook as candidate for Trustee at the Special Meeting. General Cook accepted the nomination immediately.

On April 8, 2019, the Trust filed this definitive proxy statement with the SEC soliciting votes from Holders for the election of General Cook as Trustee.

**MANAGEMENT'S SIDE (BLUE PROXY CARD):**

The management and the Board of Directors recommend the shareholders to vote FOR election of the slate of nominees for directors, and reject the Mr. Oliver as summarized to  the following reasons:

- · **Extraordinary Track Record of Value Creation and Shareholder Returns:**  The Trust has been a prudent steward of shareholder assets for over a century, which has led to unparalleled growth and capital returns for the shareholders. Over the 5- and 10-year periods preceding the dissident group's campaign, TPL generated total shareholder returns of 475% and 3,856%, respectively.

- **Building on a Successful, Proven Strategy:** As market conditions in the Permian Basin have become more attractive, TPL has evolved its organizational structure, a commitment to its field level value proposition, including developing a land management segment and forming Texas Pacific Water Resources, a full-service water offering.
- **Nominated Independent Expert for Trust's Next Chapter:** The Trust has nominated General Donald "Don" G. Cook – a highly-experienced, independent candidate with extraordinary leadership, corporate governance and public company board experience – to serve as Trustee and to add his leadership and governance insights and expertise to the Board.
- **Serious Concerns about the Dissident Nominee:** The Trustees have serious concerns with the dissident group's nominee's judgment, experience and ability to act in the interest of all shareholders.

## DISSIDENT SHAREHOLDERS' SIDE (WHITE PROXY CARD):

At the Special Meeting, one trustee of the Trust is to be elected to fill the vacancy created by the resignation of Mr. Maurice Meyer III. The dissidents are seeking your proxy to vote for the election of Mr. Oliver as a trustee.

- Well-Qualified Nominee: Mr. Oliver is an experienced oil and gas investor with over 22 years of experience buying and selling properties and over 35 years of experience managing investments with an emphasis in the energy market. Among other relevant experience:

- Mr. Oliver currently serves as the President of SoftVest Advisors, a registered investment adviser that acts as an investment manager for clients, including funds and managed accounts, with investments in oil and gas minerals and royalties;

- Mr. Oliver was President of Midland Map Company, LLC, a Permian Basin oil and gas lease and ownership map producer since 1997, and recently sold in January 2019 to Drilling Info;

- Mr. Oliver is Principal of Geologic Research Centers LLC, a log library providing geological data to the oil and gas industry with a library in Abilene, Texas;

- Mr. Oliver has served on the Board of Directors of Texas Mutual Insurance Company since 2009, where he currently also serves as Chairman of the Investment Committee, with over $6,500,000,000 of total assets;

- Mr. Oliver has served as a director on the Board of Directors of AMEN Properties, Inc. since July 2001 and was appointed Chairman of the Board in September 2002. AMEN Properties owns, directly or indirectly, certain oil and gas royalty and working interest properties; and

- In 2007, through certain affiliated entities, Mr. Oliver led a team to successfully acquire the assets of the Santa Fe Energy Trust (formerly NYSE ticker SFF), which consisted of over 12,000 royalty and working interest properties in at least seven states.

- Commitment to Fully Explore Conversion of the Trust into a Delaware Corporation: Mr. Oliver and the other Participants believe that the Trust would benefit from converting into a Delaware corporation, and subject to his duties as trustee, Mr. Oliver is committed to fully exploring this alternative.

Among other things, the Participants believe that, as compared to trust law, Delaware corporate law has a more well-developed legal framework around matters of governance and investor rights, which in the dissidents' view provides greater comfort and predictability to investors in a publicly-traded entity. In that regard, the dissidents note by way of example:

- Election of Trustees and Shareholder Meetings: Trustees of the Trust serve until their death, resignation or diqualification, which in the dissidents' view makes the election of a trustee comparable to a life-tenured appointment. Meetings of holders of Shares only occur when a new trustee needs to be elected to fill a vacancy of one of the three trustee positions. Indeed, public filings show that the Trust has only held three meetings of holders of Shares since the year 2000.

- In contrast, Delaware law generally requires that corporations hold an annual meeting to vote on the election of directors. Directors, in turn, can be elected for terms of one year (if the board is not staggered) or three years (if the board is staggered).

- The dissidents do note that if the Trust were to hold annual elections of the entire Board, a party may have the ability to effect a change in control of the Trust at an annual meeting.

- Mr. Oliver is Committed to Fully Exploring the Best Options for the Trust's New Water Business: In June 2017, the Trust announced the formation of Texas Pacific Water Resources LLC ("TPWR"). TPWR, a single member LLC and wholly owned subsidiary of the Trust, focuses on providing a full-service water offering to operators in the Permian Basin. These services include, but are not limited to, brackish water sourcing, produced-water gathering/treatment/recycling, infrastructure development/construction, disposal, water tracking, analytics and well testing services. The Participants believe that these activities could create various risks for the Trust, such as risks related to workers compensation, leaks or rupturing of pipelines (including surface damage) and injection well casings (including potential acquifier contamination). In light of those risks, Mr. Oliver is committed to actively encouraging the Trust to evaluate the existing water business and, with the assistance of outside consultants and other advisors, determine if it is advisable to grow operations internally, partner with a strategic partner, or sell the water rights to a third party and retain a royalty. Mr. Oliver is not pre-judging any such approach, and believes each such option needs to be fully evaluated with proper outside consultants, in order to maximize value for holders of Shares. In addition, Mr. Oliver believes that any proposed capital expenditures and operating expenses incurred in connection with TPWR should have their respective expected rates of return carefully compared to the compounding benefits of retiring outstanding Shares.


**Closing Comments**


Ratification of independent auditors is not an agenda item. Lane Gorman Trubitt has served as independent auditors for the Company in fiscal year 2018. The following table sets forth the aggregate fees billed by Lane Gorman Trubitt in connection with services rendered during the last two fiscal years.

Exhibit 1 - Audit Fees

|  | Current Fiscal Year | | Prior Fiscal Year | |
|---|---|---|---|---|
| Audit Fees | $ | 174,250 | $ | 112,600 |
| Audit Related Fees | — | | — | |
| Non Audit and Tax Fees | $ | - | $ | - |
| Total Fees | $ | 174,250 | $ | 112,600 |

Exhibit 2 - Audit Fee Ratios

|  | Relevant Ratios | Note |
|---|---|---|
| Total Fee Increase/Decrease | 54.8% | |
| Non-Audit Related Fees divided by Total Fees (Current FY): | 0.0% | Should not be higher than 50% |

We have seen no evidence that its integrity, independence or professionalism is in question.

*While Egan-Jones Proxy Services ("EJP"), a unit of Egan-Jones Ratings Co. ("EJR"), exercised due care in compiling this analysis, it makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of this information and assumes no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.*

*EJR has established policies and procedures which prohibit the involvement of any of EJR-affiliated persons who are involved as analysts in EJR's credit ratings business in the content of EJP's analyses and vote recommendations. None of such EJR personnel are informed of the contents of any of EJP's analyses or recommendations prior to their publication or dissemination.*

*One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of Egan-Jones. Egan-Jones may in some circumstances afford issuers the right to review draft research analyses so that factual inaccuracies may be corrected before the report and recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with Egan-Jones.*

**Those wishing to purchase Egan-Jones Proxy reports should contact proxy@egan-jones.com (mailto:proxy@egan-jones.com)**

**Interested in learning more about Egan-Jones Proxy? See our website at http://www.ejproxy.com (http://www.ejproxy.com)**

© 2019 Egan-Jones Ratings Company. All rights reserved.

**Contact Support** (mailto:proxy.support@egan-jones.com?subject=EJ Proxy Support Request)

# EXHIBIT D



**ISS** Special Situations Research

Analysis

*May 7, 2019*

# Texas Pacific Land Trust (TPL): Proxy Contest with Horizon Kinetics/SoftVest

## Vote Recommendation: Vote FOR management nominee Cook

## Executive Summary

A dissident group which includes Horizon Kinetics (23.2 percent shareholder) and SoftVest Advisors (1.7 percent shareholder) has nominated one candidate to challenge the management nominee standing for election at this AGM.

A proxy contest in which the dissident's primary request is that the company "create a board of directors" is highly unusual. Then again, Texas Pacific Land Trust (TPL) is somewhat of a relic among publicly traded companies, in that it is governed by an 1888 Declaration of Trust which stipulates that three trustees shall oversee the company, providing no mechanism for changing the number of trustees or removing trustees, who effectively have lifetime appointments.

TPL's five-year TSR of approximately 500 percent is another factor that sets it apart from companies typically targeted in proxy contests. However, the dissident argues that these strong shareholder returns are driven by TPL passively benefiting as other companies drill more oil & gas wells on its land. The dissident also claims that TPL's expanding operational scope and increase in employees represent a deviation from TPL's original purpose as a liquidating trust. The dissident seeks to address what it believes are symptoms of weak corporate governance, such as limited disclosure, no requirements for annual meetings, and the lack of established terms for trustees.

In analyzing proxy contests, ISS focuses on two central questions:

1. Have the dissidents made a compelling case that change is warranted?

2. If so, which nominees are most likely to drive that change?

| Record Date: | March 28, 2019 |
|---|---|
| Meeting Date: | May 22, 2019 |

## Contents

| | |
|---|---|
| Executive Summary | 1 |
| Total Shareholder Return & Historical Performance | 6 |
| Shareholder Base | 10 |
| Background and Key Events | 11 |
| Dissident Critique/Management Response | 13 |
| 1. Is Change Warranted? | 17 |
| 2. Which Nominees? | 21 |
| Conclusion and Vote Recommendation | 22 |

## Chart Focus: TPL Share Price



Dissident group files 13D

Source: Bloomberg Finance LP

## Contacts

**Kurt Moeller, CFA**
Phone: +1 301.556.0294
Kurt.Moeller@issgovernance.com

**Heath Winter, CFA**
Phone: +1 301.556.0192
Heath.Winter@issgovernance.com

**Cristiano Guerra**
Phone: +1 301.556.0417
Cristiano.Guerra@issgovernance.com

Special Situations Research delivers comprehensive, independent research on high-profile economic proposals including M&A and proxy contests, and on the implications for shareholders of evolving trends in corporate governance and shareholder rights.

© 2019. All Rights Reserved. Institutional Shareholder Services Inc.  |  www.issgovernance.com



ISS Special Situations Research

*May 7, 2019*



## QUESTION 1: IS CHANGE WARRANTED?

### TSR and Fundamental Performance

The company has stated that TPL has no true peers, and the dissident has not specified any peers. ISS utilized 13 E&P companies with market capitalization as of April 30, 2019 between $2.5 billion and $10 billion as illustrative peers. Eight of those peers have been trading publicly for at least five years.

For the five years ending on the unaffected date of March 14, 2019, the last day before the dissident announced its intent to nominate Oliver, TPL delivered TSR well above any of the peers. For every time period ending on the unaffected date, TPL's TSR far exceeded the peer median and an industry benchmark, the S&P Oil & Gas E&P Select Industry Index. For example, over the one year ending on the unaffected date, TPL's TSR was 44.9 percent, compared with (15.8) percent for the peer median and (11.9) percent for the index. For the five years ending on the unaffected date, TPL's TSR was 485.8 percent, compared with (40.7) percent for the peer median and (53.8) percent for the index. That substantial outperformance has continued through to a more recent date of April 30, 2019.

The dissident is correct in noting that TPL has benefited substantially from strong industry conditions, which the company itself acknowledges. TPL's royalty BOE production was 8.5x higher in 2018 than in 2013: 2.26 million BOE vs. 267,000 BOE. That is partly mitigated by lower oil and gas prices in 2018 vs. 2013, which resulted in oil and gas royalties in 2018 of $123.8 million, 5.1x their 2013 total of $24.5 million.

While it has been dealt a strong hand, management deserves some credit for the strong TSR that TPL has generated. One example is the water company which TPL formed in June 2017. Previously, TPL had entered into agreements with energy companies to allow them to drill water wells, construct water-related infrastructure, and purchase water sourced from TPL's land. By 2017, companies drilling for and producing oil & gas were drilling more wells and longer well laterals, resulting in increasing water demand. TPL created a water company which offers energy companies a full-service water offering, including water sourcing, treatment, and recycling, as well as infrastructure development. Forming this company has increased TPL's ability to generate revenue from the surface acres it owns and their accompanying water rights. This strategically sound decision was enhanced by TPL's ability to persuade two former executives from EOG Resources, a well-respected E&P company, to lead this division.

With minimal contribution from the water company, TPL's water segment generated $11.7 million of revenue in 1H 2017. That was an increase over its revenue for all of 2016, when TPL generated $8.1 million in water revenue and TPL earned $5.2 million in net income. Last year, TPL generated $88.7 million in revenue and $50.1 million in net income from the water segment. Capital spending in the water segment for 2017-18 combined was $62.8 million. There is no way to determine how much the water segment would have earned in net income last year had the water company not been formed, but those figures imply that the company's decision to form a water company has been financially astute. The dissident

has stated publicly that the water business should be expanded, indicating its approval of this decision.

### Executive Compensation

As the company has grown in revenue, market capitalization, and complexity, compensation for trustees and its co-general agents has risen substantially. Trustee compensation grew from $2,000 in 2017 to $104,000 in 2018. The rationale for the change, to adjust for inflation since the original trustee compensation was set in 1888, appears reasonable. The $104,000 figure does not appear unreasonable for a company of TPL's size.

Management compensation has also risen. For example, former general agent (CEO) David Peterson received $354,000 in total compensation in 2015, his last full year in that role. Current co-general agents Ty Glover (CEO) and Robert Packer (CFO) each received approximately $2.3 million in 2018. A significant driver of the company's greater size and complexity has been the creation of the water company. As this appears strategically logical and financially beneficial, it does not appear that management is using the water company to justify higher compensation through "empire-building."

Despite such large increases, TPL's management compensation in 2018 was less than management compensation at peers which have delivered substantially weaker TSR: 11 peers have reported management compensation for 2018 in their proxy statements; at those peers, median total compensation was $7.0 million for the CEO (3x TPL's CEO compensation) and $3.6 million for the CFO (1.5x TPL's CFO compensation). We acknowledge that TPL's 71 full-time employees (as of Jan. 31,


2019), are far fewer than those at the companies which ISS selected as peers, so this is not an apples-to-apples comparison.

It is nonetheless troubling that trustees and management own so few shares. CEO Glover's 100 shares were valued at $80,000 and CFO Packer's 200 were valued at $160,000, using TPL's closing price on April 30. Unlike many companies today, TPL does not have any minimum share ownership requirements, for either trustees or management. It would seem reasonable that the company could improve executive compensation by setting a share ownership target and requiring that management use a certain percentage of its annual cash bonus to buy shares in the open market, until managers reach that target. Such a change would be more in line with contemporary corporate governance best practices and would align management's interests more tightly with those of shareholders.

## Corporate Governance

TPL's 2018 10-K refers readers to TPL's 2002 10-K, which provides the governing document for TPL. The 2002 10-K shows the original trust document, created in 1888. That document does not provide for a way to decrease or increase the number of trustees or for regular elections of trustees, establishing that a new trustee will be elected "in the event of the death, resignation or disqualification of any of the trustees."

Though the company could attempt to change the terms of the trust through the courts, it is not clear how a court would view such a move, or even in which state the change would need to occur. The trust was drawn up and filed in New York, but all its physical assets are in Texas, and TPL now has no physical presence in New York. Trustees so far have not attempted to change the trust through the courts, but that appears to be an avenue that they could pursue.

The ability to elect directors is the most important use of the shareholder franchise. However, TPL's current governance structure denies shareholders that basic right. The trust's original governing document states that, "the trustees may in their discretion take such action as they may deem advisable under any general or special law of any state, to form a corporation for carrying out the purposes declared in this instrument." Converting TPL from a trust to a corporation would appear to allow for the establishment of a board with more than three directors, whom shareholders could elect on an annual basis.

Fundamentals and TSR are strong now, which undoubtedly underpins the "if it ain't broke don't fix it" view expressed by the current trustees during engagement with ISS in regard to TPL's current governance structure. The point of corporate governance, however, is to prevent something from breaking in the first place. Moreover, improving corporate governance under present conditions would seem far more proactive than waiting to fix governance under the backdrop of weaker industry or company fundamentals, particularly given the cyclicality of the oil & gas industry. Industry conditions, company fundamentals, and the share price may all change, prompting shareholders to seek more active engagement with management and those overseeing them. Yet, the current structure

provides limited opportunity for shareholder oversight.

The trust has not yet pursued converting to a corporation; during engagement with ISS, the trustees stated that no shareholders had previously pushed for such a change, and as such, the company did not want to incur the expense of hiring outside experts to evaluate the benefits and risks of such a conversion. The trustees did not appear unwilling, however, to consider that possibility. As evidence of the trustees' willingness to consider such changes, after the dissident privately suggested converting to an MLP in 2016, the trustees apparently explored that suggestion in good faith, consulting with two outside law firms before determining that such a move was not in the best interests of TPL – a prudent decision in light of subsequent tax law changes.

Prior to the dissident's public campaign, the company's succession process for departed trustees did not inspire confidence among shareholders. John Norris III became a trustee in 2000 after representing TPL as a lawyer for many years. Despite his extensive familiarity with the company, David Barry, who became a trustee in 2017, brought arguably duplicative experience as a lawyer who had represented TPL for many years. Earlier this year, the company initially nominated Preston Young as a trustee, naming him on its preliminary proxy. Young is regional managing partner and leads the Houston office of Stream Realty Partners, a real estate investment, development, and services company. While his commercial real estate background appears relevant, Young does not have operational experience in the oil and gas industry or any public company board experience - skill sets apparently



lacking among current trustees. Given the fact that Young is 39 years old, he might have served an extensive tenure as a trustee.

The proxy does not indicate that the trustees had run a process before nominating Young. They considered and declined to nominate Oliver, whose resume they had received, despite his familiarity with TPL, the oil & gas industry, and the region in which it operates. It was only after the dissident disclosed its intent to nominate Oliver that trustees began running a formal process to find a new director, engaging with search firm Spencer Stuart.

Management nominee Cook, who was suggested by the company's outside counsel, appears to be a more appropriate candidate than Young. Cook brings substantial experience as a public company board member, having been a director of Crane Co. for 14 years and previously, of Burlington Northern Santa Fe Railroad for five years. If nothing else, the dissident campaign has spurred management to nominate a far better candidate than originally planned. That alone has brought value to shareholders.

### ISS Conclusion: Is Change Warranted?

Industry tailwinds have been at the company's back in recent years, but that does not negate the strong TSR which the company has delivered. Furthermore, its fundamental performance appears solid, including that from the newly formed water company, which appears strategically and financially sound.

The amount of executive compensation is less than at peers, although prohibitions on TPL issuing shares make the all-cash nature of that compensation less than optimal. These prohibitions have resulted in de minimis share ownership by management and trustees, which could be corrected through requiring management and trustees to buy shares in the open market and establishing a minimum ownership requirement.

The dissident has shone a spotlight on the company's governance weaknesses, including lax oversight of the previous general agent and a board of trustees that appears to lack members with deep industry experience and financial knowledge. Without a doubt, however, the most troubling aspect of TPL's current governance structure is the lifetime appointment of trustees. This appears to be an anachronism from when TPL was created in 1888 and has not evolved to reflect governance practices appropriate for a publicly traded company with a $6 billion market capitalization. While the company has some remedies available, such as converting to a corporation or seeking to modify the trust through the courts, the trustees have not yet taken steps in that direction. Considering this current framework, the trustee selection process prior to the dissident campaign was clearly suboptimal.

The dissident has stated publicly that its goals are to create a board of directors and implement annual elections for all shareholders, each of which would be extremely positive. Converting to a C-corporation, the corporate form of most publicly traded companies, may or may not be beneficial to shareholders in the long term; determining whether that would benefit long-term shareholders is beyond the scope of this analysis, as it would require detailed information currently available only to the trustees and management. However, it certainly seems worthwhile to thoroughly examine the benefits and drawbacks of such a conversion.

The company has stated that Horizon Kinetics may be seeking to gain liquidity for its large holding by looking to sell the company. Horizon Kinetics' ownership of 1.8 million shares is 85x TPL's average daily trading of 21,000 shares, based on year-to-date volume, ending April 30, making that a plausible argument. However, conversion to a C-corporation with an annually elected board would likely broaden the base of shareholders willing to buy TPL and boost confidence in its governance. Both of those items could improve TPL's liquidity and the multiples at which it trades, thus providing Horizon Kinetics greater liquidity without any type of corporate sale.

On balance, the dissident has presented a compelling case that shareholder oversight is needed through the election of an independent trustee capable of assessing the shortcomings of the current governance structure and pushing for appropriate improvements.

### QUESTION 2: WHICH NOMINEE?

Both current nominees appear to be far better choices than the company's original nominee, who would have potentially served for decades, despite having no experience in the oil & gas industry or as a public company director, as well as potential ties to one of the incumbent trustees.

Oliver and his fellow dissidents brought to investors' attention TPL's governance weaknesses. The dissident group comprises long-term holders of TPL, with an aggregate ownership of 25.0 percent of



**ISS** Special Situations Research
*May 7, 2019*

shares, whose economic interests seem more aligned with the interests of the broader shareholder base than those of management and the incumbent trustees, who receive generous cash compensation and own very few shares.

Oliver also has extensive knowledge of the oil & gas business, especially in the Permian Basin, where TPL has royalty interests and operates its water company. This could address the lack of industry knowledge among the current trustees, enhancing management oversight and preventing future failures like the apparent conflict of interest involving TPL's former general agent.

However, the dissident group has not publicly addressed some of the company's allegations, including those related to Oliver's own potential conflicts of interests due to ownership of oil and gas royalty interests by AMEN, SoftVest, and their clients. (We note that current trustee Barry is president of Tarka Resources, Inc., which engages in oil & gas exploration in Texas, and thus would appear to have a similar potential for conflicts). The questions about Oliver's involvement on the boards of AMEN and of First National Bank of Midland may simply boil down to bad optics; in any event, such experiences appear hardly relevant to being a trustee of a $6 billion, publicly traded company. Perhaps the most meaningful criticism of the dissident is the fact that though its strongest argument revolves around TPL's governance shortcomings, its nominee has no public corporate governance track record at a company in any way comparable to TPL.

Management nominee Cook, on the other hand,

does not appear to have experience in oil & gas or in real estate, which would be additive to the current board of trustees. He does, however, have a public track record that seems to reflect direct efforts to improve the governance of the companies on whose boards he has served.

Cook brings substantial experience as a public company board member, as well as chairman of the San Antonio chapter of the National Association of Corporate Directors. In fact, he appears to have played an integral part in the effort to de-classify the board of Crane. At Crane's first annual meeting after Cook became the chairman of the Nominating and Governance Committee, the company granted shareholders a vote on whether to de-classify its board, which shareholders approved. Cook's track record appears to reflect a willingness and ability to push for corporate governance changes that benefit shareholders.

During engagement with ISS, Cook expressed his view that TPL's governance framework needs a serious and prudent review; he also specifically stated that he did not endorse the notion of lifetime appointments. Cook has pledged publicly to serve as a change agent for TPL's corporate governance, including resigning as a trustee after no more than three years, to allow shareholders to evaluate his performance and determine whether to retain him.

Three years is far better than a lifetime appointment, though some shareholders may find that to be a long time to demonstrate concrete progress toward needed changes. The fact that Cook was identified as a potential candidate by

legal advisors representing TPL as part of this proxy contest could also heighten shareholder skepticism regarding the management nominee. This issue notwithstanding, there seem to be fewer concerns regarding Cook's public record than that of the dissident nominee, particularly in regard to potential conflicts of interest. On balance, Cook's public record as a director suggests that his experience and abilities may be more suited to drive changes that may be needed at TPL.

## Vote Recommendation

The dissident has made a valid case that change is warranted, as having three trustees serving lifetime appointments is well out of step with contemporary best practices for corporate governance at publicly traded companies. Improved oversight is needed through the election of an independent trustee capable of assessing the shortcomings of the current governance structure and pushing for appropriate improvements.

The dissident campaign has already benefited shareholders by preventing the election of a suboptimal candidate initially nominated by the company. However, current management nominee Cook – who has publicly acknowledged the need for TPL's governance to evolve and has committed to resigning within three years so that shareholders can assess his performance and vote on his potential reelection – appears to have more relevant experience than the dissident nominee as a public company director, particularly in the area of corporate governance. Therefore, a vote FOR nominee Cook on the management (BLUE) card is warranted.



ISS Special Situations Research

*May 7, 2019*

## 1-Year Total Shareholder Return



*Source: Bloomberg Finance LP*



## 3-Year Total Shareholder Return



*Source: Bloomberg Finance LP*



ISS Special Situations Research
*May 7, 2019*

## 5-Year Total Shareholder Return



*Source: Bloomberg Finance LP*

www.issgovernance.com
© 2019 ISS | Institutional Shareholder Services Inc.



ISS Special Situations Research

*May 7, 2019*

# Historical Financial Performance

| Texas Pacific Land Trust | FY 2018 | FY 2017 | FY 2016 | FY 2015 | FY 2014 | FY 2013 | Five-Year CAGR |
|---|---|---|---|---|---|---|---|
| | 12/31/2018 (mils) | 12/31/2017 (mils) | 12/31/2016 (mils) | 12/31/2015 (mils) | 12/31/2014 (mils) | 12/31/2013 (mils) | |
| Market Cap | $ 4,211 | $ 3,501 | $ 2,353 | $ 1,070 | $ 994 | $ 855 | 37.6 % |
| **Income Statement** | | | | | | | |
| Revenue | $ 300.2 | $ 154.6 | $ 59.9 | $ 79.4 | $ 55.1 | $ 43.6 | 47.1 % |
| COGS | | | | | | | |
| SG&A | $ 39.4 | $ 9.7 | $ 4.9 | $ 4.2 | $ 3.8 | $ 4.0 | 58.2 % |
| EBITDA | $ 263.4 | $ 145.3 | $ 55.1 | $ 75.3 | $ 51.3 | $ 39.7 | 46.0 % |
| Adjusted EBITDA | $ 263.4 | $ 145.3 | $ 55.1 | $ 75.3 | $ 51.3 | $ 39.6 | 46.0 % |
| Operating Income | $ 260.8 | $ 144.9 | $ 55.1 | $ 75.3 | $ 51.3 | $ 39.6 | 45.8 % |
| Net Income | $ 209.7 | $ 97.2 | $ 37.2 | $ 50.0 | $ 34.8 | $ 27.2 | 50.4 % |
| EPS (Adjusted) | $ 26.93 | $ 12.38 | $ 4.66 | $ 6.10 | $ 4.14 | $ 3.16 | 53.5 % |
| **Balance Sheet** | | | | | | | |
| Cash & ST Investments | $ 119.6 | $ 79.6 | $ 49.4 | $ 45.0 | $ 26.8 | $ 13.2 | 55.3 % |
| Total Debt | | | | | | | |
| Shareholder's Equity | $ 244.7 | $ 105.1 | $ 47.6 | $ 45.7 | $ 26.7 | $ 17.9 | 68.7 % |
| **Cash Flow** | | | | | | | |
| Operating Cash Flow | $ 191.6 | $ 93.8 | $ 41.0 | $ 49.6 | $ 38.9 | $ 30.1 | 44.8 % |
| Capex | $ (57.3) | $ (18.7) | $ (1.0) | $ (0.2) | $ (0.1) | $ (0.1) | NM |
| Free Cash Flow | $ 134.4 | $ 75.1 | $ 40.0 | $ 49.3 | $ 38.8 | $ 30.0 | 35.0 % |
| **Margins and Return Ratios** | | | | | | | **Change (ppt)** |
| EBITDA Margin | 87.7 % | 94.0 % | 92.0 % | 94.8 % | 93.2 % | 90.9 % | (3.2) |
| Adjusted EBITDA Margin | 87.7 % | 94.0 % | 92.0 % | 94.8 % | 93.1 % | 90.9 % | (3.1) |
| Operating Margin | 86.9 % | 93.7 % | 91.9 % | 94.8 % | 93.1 % | 90.9 % | (4.0) |
| Return on Assets | 103.5 % | 106.6 % | 66.0 % | 119.8 % | 125.4 % | 125.0 % | (21.5) |
| Return on Common Equity | 119.9 % | 127.3 % | 79.8 % | 138.2 % | 155.7 % | 162.4 % | (42.5) |
| Return on Invested Capital | 118.6 % | 121.9 % | 74.5 % | 135.2 % | 146.2 % | 133.5 % | (14.9) |

*Source: Bloomberg Finance LP*



ISS Special Situations Research
*May 7, 2019*

# Shareholder Base

**Texas Pacific Land Trust**

| | | Ownership Stake | | | | |
|---|---|---|---|---|---|---|
| | | **Shares** | **Pct O/S** | **Filing** | **Date** | **Investor Type** |
| 1 | Horizon Kinetics | 1,827,837 | 23.6% | Form 4 | 4/30/19 | Investment Advisor |
| 2 | First Manhattan | 155,213 | 2.0% | 13F | 3/31/19 | Investment Advisor |
| 3 | UBS | 147,414 | 1.9% | ULT-AGG | 12/31/18 | Investment Advisor |
| 4 | SoftVest | 130,500 | 1.7% | 13D | 3/15/19 | Unclassified |
| 5 | First Dallas Holdings | 98,873 | 1.3% | ULT-AGG | 3/31/19 | Investment Advisor |
| 6 | Pacific Heights Asset Management L | 77,500 | 1.0% | 13F | 3/31/19 | Investment Advisor |
| 7 | Maurice Meyer | 72,046 | 0.9% | Form 4 | 11/19/18 | Unclassified |
| 8 | MRM-Horizon Advisors | 57,535 | 0.7% | 13F | 12/31/18 | Investment Advisor |
| 9 | Fil | 51,509 | 0.7% | ULT-AGG | 12/31/18 | Investment Advisor |
| 10 | Lawson Kroeker Investment Mgmt | 46,896 | 0.6% | 13F | 3/31/19 | Investment Advisor |
| 11 | Morgan Stanley | 44,272 | 0.6% | ULT-AGG | 12/31/18 | Investment Advisor |
| 12 | BNY Mellon | 39,367 | 0.5% | ULT-AGG | 12/31/18 | Investment Advisor |
| 13 | Universal Guaranty Life Insurance | 38,300 | 0.5% | Sch-D | 9/30/18 | Insurance Company |
| 14 | Polar Capital Partners | 37,265 | 0.5% | ULT-AGG | 12/31/18 | Investment Advisor |
| 15 | Schwartz Investment Counsel | 35,400 | 0.5% | 13F | 12/31/18 | Investment Advisor |
| 16 | White Elm Capital | 21,825 | 0.3% | 13F | 12/31/18 | Hedge Fund Manager |
| 17 | Vanguard Group | 21,241 | 0.3% | ULT-AGG | 12/31/18 | Investment Advisor |
| 18 | Wells Fargo | 20,787 | 0.3% | ULT-AGG | 12/31/18 | Investment Advisor |
| 19 | Santa Monica Partners | 17,892 | 0.2% | 13D | 4/8/19 | Investment Advisor |
| 20 | Moors & Cabot | 17,303 | 0.2% | 13F | 12/31/18 | Investment Advisor |
| | | 2,958,975 | 38.1% | | | |

*Source: Bloomberg Financial LP*



# Background

**Texas Pacific Land Trust (TPL)** was organized in 1888 and owns approximately 900,000 surface acres of land in the Permian Basin in West Texas and has Non-Participating Royalty Interest (NPRI) rights to oil and natural gas below the surface on approximately 455,000 acres. It receives revenue from oil and gas royalties (41 percent of 2018 revenue), water services (21 percent), easements across its land (30 percent), and sales of royalties and land.

**SoftVest Advisors** is a shareholder of TPL with a 1.7 percent stake. It is part of a group with **Horizon Kinetics** (23.2 percent shareholder) and **ART-FGT LP** (0.1 percent shareholder).

## Unusual Structure

TPL is structured as a trust. Sub-shares in the trust's Certificates of Proprietary Interest are traded on the New York Stock Exchange under the symbol "TPL." TPL is governed by an 1888 Declaration of Trust which was filed in New York state. That declaration stipulates that there will be three trustees and provides no mechanism for increasing or decreasing the number of trustees. The declaration is silent on the issue of removing trustees - who effectively have lifetime appointments - stating that in the event of the death, resignation, or disqualification of any trustee, a successor shall be elected at a special meeting. The declaration states that trustees may convert the trust to a corporation. The current trustees are John Norris III and David Barry. They have served for 19 years and two years, respectively.

# Key Events

**March 8, 2016:**   Horizon Kinetics files a Schedule 13D, indicating 20.3 percent ownership and that its shares were purchased for investment purposes only.

**June 29, 2016:**   SoftVest and ART-FGT Family Partners Limited submit a restructuring proposal to TPL, suggest converting TPL into a master limited partnership (MLP).

**Sept. 29, 2016:**   TPL provides written response to MLP proposal.

**Oct. 25, 2016:**   SoftVest and ART-FGT submit second restructuring proposal to TPL.

**Dec 15, 2016:**   SoftVest and ART-FGT submit third restructuring proposal to TPL, suggesting that TPL be converted into a corporation and then possibly, an MLP.

**Dec. 19, 2016:**   TPL sends letter to SoftVest and ART-FGT, saying proposal is under review.

**June 8, 2017:**   TPL announces formation of Texas Pacific Water Resources, a new business providing water services to companies drilling oil & gas wells in the Permian Basin.

**Oct. 24, 2017:**   TPL replies that it has reviewed the proposals and has determined that it is not in the best interests of TPL holders to restructure, primarily due to uncertainty over tax implications.

**July 23, 2018:**   Horizon Kinetics files an amended Schedule 13D, indicating 23.5 percent ownership and that its shares were purchased for investment purposes only.

**Feb. 25, 2019:**   Maurice Meyer III resigns as trustee for medical reasons.

**Feb. 26, 2019:**   Allan Tessler of ART-FGT suggests Eric Oliver of SoftVest as a nominee.

**Feb. 28, 2019:**   Oliver delivers his resume to TPL CFO Robert Packer, and trustees review his qualifications.

**March 4, 2019:**   TPL discloses that trustees have nominated Preston Young as a trustee, to be voted on at special meeting on May 8.

**March 15, 2019:**   Horizon, SoftVest, & ART-FGT file a Schedule 13D, forming a group and announcing intent to nominate Oliver as a trustee. Horizon files an amended Schedule 13D, indicating intent to engage with investors and trustees to maximize value of TPL.



ISS Special Situations Research
*May 7, 2019*

**March 19, 2019:**   SoftVest delivers to TPL formal notice of its intent to nominate Oliver as a trustee. Following receipt of this notice, the trustees engage executive search firm Spencer Stuart and begin a process in which they consider more than 15 trustee candidates that Spencer Stuart identifies.

**March 25, 2019:**   TPL postpones special meeting from May 8 until May 22.

**March 25, 2019:**   Dissident group files preliminary proxy statement.

**March 28, 2019:**   TPL files preliminary proxy statement, nominating Preston Young as trustee.

**March 27, 2019:**   TPL's management discusses with Horizon Kinetics the possibility of identifying a mutually acceptable compromise candidate.

**April 6, 2019:**   Horizon Kinetics indicates it will not consider candidates other than Oliver as a nominee.

**April 8, 2019:**   TPL files definitive proxy statement, nominating Donald Cook as trustee.

**April 8, 2019:**   Santa Monica Partners files a Schedule 13D, indicating 0.2 percent ownership and its support for the dissident.

**April 9, 2019:**   Dissident group files definitive proxy statement.

**April 25, 2019:**   Mission Advisors writes an open letter, stating substantial but unspecified TPL ownership, and its support for the company.


# Dissident Critique

The dissident argues that TPL's strong shareholder returns are driven by TPL passively benefiting as other companies drill more oil & gas wells on TPL's land. It claims that TPL's recent growth in operational scope and employees are a deviation from TPL's original purpose as a liquidating trust. The dissident would fix what it says is weak corporate governance with limited disclosure, no requirements for annual meetings, and trustees who serve lifetime appointments.

## Stock Price Due to Strong Environment

According to the dissident, while TPL's stock price has risen in recent years, it has trailed the increase in production of oil & gas from which it receives royalties. The dissident notes that from 2013 through 2018, royalty barrel of oil equivalent (BOE) production rose 746 percent, while TPL shares rose 448 percent from Dec. 31, 2013 through Dec. 31, 2018. According to the dissident, Chevron, the primary operator on TPL's acreage, is driving the growth of the royalty portfolio, along with other operators.

The dissident argues that energy companies' spending on water management in the Permian Basin has risen sharply since 2011 and is expected to increase through 2022, driven by drilling activity and more tightly clustered wells. It notes that TPL's water revenue was $11.7 million in 1H 2017, and grew 219 percent vs. 1H 2016, even before TPL formed a water division in June 2017. The dissident states that easement and sundry income stagnated from 2017 to 2018.

## Deviation from Original Purpose

The dissident claims that recent growth in operations and employees are a deviation from TPL's original purpose as a liquidating trust. It states that variable operating expenses in 2018 were almost 10 times those in 2016, outstripping the growth in both revenue (4.5x) and revenue excluding land sales and oil & gas royalties (4.4x). It claims that the increased capital and operating expenses have resulted in a reduction in the ratio of (share repurchases + dividends) / revenue, from 66.2 percent in 2016 to 28.3 percent in 2018. The dissident states that the company has invested $62 million of capital thus far in the water business. It argues that poor disclosure prevents it from determining the returns on that

capital and the accompanying large increase in employees and employee salaries and expenses.

The dissident also questions the logic of recent asset sales in core areas, including a $100 million land sale to WPX Energy earlier in 2019, and other transactions in TPL's core area. It also wonders if the trustees and general agents (CEO and CFO) are qualified to negotiate deals of that size with large and sophisticated buyers.

## Corporate Governance and Executive Compensation

The dissident claims that there is no precedent for a company which is an operating business to be structured as a business trust, nor any justification to forego disclosures, controls, and governance of a modern operating corporation. It notes that TPL has three trustees who serve lifetime appointments. The dissident points out that no annual meetings are required, with shareholders only able to vote on a trustee when an incumbent trustee dies, resigns, or is disqualified. According to the dissident, TPL has held only four shareholder meetings in the last 30 years.

The dissident argues that the current trustees lack relevant experience. It notes that both have spent their careers as attorneys and that in TPL's 2018 10-K, the trustees acknowledge that no current trustee would meet the definition of an audit committee financial expert.

According to the dissident, trustees have ignored and failed to disclose conflicts. It asserts that in 2015, then-general agent David Peterson entered into a development agreement with the Cocanougher family and Wise Oil to develop more than 120,000 acres of water in Culberson County, then went to work for the same company the next year. The dissident argues that there was no disclosure about this transaction or Peterson's departure from TPL. The dissident states that trustee Barry serves as president of Tarka Resouces, the subsidiary of an E&P company which has drilled on TPL's land. It states that TPL failed to disclose that the firm which employs former trustee nominee Preston Young manages three large buildings owned by Barry's firm.

The dissident says that trustees recently increased their own pay by 52x, while increasing management compensation by over 10x, without shareholder


disclosure or approval. The dissident notes that trustees and directors combine to own 1,600 shares, which represents a dramatic decline and the lowest inside ownership level over the past 30 years. It claims that the general agents' incentives to earn large bonuses are tied to short-term profits and that unlike shareholders, the general agents have little to gain from long-term stock appreciation.

## Dissident's Plan

The dissident believes that TPL would benefit from converting into a Delaware corporation, and it would fully explore such a conversion. It says that it would seek to create an expanded board of directors, to be elected annually and including an audit committee expert and several oil and gas professionals. The dissident would look to increase company disclosure and to further develop the water business. It would commit to returning capital to shareholders, including setting parameters for stock repurchases and dividends.


# Management Response

The company asserts that it has generated outstanding shareholder returns over long time periods, in part due to execution of its strategy to drive value from TPL's assets, including through land sales and the creation of a water company. It points out that it has returned substantial capital to shareholders in recent years, through both dividends and share repurchases. According to the company, it has shown an openness to changes in corporate governance structure. It argues that the dissident has limited experience as a public company director.

## Extraordinary Shareholder Returns

The company points out that TPL's total shareholder return far exceeds the change in the price of West Texas Intermediate (WTI) crude oil, and the TSR of the S&P 500 Exploration & Production Index and the S&P 500 Index, for trailing time periods of one through almost 19 years, ending with March 15, 2019, the day that the dissident publicly disclosed its intention to nominate a trustee. According to the company, TPL's five-year TSR was 474.7 percent, compared to 69.8 percent for the S&P 500 Index and (54.2) percent for the S&P 500 Exploration & Production Index.

## Strong Business Strategy

The company states that oil & gas rigs and water volumes across the Permian have increased in recent years. It asserts that it has consolidated its strong surface footprint in the Permian Basin through acquiring, divesting, and swapping land; this includes selling 14,000 non-core surface acres to WPX Energy for $100 million and redeploying that to purchase surface acreage in TPL's core area – which was originally designated in a checkerboard pattern – such that it can increase its contiguous ownership.

The company notes that its expansive surface acreage gives it a significant advantage when developing water infrastructure. TPL in June 2017 began taking a more active approach, when it formed Texas Pacific Water Resources to provide a full-service water offering to companies drilling oil & gas wells in the Permian Basin. To lead this division, TPL hired two former executives at EOG Resources who were involved with sourcing water in the Permian Basin. This segment includes providing brackish water for use in fracking wells, collecting and recycling water used during oil & gas production, and designing and building water infrastructure. TPL claims that the water company has negotiated numerous long-term contracts with major oil companies or large independents. TPL notes that water revenue rose from $11.8 million in 1H 2017 to $50.0 million in 2H 2018. During engagement with ISS, management indicated that it expected headcount for the water business to grow from 35 to 50 people in the near future.

## Returning Capital to Shareholders

According to the company, TPL has returned approximately $200 million to shareholders through dividends or share repurchases, from 2016 and including a dividend declared in February 2019. It states that TPL has a disciplined history of returning capital to shareholders through dividends and stock buybacks, including consistently paying dividends for more than 60 years.

The company points out that as a liquidating trust, TPL has not issued additional equity since its inception in 1888 and is not authorized to issue any new equity. During engagement with ISS, the company stated that TPL is not allowed to repurchase equity and then use those repurchased shares for other purposes, such as compensating executives.

## Corporate Governance

The company asserts that its compensation program was designed to be competitive and align with long term shareholders' interests. It notes that executives' bonuses are based on individual performance, company performance, and shareholder returns. The company states that a respected independent compensation consultant benchmarked management's compensation at significantly below the 25th percentile of peers' compensation. During engagement with ISS, the company noted that most companies grant executives equity and do not require them to purchase equity with their own money. It further adds that trustees had received $2,000 annually prior to Jan. 1, 2018, and that their current compensation of $104,000 per year reflects an inflation adjustment based on the $2,000 annual compensation set in the original trust.



During engagement with ISS, the company conceded that its former general agent had signed a contract which was not favorable toward TPL. The trustees indicated that they were not aware of that contract before it was signed and that the company changed the contract after his departure.

The company argues that the trust structure protects shareholders, as that structure recognizes the need for long-term stewardship, given the unique nature of TPL's assets. It states that a liquidating trust does not have the capital needs that a corporate structure typically provides, reflecting its longstanding mission of returning cash to shareholders. The company notes that trustees are fiduciaries with a special duty of loyalty to the beneficiaries.

According to the company, it has demonstrated that it would consider changes which might be in the long-term interests of shareholders, but that it would only make such changes after a thorough evaluation. It argues that it has taken several actions to build TPL, including expanding its leadership team, enhancing investor disclosure, and using outside tax and legal experts while evaluating a conversion to an MLP.

During engagement with ISS, management nominee Cook acknowledged that the governance framework needed a serious and prudent review and specifically noted that he did not agree with the notion of lifetime appointments.

## Critique of the Dissident

The company claims that dissident nominee Oliver directly or indirectly owns numerous oil and gas royalty and working interests in the Permian Basin, and that as a trustee, he could gain access to non-public information that could give him an edge in those business dealings. According to the company, Oliver did not answer any questions on the company's standard director questionnaire, which would require him to disclose information such as potential conflicts of interest; management nominee Cook submitted the same questionnaire.

The company argues that Oliver has served as a director of only one public company, a micro-cap firm called AMEN Properties which was de-listed from NASDAQ and trades on the pink sheets. It notes that AMEN's annual reports from 2011 through 2018 also list Oliver as a director of First National Bank of Midland, a claim the company cannot verify, as the bank no longer appears to operate.

Furthermore, the company claims that AMEN has violated its publicly stated "tithing" commitment of donating 10 percent of net earnings to Christian organizations by paying an additional dividend of 10 percent of earnings to its shareholders (including the Oliver family, which purportedly controls 20 percent of AMEN) and simply labelling it as a "tithing dividend."

The company questions Oliver's business judgment, noting that Oliver in 2016 forcefully advocated converting the trust to a Master Limited Partnership (MLP). After hiring outside advisors and carefully contemplating the proposed conversion, the trust decided in October 2017 not to convert; TPL shares have since risen 128 percent, while the Alerian MLP Index has risen only 3 percent, a clear indication that MLP structures have fallen out of favor.

Finally, the company expresses concern that dissident group member Horizon Kinetics may be seeking a liquidity event, due to its large holdings of TPL in many funds with poor relative performance, which would not be in the best interests of TPL's long-term shareholders. The company also dismisses public third-party support for the dissident, pointing out that these shareholders have longstanding ties to the dissident group and may be attempting to overstate the significance of their small ownership stakes.



# Analytic Framework

In analyzing proxy contests, ISS focuses on two central questions:

1. Have the dissidents made a compelling case that change is warranted?

2. If so, which nominees are most likely to drive that change?

When the dissidents are seeking a minority position on the board, ISS does not require a detailed plan of action, nor that the dissidents prove their plan is preferable to the incumbent board. Instead, ISS will require that dissidents prove that change is preferable to the status quo and that the dissident slate will add value to board deliberations of the issues at hand.

# 1. Is Change Warranted?

## Total Shareholder Return (TSR) and Fundamental Performance

The company has stated that TPL has no true peers, and the dissident has not specified any peers. ISS utilized 13 E&P companies with market capitalization as of April 30, 2019 between $2.5 billion and $10 billion as illustrative peers. Eight of those peers have been trading publicly for at least five years.

For the five years ending on the unaffected date of March 14, 2019, the last day before the dissident announced its intent to nominate Oliver, TPL delivered TSR well above any of the peers. For every time period ending on the unaffected date, TPL's TSR far exceeded the peer median and an industry benchmark, the S&P Oil & Gas E&P Select Industry Index. For example, over the one year ending on the unaffected date, TPL's TSR was 44.9 percent, compared with (15.8) percent for the peer median and (11.9) percent for the index. For the five years ending on the unaffected date, TPL's TSR was 485.8 percent, compared with (40.7) percent for the peer median and (53.8) percent for the index. That substantial outperformance has continued through to a more recent date of April 30, 2019.

The dissident is correct in noting that TPL has benefited substantially from strong industry conditions, which the company itself acknowledges. TPL's royalty BOE production was 8.5x higher in 2018 than in 2013: 2.26 million BOE vs. 267,000 BOE. That is partly mitigated by lower oil and gas prices in 2018 vs. 2013, which resulted in oil and gas royalties in 2018 of $123.8 million, 5.1x their 2013 total of $24.5 million.

While it has been dealt a strong hand, management deserves some credit for the strong TSR that TPL has generated. One example is the water company which TPL formed in June 2017. Previously, TPL had entered into agreements with energy companies to allow them to drill water wells, construct water-related infrastructure, and purchase water sourced from TPL's land. By 2017, companies drilling for and producing oil & gas were drilling more wells and longer well laterals, resulting in increasing water demand. TPL created a water company which offers energy companies a full-service water offering, including water sourcing, treatment, and recycling, as well as infrastructure development. Forming this company has increased TPL's ability to generate revenue from the surface acres it owns and their accompanying water rights. This strategically sound decision was enhanced by TPL's ability to persuade two former executives from EOG Resources, a well-respected E&P company, to lead this division.

| **Total Shareholder Return** | | | | | | |
|---|---|---|---|---|---|---|
| | One-Year | | Three-Year | | Five-Year | |
| | Through Unaff. Date | Extended Through | Through Unaff. Date | Extended Through | Through Unaff. Date | Extended Through |
| | 3/14/2019 | 4/30/2019 | 3/14/2019 | 4/30/2019 | 3/14/2019 | 4/30/2019 |
| Texas Pacific Land Trust | 44.9 % | 56.6 % | 414.2 % | 455.9 % | 485.8 % | 533.3 % |
| Peer Median | (15.8)% | (7.6)% | (25.1)% | (20.7)% | (40.7)% | (41.4)% |
| S&P Oil & Gas E&P Select Index | (11.9)% | (9.3)% | 6.3 % | 9.5 % | (53.8)% | (52.4)% |
| Texas Pacific Land Trust B/(W) | | | | | | |
| Peer Median | 60.6 | 64.2 | 439.3 | 476.6 | 526.6 | 574.7 |
| S&P Oil & Gas E&P Select Index | 56.8 | 65.9 | 407.9 | 446.4 | 539.6 | 585.7 |

*Source: Bloomberg Finance LP. Peers include Cimarex Energy Co., EQT Corp., WPX Energy Inc., Chesapeake Energy Corp., Murphy Oil Corp., PDC Energy Inc., Kosmos Energy Ltd., and Whiting Petroleum Corp.*



With minimal contribution from the water company, TPL's water segment generated $11.7 million of revenue in 1H 2017. That was an increase over its revenue for all of 2016, when TPL generated $8.1 million in water revenue and TPL earned $5.2 million in net income. Last year, TPL generated $88.7 million in revenue and $50.1 million in net income from the water segment. Capital spending in the water segment for 2017-18 combined was $62.8 million. There is no way to determine how much the water segment would have earned in net income last year had the water company not been formed, but those figures imply that the company's decision to form a water company has been financially astute. The dissident has stated publicly that the water business should be expanded, indicating its approval of this decision.

## Executive Compensation

As the company has grown in revenue, market capitalization, and complexity, compensation for trustees and its co-general agents has risen substantially. Trustee compensation grew from $2,000 in 2017 to $104,000 in 2018. The rationale for the change, to adjust for inflation since the original trustee compensation was set in 1888, appears reasonable. The $104,000 figure does not appear unreasonable for a company of TPL's size.

Management compensation has also risen. For example, former general agent (CEO) David Peterson received $354,000 in total compensation in 2015, his last full year in that role. Current co-general agents Ty Glover (CEO) and Robert Packer (CFO) each received approximately $2.3 million in 2018. A significant driver of the company's greater size and complexity has been the creation of the water company. As this appears strategically logical and financially beneficial, it does not appear that management is using the water company to justify higher compensation through "empire-building."

Despite such large increases, TPL's management compensation in 2018 was less than management compensation at peers which have delivered substantially weaker TSR: 11 peers have reported management compensation for 2018 in their proxy statements; at those peers, median total compensation was $7.0 million for the CEO (3x TPL's CEO compensation) and $3.6 million for the CFO (1.5x TPL's CFO compensation). We acknowledge that TPL's 71 full-time employees (as of Jan. 31, 2019), are far fewer than those at the companies which ISS selected as peers, so this is not an apples-to-apples comparison.

It is nonetheless troubling that trustees and management own so few shares. CEO Glover's 100 shares were valued at $80,000 and CFO Packer's 200 were valued at $160,000, using TPL's closing price on April 30. Unlike many companies today, TPL does not have any minimum share ownership requirements, for either trustees or management. It would seem reasonable that the company could improve executive compensation by setting a share ownership target and requiring that management use a certain percentage of its annual cash bonus to buy shares in the open market, until managers reach that target. Such a change would be more in line with contemporary corporate governance best practices and would align management's interests more tightly with those of shareholders.

## Corporate Governance

TPL's 2018 10-K refers readers to TPL's 2002 10-K, which provides the governing document for TPL. The 2002 10-K shows the original trust document, created in 1888. That document does not provide for a way to decrease or increase the number of trustees or for regular elections of trustees, establishing that a new trustee will be elected "in the event of the death, resignation or disqualification of any of the trustees."

Though the company could attempt to change the terms of the trust through the courts, it is not clear how a court would view such a move, or even in which state the change would need to occur. The trust was drawn up and filed in New York, but all its physical assets are in Texas, and TPL now has no physical presence in New York. Trustees so far have not attempted to change the trust through the courts, but that appears to be an avenue that they could pursue.

The ability to elect directors is the most important use of the shareholder franchise. However, TPL's current governance structure denies shareholders that basic right. The trust's original governing document states that, "the trustees may in their discretion take such action as they may deem advisable under any general or special law of any state, to form a corporation for carrying out the purposes declared in this instrument." Converting TPL from a trust to a corporation would appear to allow for the establishment of a board with more than three directors, whom shareholders could elect on an annual basis.

Fundamentals and TSR are strong now, which undoubtedly underpins the "if it



ain't broke don't fix it" view expressed by the current trustees in regard to TPL's current governance structure. The point of corporate governance, however, is to prevent something from breaking in the first place. Moreover, improving corporate governance under present conditions would seem far more proactive than waiting to fix governance under the backdrop of weaker industry or company fundamentals, particularly given the cyclicality of the oil & gas industry. Industry conditions, company fundamentals, and the share price may all change, prompting shareholders to seek more active engagement with management and those overseeing them. Yet, the current structure provides limited opportunity for shareholder oversight.

The trust has not yet pursued converting to a corporation; during engagement with ISS, the trustees stated that no shareholders had previously pushed for such a change, and as such, the company did not want to incur the expense of hiring outside experts to evaluate the benefits and risks of such a conversion. The trustees did not appear unwilling, however, to consider that possibility. As evidence of the trustees' willingness to consider such changes, after the dissident privately suggested converting to an MLP in 2016, the trustees apparently explored  that suggestion in good faith, consulting with two outside law firms before determining that such a move was not in the best interests of TPL – a decision proven prudent in light of subsequent tax law changes.

Prior to the dissident's public campaign, the company's succession process for departed trustees did not inspire confidence among shareholders. John Norris III became a trustee in 2000 after representing TPL as a lawyer for many years. Despite his extensive familiarity with the company, David Barry, who became a trustee in 2017, brought arguably duplicative experience as a lawyer who had represented TPL for many years. Earlier this year, the company initially nominated Preston Young as a trustee, naming him on its preliminary proxy. Young is regional managing partner and leads the Houston office of Stream Realty Partners, a real estate investment, development, and services company. While his commercial real estate background appears relevant, Young does not have operational experience in the oil and gas industry or any public company board experience - skill sets apparently lacking among current trustees. Given the fact that Young is 39 years old, he might have served an extensive tenure as a trustee.

The proxy does not indicate that the trustees had run a process before nominating Young. They considered and declined to nominate Oliver, whose resume they had received, despite his familiarity with TPL, the oil & gas industry, and the region in which it operates. It was only after the dissident disclosed its intent to nominate Oliver that trustees began running a formal process to find a new director, engaging with search firm Spencer Stuart.

Management nominee Cook, who was suggested by the company's outside counsel, appears to be a more appropriate candidate than Young. Cook brings substantial experience as a public company board member, having been a director of Crane Co. for 14 years and previously, of Burlington Northern Santa Fe Railroad for five years. If nothing else, the dissident campaign has spurred management to nominate a far better candidate than originally planned. That alone has brought value to shareholders.

## ISS Conclusion: Is Change Warranted?

Industry tailwinds have been at the company's back in recent years, but that does not negate the strong TSR which the company has delivered. Furthermore, its fundamental performance appears solid, including that from the newly formed water company, which appears strategically and financially sound.

The amount of executive compensation is less than at peers, although prohibitions on TPL issuing shares make the all-cash nature of that compensation less than optimal. These prohibitions have resulted in de minimis share ownership by management and trustees, which could be corrected through requiring management and trustees to buy shares in the open market and establishing a minimum ownership requirement.

The dissident has shone a spotlight on the company's governance weaknesses, including lax oversight of the previous general agent and a board of trustees that appears to lack members with deep industry experience and financial knowledge. Without a doubt, however, the most troubling aspect of TPL's current governance structure is the lifetime appointment of trustees. This appears to be an anachronism from when TPL was created in 1888 and has not evolved to reflect governance practices appropriate for a publicly traded company with a $6 billion market capitalization. While the company has some remedies available, such as converting to a corporation or seeking to modify


the trust through the courts, the trustees have not yet taken steps in that direction. Considering this current framework, the trustee selection process prior to the dissident campaign was clearly suboptimal.

The dissident has stated publicly that its goals are to create a board of directors and implement annual elections for all shareholders, each of which would be extremely positive. Converting to a C-corporation, the corporate form of most publicly traded companies, may or may not be beneficial to shareholders in the long term; determining whether that would benefit long-term shareholders is beyond the scope of this analysis, as it would require detailed information currently available only to the trustees and management. However, it certainly seems worthwhile to thoroughly examine the benefits and drawbacks of such a conversion.

The company has stated that Horizon Kinetics may be seeking to gain liquidity for its large holding by looking to sell the company. Horizon Kinetics' ownership of 1.8 million shares is 85x TPL's average daily trading of 21,000 shares, based on year-to-date volume, ending April 30, making that a plausible argument. However, conversion to a C-corporation with an annually elected board would likely broaden the base of shareholders willing to buy TPL and boost confidence in its governance. Both of those items could improve TPL's liquidity and the multiples at which it trades, thus providing Horizon Kinetics greater liquidity without any type of corporate sale.

On balance, the dissident has presented a compelling case that shareholder oversight is needed through the election of an independent trustee capable of assessing the shortcomings of the current governance structure and pushing for appropriate improvements.



**ISS Special Situations Research**

*May 7, 2019*

# 2. Which Nominees?

## Director nominees

The company has nominated the following candidate:

**Donald Cook**, 72, is a consultant for Lockheed Martin Corporation. He has been a director since 2005 of Crane Corporation. He was a director of Burlington Northern Santa Fe Railroad from 2005 to 2010. Cook is a retired four-star General of the United States Air Force, in which he served for 36 years

The dissident is nominating the following candidate:

**Eric Oliver**, 60, is president of SoftVest Advisors, a registered investment adviser. Since 2001, including as chairman since 2002, he has been a director of AMEN Properties, Inc., which owns oil and gas royalty and working interests. Oliver was president of Midland Map Company, LLC, a Permian Basin oil and gas lease and ownership map producer from 1997 until its sale in January 2019 to Drilling Info. Oliver is principal of Geologic Research Centers LLC, which provides geological data to the oil and gas industry; and principal of TenTex Music LLC, a private music royalty partnership.

## Dissident Nominee Compensation

No compensation arrangements regarding the nominee for standing in this election were disclosed in the dissident's definitive proxy statement.

## ISS Conclusion: Which Nominee?

Both current nominees appear to be far better choices than the company's original nominee, who would have potentially served for decades, despite having no experience in the oil & gas industry or as a public company director, as well as potential ties to one of the incumbent trustees.

Oliver and his fellow dissidents brought to investors' attention TPL's governance weaknesses. The dissident group comprises long-term holders of TPL, with an aggregate ownership of 25.0 percent of shares, whose economic interests seem more aligned with the interests of the broader shareholder base than those of

management and the incumbent trustees, who receive generous cash compensation and own very few shares.

Oliver also has extensive knowledge of the oil & gas business, especially in the Permian Basin, where TPL has royalty interests and operates its water company. This could address the lack of industry knowledge among the current trustees, enhancing management oversight and preventing future failures like the apparent conflict of interest involving TPL's former general agent.

However, the dissident group has not publicly addressed some of the company's allegations, including those related to Oliver's own potential conflicts of interests due to ownership of oil and gas royalty interests by AMEN, SoftVest, and their clients. (We note that current trustee Barry is president of Tarka Resources, Inc., which engages in oil & gas exploration in Texas, and thus would appear to have a similar potential for conflicts). The questions about Oliver's involvement on the boards of AMEN and of First National Bank of Midland may simply boil down to bad optics; in any event, such experiences appear hardly relevant to being a trustee of a $6 billion, publicly traded company. Perhaps the most meaningful criticism of the dissident is the fact that though its strongest argument revolves around TPL's governance shortcomings, its nominee has no public corporate governance track record at a company in any way comparable to TPL.

Management nominee Cook, on the other hand, does not appear to have experience in oil & gas or in real estate, which would be additive to the current board of trustees. He does, however, have a public track record that seems to reflect direct efforts to improve the governance of the companies on whose boards he has served.

Cook brings substantial experience as a public company board member, as well as chairman of the San Antonio chapter of the National Association of Corporate Directors. In fact, he appears to have played an integral part in the effort to de-classify the board of Crane. At Crane's first annual meeting after Cook became the chairman of the Nominating and Governance Committee, the company granted shareholders a vote on whether to de-classify its board, which shareholders approved. Cook's track record appears to reflect a willingness and ability to push for corporate governance changes that benefit shareholders.



During engagement with ISS, Cook expressed his view that TPL's governance framework needs a serious and prudent review; he also specifically stated that he did not endorse the notion of lifetime appointments. Cook has pledged publicly to serve as a change agent for TPL's corporate governance, including resigning as a trustee after no more than three years, to allow shareholders to evaluate his performance and determine whether to retain him.

Three years is far better than a lifetime appointment, though some shareholders may find that to be a long time to demonstrate concrete progress toward needed changes. The fact that Cook was identified as a potential candidate by legal advisors representing TPL as part of this proxy contest could also heighten shareholder skepticism regarding the management nominee. This issue notwithstanding, there seem to be fewer concerns regarding Cook's public record than that of the dissident nominee, particularly in regard to potential conflicts of interest. On balance, Cook's public record as a director suggests that his experience and abilities may be more suited to drive changes that may be needed at TPL.

## Vote Recommendation

The dissident has made a valid case that change is warranted, as having three trustees serving lifetime appointments is well out of step with contemporary best practices for corporate governance at publicly traded companies. Improved oversight is needed through the election of an independent trustee capable of assessing the shortcomings of the current governance structure and pushing for appropriate improvements.

The dissident campaign has already benefited shareholders by preventing the election of a suboptimal candidate initially nominated by the company. However, current management nominee Cook – who has publicly acknowledged the need for TPL's governance to evolve and has committed to resigning within three years so that shareholders can assess his performance and vote on his potential reelection – appears to have more relevant experience than the dissident nominee as a public company director, particularly in the area of corporate governance. On balance, Cook appears to be the best nominee to drive change needed at TPL. Therefore, a vote FOR management nominee Cook on the management (BLUE) card is warranted.

*The issuer that is the subject of this analysis may have purchased self-assessment tools and publications from ISS Corporate Solutions, Inc. (formerly known as ISS Corporate Services, Inc. and referred to as "ICS"), a wholly-owned subsidiary of ISS, or ICS may have provided advisory or analytical services to the issuer in connection with the proxies described in this report. These tools and services may have utilized preliminary peer groups generated by ISS' institutional research group. No employee of ICS played a role in the preparation of this report. If you are an ISS institutional client, you may inquire about any issuer's use of products and services from ICS by emailing disclosure@issgovernance.com.*

This proxy analysis and vote recommendation has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. While ISS exercised due care in compiling this analysis, it makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of this information and assumes no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.

ISS is an independent company owned by entities affiliated with Genstar Capital ("Genstar").  ISS and Genstar have established policies and procedures to restrict the involvement of Genstar and any of Genstar's employees in the content of ISS' analyses.  Neither Genstar nor their employees are informed of the contents of any of ISS' analyses or recommendations prior to their publication or dissemination. More information is available at https://www.issgovernance.com/compliance/due-diligence-materials/.

The issuer that is the subject of this proxy analysis may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS.

One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

ISS may in some circumstances afford issuers, whether or not they are clients of ICS, the right to review draft research analyses so that factual inaccuracies may be corrected before the report and recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with ISS.

ISS makes its proxy voting policy formation process and summary proxy voting policies readily available to issuers, investors and others on its public website: http://www.issgovernance.com/policy.

- - -

Copyright © 2019 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or redisseminated in whole or in part without prior written permission from ISS.



# The Global Leader in Corporate Governance

Founded in 1985 as Institutional Shareholder Services Inc., ISS is the world's leading provider of corporate governance and responsible investment (RI) solutions for asset owners, asset managers, hedge funds, and asset service providers. More than 1,900 institutional clients turn to ISS to apply their corporate governance views, identify environmental, social and governance risk, and manage their complete proxy voting needs on a global basis. ISS is a global company with approximately 1,200 employees spread across 19 offices in 13 countries.

For more information, please visit: www.issgovernance.com

# EXHIBIT E

PROXY PAPER
# TEXAS PACIFIC LAND TRUST


GLASS LEWIS

NYSE: **TPL**

ISIN: **US8826101086**

| | | | |
|---|---|---|---|
| **MEETING DATE:** | 22 MAY 2019 | **INDEX MEMBERSHIP:** | N/A |
| **RECORD DATE:** | 28 MARCH 2019 | **SECTOR:** | ENERGY |
| **PUBLISH DATE:** | 10 MAY 2019 | **INDUSTRY:** | OIL, GAS AND CONSUMABLE FUELS |
| | | **COUNTRY OF TRADE:** | UNITED STATES |
| **COMPANY DESCRIPTION** | | **COUNTRY OF INCORPORATION:** | UNITED STATES |
| | | **HEADQUARTERS:** | TEXAS |
| | | **VOTING IMPEDIMENT:** | NONE |

**COMPANY DESCRIPTION**

Texas Pacific Land Trust holds title to tracts of land in the state of Texas. The company operates through two segments, Land and Resource Management, and Water Service and Operations.

OWNERSHIP    COMPANY PROFILE    ESG PROFILE    COMPENSATION    COMPANY UPDATES    PEER COMPARISON

VOTE RESULTS    APPENDIX

## 2019 CONTESTED MEETING - MANAGEMENT (BLUE) CARD

| PROPOSAL | ISSUE | BOARD | GLASS LEWIS | CONCERNS |
|---|---|---|---|---|
| 1.00 | Election of Trustees | FOR | **FOR** | |
| 1.01 | Elect Donald G. Cook | FOR | **FOR** | |

## 2019 CONTESTED MEETING - DISSIDENT (WHITE) CARD

| PROPOSAL | ISSUE | BOARD | GLASS LEWIS | CONCERNS |
|---|---|---|---|---|
| 2.00 | Election of Trustees | DO NOT VOTE | **DO NOT VOTE** | |
| 2.01 | Elect Eric L. Oliver | DO NOT VOTE | **DO NOT VOTE** | |

## DISCLOSURE NOTES

**ENGAGEMENT:** On May 2, 2019, Glass Lewis held a conference call with representatives of SoftVest LP and Horizon Kinetics LLC, including the dissident group's trustee nominee, to discuss the proxy contest. On May 3, 2019, Glass Lewis held a conference call with senior executives and trustees of Texas Pacific Land Trust, including the board's trustee nominee, to discuss the proxy contest.

# SHARE OWNERSHIP PROFILE

## ▪ SHARE BREAKDOWN



| | 1 |
|---|---|
| **SHARE CLASS** | Certificates of Proprietary Interest |
| **SHARES OUTSTANDING** | 7.8 M |
| **VOTES PER SHARE** | 1 |
| **INSIDE OWNERSHIP** | 0.20% |
| **STRATEGIC OWNERS**\*\* | 0.20% |
| **FREE FLOAT** | 99.80% |

*SOURCE CAPITAL IQ AND GLASS LEWIS. AS OF 02-MAY-2019*



## ▪ TOP 20 SHAREHOLDERS

| | HOLDER | OWNED* | COUNTRY | INVESTOR TYPE |
|---|---|---|---|---|
| 1. | Horizon Kinetics LLC | 23.24% | United States | Traditional Investment Manager |
| 2. | First Manhattan Co. | 2.00% | United States | Traditional Investment Manager |
| 3. | UBS Asset Management | 1.90% | Switzerland | Traditional Investment Manager |
| 4. | SoftVest Management, LP | 1.68% | United States | Hedge Fund Manager/CTA |
| 5. | Pacific Heights Asset Management, LLC | 1.00% | United States | Traditional Investment Manager |
| 6. | Hodges Capital Management Inc. | 0.98% | United States | Traditional Investment Manager |
| 7. | Mrm Horizon Advisors | 0.74% | United States | Traditional Investment Manager |
| 8. | FIL Limited | 0.63% | Bermuda | Traditional Investment Manager |
| 9. | Lawson Kroeker Investment Management, Inc. | 0.60% | United States | Traditional Investment Manager |
| 10. | Morgan Stanley, Investment Banking and Brokerage Investments | 0.57% | United States | Bank/Investment Bank |
| 11. | BNY Mellon Asset Management | 0.51% | United States | Traditional Investment Manager |
| 12. | Polar Capital Holdings plc | 0.48% | United Kingdom | Traditional Investment Manager |
| 13. | Schwartz Investment Counsel, Inc. | 0.46% | United States | Traditional Investment Manager |
| 14. | First Dallas Securities, Asset Management Arm | 0.30% | United States | Traditional Investment Manager |
| 15. | White Elm Capital, LLC | 0.28% | United States | Hedge Fund Manager/CTA |
| 16. | The Vanguard Group, Inc. | 0.27% | United States | Traditional Investment Manager |
| 17. | SMP Asset Management, LLC | 0.23% | United States | Hedge Fund Manager/CTA |
| 18. | Moors & Cabot, Inc., Asset Management Arm | 0.22% | United States | Traditional Investment Manager |
| 19. | California Public Employees' Retirement System | 0.22% | United States | Government Pension Plan Sponsor |
| 20. | U.S. Bancorp Asset Management, Inc. | 0.18% | United States | Traditional Investment Manager |

*\*COMMON STOCK EQUIVALENTS (AGGREGATE ECONOMIC INTEREST) SOURCE: CAPITAL IQ. AS OF 02-MAY-2019*
*\*\*CAPITAL IQ DEFINES STRATEGIC SHAREHOLDER AS A PUBLIC OR PRIVATE CORPORATION, INDIVIDUAL/INSIDER, COMPANY CONTROLLED FOUNDATION, ESOP OR STATE OWNED SHARES OR ANY HEDGE FUND MANAGERS, VC/PE FIRMS OR SOVEREIGN WEALTH FUNDS WITH A STAKE GREATER THAN 5%.*

## ▪ SHAREHOLDER RIGHTS

| | MARKET THRESHOLD | COMPANY THRESHOLD1 |
|---|---|---|
| VOTING POWER REQUIRED TO CALL A SPECIAL MEETING | N/A | N/A |
| VOTING POWER REQUIRED TO ADD AGENDA ITEM | 1.00%2 | 1.00%2 |
| VOTING POWER REQUIRED FOR WRITTEN CONSENT | N/A | N/A |

*1N/A INDICATES THAT THE COMPANY DOES NOT PROVIDE THE CORRESPONDING SHAREHOLDER RIGHT.*
*2SHAREHOLDERS MUST OWN THE CORRESPONDING PERCENTAGE OR SHARES WITH MARKET VALUE OF AT LEAST $2,000 FOR AT LEAST ONE YEAR.*

# 1.00: ELECTION OF TRUSTEES


FOR

**PROPOSAL REQUEST:** Election of one trustee

**ELECTION METHOD:** Majority

**RECOMMENDATIONS & CONCERNS:**

    **FOR:**    **D. Cook**

    **NOT UP:**    **D. Barry ; J. Norris III**

## ▪▪ BOARD OF TRUSTEES

| UP | NAME | AGE | GENDER | GLASS LEWIS CLASSIFICATION | OWNERSHIP** | AUDIT | COMP | GOV | NOM | TERM START |
|----|------|-----|--------|---------------------------|-------------|-------|------|-----|-----|------------|
| | David E. Barry | 73 | M | Independent | Yes | ✔ | ✔ | ✔ | ✔ | 2017 |
| ✔ | Donald G. Cook | 72 | M | Independent | No | | | | | 2019 |
| | John R. Norris III | 65 | M | Independent | Yes | ✔ | ✔ | ✔ | ✔ | 2000 |

C = Chair, * = Public Company Executive, ▪ = Withhold or Against Recommendation

*\*Percentages displayed for ownership above 5%, when available*

| NAME | ATTENDED AT LEAST 75% OF MEETINGS | PUBLIC COMPANY EXECUTIVE | ADDITIONAL PUBLIC COMPANY DIRECTORSHIPS |
|------|-----------------------------------|--------------------------|------------------------------------------|
| David E. Barry | Yes | No | None |
| Donald G. Cook | N/A | No | (1) Crane Co. |
| John R. Norris III | Yes | No | None |

## ▪▪ MARKET PRACTICE

| INDEPENDENCE AND COMPOSITION | TPL* | REQUIREMENT | BEST PRACTICE |
|------------------------------|------|-------------|---------------|
| Independent Chair | No | No[1] | Yes[5] |
| Board Independence | 100% | Majority[2] | 66.7%[5] |
| Audit Committee Independence | 100% | 100%[3] | 100%[5] |
| Compensation Committee Independence | 100% | 100%[2] | 100%[5] |
| Nominating Committee Independence | 100% | 100%[2] | 100%[5] |
| Percentage of women on board | 0% | N/A[4] | N/A[4] |
| Directors' biographies | Proxy Statement | | |

*\* Based on Glass Lewis Classification*

1. NYSE Listed Company Manual
2. Independence as defined by NYSE listing rules
3. Securities Exchange Act Rule 10A-3 and NYSE listing rules
4. No current marketplace listing requirement
5. CII

Glass Lewis believes that boards should: (i) be at least two-thirds independent; (ii) have standing audit, compensation and nomination committees comprised solely of independent directors; and (iii) designate an independent chair, or failing that, a lead independent director.

## PROXY CONTEST

The special meeting of holders of sub-share certificates of Texas Pacific Land Trust ("TPL" or the "Trust") involves a contested election of one trustee to the TPL board. The Trust's declaration provides for three trustees, each of whom hold office until death, resignation or disqualification. Until recently, the trustees consisted of chairman Maurice Meyer III (elected in 1991), John Norris III (elected in 2000) and David Barry (elected in 2017). In February 2019, Mr. Meyer resigned for health reasons and passed away the following month. In order to fill the vacancy on the board, the Trust has nominated retired four-star general Donald Cook for election to the board of trustees of TPL.

In contest to the Trust's nominee, a group of shareholders consisting of SoftVest LP ("SoftVest"), Horizon Asset Management LLC ("HAM"), Kinetics Asset Management LLC ("KAM"), Horizon Kinetics LLC ("Horizon Kinetics") and ART-FGT Family LP ("Tessler"), as well as certain of their affiliates (collectively, the "Dissidents"), have nominated Eric Oliver, the managing member of SoftVest, for election to the board of trustees of TPL. Collectively, the Dissidents own 25.1% of the outstanding shares of the Trust, consisting primarily of a 23.2% stake held by Horizon Kinetics, which has been a TPL shareholder since 1994. SoftVest, which owns 1.7% of the outstanding shares, has been a TPL shareholder since 2004.

The Trust is soliciting voting support for General Cook on the BLUE proxy card, while the Dissidents are soliciting voting support for Mr. Oliver on the WHITE proxy card.

### Commitment to Limited Term

The Trust's nominee, General Cook, has committed to serve a limited term of three years on the board. If elected, General Cook states that he will resign as a trustee after three years, at which point he would stand for re-election if re-nominated by the Trust. General Cook has signed a binding letter of resignation effective on the third anniversary of his election to the TPL board to enforce this commitment. The Dissidents state that General Cook's "palm branch of committing to a three-year term is too little, too late." The Dissidents' nominee, Mr. Oliver, has not committed to serve a limited term; nor have the current trustees, Messrs. Norris and Barry, who currently intend to remain on the board until death, resignation or disqualification.

### Planned Adjournment and Postponement of the Special Meeting

On May 8, 2019, the Trust announced that it intends to convene the special meeting on May 22, 2019 and then immediately adjourn the meeting -- without conducting any business -- until June 6, 2019. According to the Trust, the postponement is in response to a comment by the SEC with respect to General Cook's commitment to resign from the TPL board after no more than three years. The Trust states that it was advised by the SEC that a supplement to the Trust's proxy statement is required because General Cook's commitment constitutes a fundamental change to the Trust's proxy solicitation. The Trust will file a supplement to its proxy statement and intends to adjourn the special meeting in order to provide shareholders sufficient time review the supplement so that they may cast their votes on a fully informed basis.

Also on May 8, 2019, the Dissidents issued a press release responding to the Trust's intention to delay the special meeting. The Dissidents note that they had previously written to shareholders suggesting that the Trust might employ such a tactic, but that they did not expect the Trust to blame securities regulators to do it. The Dissidents state that on behalf of all shareholders they reserve the right to move forward with a vote on the election of a new trustee on May 22, 2019, as previously scheduled.

## BACKGROUND

### TPL History

TPL was created as a business trust in 1888 as a result of a reorganization following the bankruptcy of the Texas & Pacific Railway (the "T&P Railway"). Upon formation of the Trust, the sole intended purpose of TPL was to provide an orderly liquidation of the land that secured the defaulted bonds of the T&P Railway, initially comprising 3.5 million acres of land. The bondholders created the Trust and converted bonds to shares of proprietary interest in the Trust. At the time, there was no oil and gas activity on the Trust's land and the trustees oversaw the liquidation of the Trust's assets and the distribution of proceeds. The shares of the Trust have been publicly traded on the New York Stock Exchange since 1927.

Today, the Trust remains one of the largest landowners in Texas with nearly 900,000 acres of land and related resources.

Much of this land is in the heart of the Permian Basin in West Texas, which over the last several years has become one of the most active areas of oil and gas exploration in the U.S. While oil production in the Permian Basin was previously thought to have peaked in the 1970s, technological advances for extracting oil, such as horizontal drilling and hydraulic fracturing, have enabled a significant increase in oil and gas production in the region, particularly in the last five years. Since 2015, oil production in the region has more than doubled to more than four million barrels a day, accounting for roughly one-third of total U.S. crude output, according to the U.S. Energy Information Administration.

TPL derives revenue from all avenues of managing its land holdings, such as oil and gas royalties, grazing leases, easements, land sales and water sales. The Trust has a perpetual oil and gas royalty interest in approximately 455,000 acres. In 2017, recognizing the need for a full-service water offering to operators in the Permian Basin, TPL formed Texas Pacific Water Resources ("TPWR"), which provides brackish water sourcing and water gathering, recycling, treatment and disposal. As a result, the Trust has two operating segments: Land and Resource Management and Water Service and Operations. Over the last decade, TPL's revenue has increased from $11.9 million in 2009 to $431 million for the 12 months ended March 31, 2019. Approximately 75% of the Trust's revenue for the last 12 months came from the Land and Resource Management segment. The Trust's operations are managed by two general agents, Tyler Glover, who has been CEO since 2016, and Robert Packer, who has been CFO since 2014.

The Trust states that the primary economic drivers of TPL's two operating segments are the pace of development in the Permian Basin and the continued evolution of horizontal completion techniques. Operators must negotiate surface rights to use TPL's land, source water for drilling, complete new wells and arrange for disposal of produced water. Each new well drilled on TPL's acreage generates additional royalty income, and the evolution of unconventional well completion design toward larger fracs requires increased fluids. Since the end of 2015, the Permian drilling rig count has increased from approximately 200 rigs to nearly 500 rigs, and Permian produced water volumes have increased roughly 50%. Since the first quarter of 2017, quarterly revenue for each of TPL's segments has increased more than 6x. Multiple tier-1 oil and gas exploration and production ("E&P") companies, including Chevron Corp., Diamondback Energy Inc., EOG Resources Inc., Apache Corp. and Anadarko Petroleum Corp., have operations on TPL's land.

During the current decade, TPL's total returns of capital, consisting of dividends and share repurchases, have grown from $10.8 million in 2009 to $82.6 million for the last 12 months ended March 31, 2019. TPL has returned a total of $200 million to shareholders since the beginning of 2016, including dividends and share repurchases in the first quarter of 2019. During roughly the same 10-year period, TPL's share price increased from roughly $30 per share to well over $750 per share, and the average dollar trading volume in TPL's NYSE-listed shares increased from less than $500,000 per day to over $10 million per day. Since 2016, TPL's market capitalization has increased from about $1 billion to more than $6 billion.

### *Interactions Between the Trust and the Dissidents*

From time to time, members of the Dissidents have engaged with the trustees and representatives of the Trust, investors and industry participants to discuss various opportunities to maximize the value of the Trust for the benefit of shareholders. Such discussions have included the potential conversion of the Trust into a master limited partnership ("MLP") or, more recently, a Delaware corporation ("C-Corp"), as permitted by the Trust's documents, establishing an experienced team around the Trust's new water business, or otherwise considering the separation or sale of such business to a third party with a retained royalty, and the addition of Mr. Oliver as a trustee of the Trust.

In 2016, SoftVest and Tessler suggested that the Trust consider converting some or all of its operations into an MLP, based on the belief that such a structure could potentially result in increased distributions to investors due to the pass-through taxation treatment available to MLPs. In response to this proposal, the Trust engaged financial, legal and tax advisors to conduct an evaluation of the Trust's optimal structure. The Trust concluded that the prohibitive tax cost of such a conversion and the risks of negative tax consequences to the Trust and shareholders outweighed the potential benefits of an MLP structure. Given various changes to U.S. tax law since 2016, including a lower corporate tax rate, the Dissidents no longer believe an MLP conversion would benefit the Trust or shareholders.

In February 2019, the Trust announced the resignation of Mr. Meyer as trustee for health reasons. Promptly following such announcement, Tessler contacted the remaining trustees to discuss Mr. Oliver's potential nomination as a trustee to fill the vacancy created by Mr. Meyer's resignation. The trustees requested a short bio from Mr. Oliver, which he delivered in February 2019.

On March 4, 2019, the Trust announced the trustees' decision to nominate Preston Young to fill the vacancy on the board.

On March 6, 2019, Mr. Barry spoke with Murray Stahl, CEO and chairman of Horizon Kinetics. Mr. Stahl proposed the formation of an advisory board of shareholders, and Mr. Barry indicated that the trustees would seriously consider this proposal.

On March 15, 2019, SoftVest delivered to the Trust written notice of its nomination of Mr. Oliver for election as a trustee at

the special meeting. That same day, SoftVest, Horizon Kinetics and Tessler filed Schedule 13Ds disclosing their cooperation agreement as a group and their intention to nominate Mr. Oliver for election as trustee to the TPL board.

On March 19, 2019, the trustees engaged Spencer Stuart, a leading global executive and director search firm, and began a process in which they considered more than 15 candidates that Spencer Stuart identified as an alternate to the candidate originally chosen by the board, Mr. Young.

On March 25, 2019, the Trust confirmed receipt of the Dissidents' nomination notice and announced the postponement of the special meeting, from May 8 until May 22, 2019, in order to provide the trustees with sufficient time to consider the nomination notice and give shareholders the opportunity to fully consider the changed circumstances in order to make an informed voting decision.

On March 27, 2019, the general agents of the Trust and Mr. Stahl had a telephone conversation in which Mr. Glover and Mr. Packer offered to identify a mutually agreeable compromise candidate for the board. Mr. Stahl stated that he would be open to this concept.

On March 28, 2019, Mr. Oliver received an email on behalf of the Trust requesting that Mr. Oliver complete a 66-page Trustee Questionnaire. In response, Mr. Oliver sent a letter to the board noting that he had complied with the trustees' prior request for a short bio, and that the board had not asked for any questionnaire before rejecting his nomination and deciding to nominate Mr. Young. Rather than complete the questionnaire after the board's rejection and opposition to his nomination, Mr. Oliver informed the board that he would directly provide to TPL investors all information necessary to make an informed voting decision regarding his candidacy for the TPL board.

On April 2, 2019, Mr. Oliver had a telephone conversation with the trustees to discuss his qualifications and experiences, whereupon he expressed his willingness to work collaboratively with the other two trustees to create value for all TPL shareholders.

On April 5, 2019, the trustees had a telephone conversation with Mr. Stahl during which the trustees offered to find a mutually agreeable compromise candidate to serve as the new trustee and referenced their list of candidates provided by Spencer Stuart. Mr. Stahl agreed to give such potential compromise candidate consideration. However, on April 6, 2019, Horizon Kinetics emailed Mr. Packer stating that it would not consider any candidates other than Mr. Oliver as the trustee nominee, as required by the terms of their cooperation agreement.

On April 8, 2019, TPL announced that instead of nominating Mr. Young for election as trustee at the special meeting, it would nominate General Cook. That same day, the Trust filed its definitive proxy statement soliciting votes for the election of General Cook.

## DISSIDENT ARGUMENT

Given the significant increase in activity on the Trust's land in recent years and the actions taken by TPL to maximize value for shareholders, including the establishment of two operating segments which together require the reinvestment of nearly $100 million of shareholder capital annually, the Dissidents argue that TPL has deviated from its original, long-held mandate to provide an orderly liquidation of the Trust's land holdings. Following the recent creation of the water operating company and the execution of land and royalty trading transactions, in the Dissident's view, TPL carries on as an operating business with no justification for maintaining the original structure of a liquidating business trust, nor any justification for TPL to forego the disclosures, controls and governance structure of a modern operating corporation.

The Dissidents note that TPL continues to be governed as a liquidating business trust with a board comprised of only three trustees who serve lifetime appointments, with no requirement to hold annual meetings of shareholders, resulting in only four shareholder meetings in the last 30 years. The Dissidents believe the lack of a modern corporate governance structure and the inherent lack of accountability has resulted in poor transparency to investors, conflicts of interest among TPL's trustees and general agents, questionable business decisions and a disregard for investors' views and rights. Additionally, the Dissidents believe the trustees and general agents lack relevant experience, having spent their careers as attorneys or in real estate with limited to no oil and gas experience beyond their current roles. Further, the Dissidents allege that TPL's disclosures with respect to capital allocation, compensation and operational activity on the Trust's land has been poor. The Dissidents also argue that management and the trustees have minimal stock ownership in the Trust, resulting in misaligned incentives.

In terms of performance, the Dissidents state that the Trust's unique inheritance of assets, which are unmatched in their scope of royalty interests, surface acreage and water rights in the oil and gas rich Permian Basin, is the root source and driver of the Trust's overall performance. The Dissidents note that TPL's share price has for the most part tracked the growth of its oil and gas royalty production figures, until recently. Specifically, over the last five years through March 15, 2019, the day of the Dissidents' nomination notice, TPL's total shareholder return was 475%, while TPL's five-year total

royalty production growth rate through 2018 was 746%. In the Dissidents' view, the trustees and general agents are taking unqualified credit for the Trust's shareholder returns, for which they believe proper credit is due to the numerous exploration and production companies that have spent over $10 billion since 2013 drilling on TPL's land. As the Dissident puts it, "being dealt a royal flush does not make one a good poker player."

Turning to the Trust's financial performance, the Dissidents note that, from 2016 through 2018, while total revenue increased 4.5x, variable expenses increased nearly 10x over the same period. Specifically, salaries and employee expenses increased from $1.4 million to $18.4 million, as the Trust went from having 10 employees for decades to 75 employees today, and general and administrative expenses increased from $0.9 million to $4.7 million over that period. According to the Dissidents' analysis, variable expenses accounted for 15.1% of "operating revenue" in 2018, compared to 6.9% in 2016. Further, over the same period, total capital returns increased only 1.9x and amounted to just 28.3% of operating revenue in 2018, compared to 66.2% in 2016.

### Dissidents' Platform and Nominee

According to the Dissidents, Mr. Oliver is an experienced oil and gas investor with over 20 years of experience buying and selling properties and over 35 years of experience managing investments with an emphasis in the energy market. Among other relevant experience, Mr. Oliver currently serves as the president of SoftVest Advisors, an investment manager with a focus in oil and gas minerals and royalties. Mr. Oliver was president of Midland Map Company LLC, a Permian Basin oil and gas lease and ownership map producer since 1997, which was sold in January 2019 to Drilling Info Inc. Mr. Oliver is principal of Geologic Research Centers LLC, a log library providing geological data to the oil and gas industry. Mr. Oliver has served on the board of directors of Texas Mutual Insurance Co. since 2009, and as a director of AMEN Properties Inc., which owns oil and gas royalty and working interest properties, since 2001. In 2007, through certain affiliated entities, Mr. Oliver led a team to successfully acquire the assets of the Santa Fe Energy Trust, which consisted of over 12,000 royalty and working interest properties in seven states.

If elected as trustee to the TPL board, Mr. Oliver is committed to remaining open to any transaction that may create value for TPL shareholders. In particular, Mr. Oliver believes the Trust should fully explore the alternative of converting the Trust into a Delaware corporation. As compared to trust law, Delaware corporate law has a more well-developed legal framework around matters of governance and investor rights, which in the Dissidents' view provides greater comfort and predictability to investors in a publicly-traded entity. In that regard, Delaware law generally requires that corporations hold an annual meeting of shareholders to vote on the election of directors, who in turn can be elected for terms of one year or three years (if the board is staggered). Mr. Oliver also intends to encourage the other trustees and the Trust to be more transparent and frequent on updates to shareholders with respect to drilling activity, drilled and uncompleted well updates, water production, water injection volumes, and engineering reports.

Additionally, following the Trust's decision in 2017 to form TPWR as a single member LLC and wholly-owned subsidiary of the Trust, the Dissidents believe that TPWR's activities could create various risks for the Trust, such as risks related to workers compensation, leaks or rupturing of pipelines (including surface damage) and injection well casings (including potential acquifer contamination). In light of those risks, Mr. Oliver is committed to actively encouraging the Trust to evaluate the water business and, with the assistance of outside consultants and other advisors, determine if it is advisable to grow operations internally, partner with a strategic partner, or sell the water rights to a third party and retain a royalty. Mr. Oliver believes each such option needs to be fully evaluated with proper outside consultants, in order to maximize value for TPL shareholders. Further, Mr. Oliver believes that any proposed capital expenditures and operating expenses incurred in connection with TPWR should have their respective expected rates of return carefully compared to the compounding benefits of repurchasing and retiring outstanding shares.

Further, the Dissidents believe that it's important that the board be represented by its owners, noting that if General Cook is elected, it would result in the least amount of share ownership on the board in over 50 years, since the Frasier and the Meyer family have served on the TPL for three generations each. Moreover, the Dissidents believe the open seat on the TPL board should be filled by an expert in the oil and gas and royalty industry and the Permian Basin marketplace. The Dissidents note that the Trust's nominee has no experience in the E&P industry and in their view does not have the set of business skills in the industry that TPL desperately needs in the current environment, which presents several possibilities and challenges for TPL. In the Dissidents' view, the TPL board needs an operator like Mr. Oliver who is in the top tier of knowledge and operating expertise about TPL and its industry.

In sum, the Dissidents argue that now is the time for TPL to have modern corporate governance, term limits, an expanded board with real committees, and to have functioning accountability and checks and balances in place. The Dissidents believe that Mr. Oliver, together with the two current trustees, can bring TPL into the 21st century and transform the Trust into a modern corporation with an expanded board with modern fiduciary duties to all shareholders, which once established could include individuals such as General Cook as part of a broader mosaic of skill sets on an expanded board.

## ▪▪ BOARD RESPONSE

According to the board, the Trust and its shareholders have benefited from a period of historic growth in the Permian Basin, and the current trustees and management team have led the Trust through this period with prudent stewardship of capital and core assets. As a result of thoughtful, shareholder-focused management, the Trust has created value and shareholders continue to capture this upside. In particular, the board notes that TPL has generated extraordinary returns for shareholders, including a 475% total return over the five-year period preceding the Dissidents' campaign and a 3,856% total return during the 10-year period preceding the campaign, which exceeds the returns of the S&P 500 Index, the average returns of oil and gas E&P companies, and even the returns of Amazon.com Inc. and Apple Inc., over those same periods.

In recent years, the Trust has recruited experienced professionals to lead the business and oversee its day-to-day operations. The board believes that Mr. Glover and Mr. Packer, as CEO and CFO, respectively, bring substantial experience and strong market knowledge that have resulted in significant value creation. As market conditions in the Permian Basin have become more attractive, TPL has evolved organizationally to capture opportunities to further build long-term value, including developing the Land and Resource Management segment and forming TPWR as a full-service water offering for operators in the region. TPL states that it pursues land sales opportunistically and only when there is a clear benefit to shareholders. Recently, the Trust's strategy has been to consolidate acreage, invest in higher-return investments, or drive further development and revenues where TPL maintains royalty interests. It is this strategy of deploying capital where it will create new value that has allowed TPL to deliver spectacular returns to shareholders, according to the board.

Key achievements of this strategy to date include monetizing non-core surface assets and redeploying proceeds to create 53,000 contiguous surface acres in the heart of the Delaware Basin, developing approximately one million barrels per day of brackish water production capacity, 16 million barrels of storage capacity and 200 miles of delivery lines and negotiating numerous long-term water contracts with tier-1 operators, a majority being industry majors or large independents. The Trust intends to continue its strategy of consolidating and maintaining the premier surface footprint in the Permian Basin through acquisitions, divestitures and land swaps, leveraging its surface acres to develop water infrastructure and expand its service offerings to become the leading full-cycle water service company in the Permian Basin, growing and optimizing royalty interest revenue through strategic use of the Trust's land position and capitalizing on accretive M&A opportunities. The Trust intends to build on its more than 130-year history of stewardship, capital discipline and delivering exceptional shareholder returns.

In terms of TPL's current structure, the board states that the Trust was established for the benefit of all shareholders and argues that the trust structure protects shareholders. In particular, the board notes that the Trust cannot issue new equity, eliminating the risk of shareholder dilution from share issuances, and that a liquidating trust does not have the capital needs that a corporate structure typically provides, reflecting the Trust's longstanding primary mission of returning cash to shareholders. As it relates to governance, the Trust states that, like the directors of a corporation, the trustees are fiduciaries with a special duty of loyalty to the beneficiaries. TPL's governance structure recognizes the need for long-term stewardship to maximize the value of TPL's holdings given the unique nature of its assets. The board states that it is open to consider any changes that may be in the long-term best interests of shareholders, as it has demonstrated, but it would make such changes only after thorough evaluation and careful planning. The board argues that such consideration would benefit from a new trustee who has significant public company and corporate governance experience, such as its nominee, General Cook.

On the compensation front, the Trust states that it has designed a program to be competitive and aligned with the interests of long-term shareholders. The board engaged a compensation consultant that benchmarked TPL management's total compensation at "significantly below the 25th percentile of the peer group." Management's compensation is comprised of base salary plus an annual performance bonus that is based on individual performance, shareholder returns and the performance of the Trust. Meanwhile, until 2018, the trustee fee was set at $2,000 per year, as per the declaration of trust in 1888. The board increased the fee to $104,000 per year effective in 2018, which reflects an adjustment for inflation over that 130-year period, according to the board. The board notes that, as a liquidating trust, the trustees are authorized to pay dividends to shareholders and to repurchase and cancel outstanding shares, but not to issue additional equity. Accordingly, equity is not an available component of TPL's compensation program under the Trust's current structure. However, all executives and trustees have purchased TPL shares personally.

### *Trust's Nominee*

The Trust states that its nominee, General Cook, has extensive leadership and corporate board experience, following his 36-year career in the Air Force, where he retired as a four-star general. General Cook has served on six public and private company boards of directors, including Crane Co., a manufacturer of industrial products, including fluid control

products and systems for the oil and gas market, where he has served since 2005 and currently chairs the nominating and governance committee and is a member of the compensation committee. General Cook has also served as a director of Cybernance Inc. since 2016. He previously served on the boards of USAA Federal Savings Bank (from 2007 to 2018) and aerospace manufacturer Beechcraft LLC (from 2007 to 2014). General Cook served on the board of Burlington Northern Santa Fe Corp. ("BNSF Railway") for almost five years until it was sold to Berkshire Hathaway Inc. in 2010 in a transaction valued at $44 billion. General Cook has been the chairman of the San Antonio chapter of the National Association of Corporate Directors, a group recognized as an authority on leading boardroom practices.

The Trust states that General Cook brings exceptional director experience and is committed to evaluating a range of alternatives to enhance shareholder value. In particular, the board states that General Cook's priorities as a trustee include: (i) providing all of TPL's businesses, including the water business, with the right foundations for long-term growth; (ii) evaluating the governance structure on a regular basis to ensure it is optimal for long-term shareholder value, including the right timing for conversion to a C-Corp; (iii) enhancing engagement with shareholders, including more frequent disclosures and investor communications; (iv) maintaining focus on achieving best practices across ESG-related topics; and (v) leveraging the Trust's knowledge of the Permian Basin to continue to grow the value of its assets, through optimal management of resources and partnerships with key players in the region.

Recently, General Cook provided responses in a video message to several questions submitted by investors with respect to his candidacy and views of TPL. In particular, General Cook says that he recognizes the importance of stock ownership by executives and trustees, the potential governance benefits of converting the Trust to a C-Corp and the complementary nature of TPL's water business with the royalties received from drilling companies. As a trustee, General Cook believes he would bring to the TPL board the governance experience that has been requested by shareholders, and that he could be a change agent in that regard. He would advocate for quarterly investor calls, quarterly management meetings and greater disclosure with respect to drilling and royalty activity. He also recognizes the importance of annual director elections, which were implemented at Crane under his leadership as chair of the nominating and governance committee, by de-staggering the Crane board.

In response to potential concerns regarding his lack of oil and gas or water business experience, General Cook notes that he served on the board of BNSF Railway, one of the country's largest railroads, but did not need to be an engineer on a train to understand the strategic and operational value of building double tracks across the country to speed the delivery of goods and services. As such, as a board member of BNSF Railway, he approved the spending of hundreds of millions of dollars to double-track the railroad. He believes he can bring a similar kind of strategic judgment to any business, including TPL. He also notes that TPL is not a pure-play oil company; it is a land management company engaged in all aspects of the land. TPL manages easements, leases, grazing rights, windtricity, wind generators and oil and gas. General Cook states that he has the expertise and the capacity to deal with ambiguity and that he will learn the business of TPL, but not at ground level. Instead, he'll know the business from 20,000 feet to where his judgment comes into play, according to the video message.

### Dissident's Nominee

The Trust has concerns with the Dissidents' nominee, Mr. Oliver, with respect to his independence, experience, judgment and intentions. The Trust notes that Mr. Oliver and his direct family members have numerous oil and gas interests, at least some of which are located in the Permian Basin, which may create a conflict with Mr. Oliver's duties as an independent trustee. As a TPL trustee, the board alleges that he would be in a position of making decisions about land swaps, acquisitions and divestitures that could benefit his other investments. In addition, the board notes that Mr. Oliver has limited public company board experience, with only one public company directorship at AMEN Properties Inc., a micro-cap company with a $40 million market cap trading on the over-the-counter Pink Sheets market after being deregistered by the SEC and delisted from the Nasdaq. At AMEN, where Mr. Oliver serves with his brother who serves as CFO, TPL alleges that the Oliver brothers have overseen a pattern of questionable corporate governance practices, including a failure to adhere to governing documents and philanthropic commitments, self-dealing, having maintained a long tenure, and a failure to comply with basic, mandatory filing obligations.

Furthermore, the Trust states that Mr. Oliver has repeatedly advocated for value-destroying initiatives at TPL, such as the proposal for the Trust to convert into an MLP and the suggestion that the board consider selling TPL's water business, which is one of the key growth drivers for the Trust. The board notes that Mr. Oliver claims that the Trust sold royalty interests to Chevron in 2018 and lost the opportunity to capitalize on prime property; however, the truth is that the Trust performed a three-way swap with Chevron and Double Eagle Energy that enabled the Trust to use the sale proceeds to purchase a royalty position over 1.8x larger than the one it sold. This swap allowed the Trust to retain half of its royalty interest in the land that was part of the sale, diversify holdings through exposure to a more varied set of operators and achieve a net increase in net royalty acres. Much of the royalty acreage the Trust acquired in this swap was superior to the acreage sold, which is consistent with TPL's strategy of focusing on higher-return assets in strategically critical areas. Mr. Oliver was also opposed to the $100 million sale of surface acreage to WPX Energy, based on his view of the

economics of the transaction and his understanding of the nature of the transaction; however, the board states that selling that position allowed the Trust to monetize a non-core asset and redeploy proceeds into strategic surface acquisitions, which will enhance near-term opportunities for the water business. In the board's view, Mr. Oliver has demonstrated a fundamental misunderstanding of TPL's business and what creates value for TPL shareholders.

## GLASS LEWIS ANALYSIS

In our evaluation of contested situations, where shareholders seek the removal of directors or the election of dissident director nominees, we consider whether a dissident shareholder has made a compelling case for change at a company, or whether the incumbent board has given shareholders reason to believe its proposed slate of directors is appropriately qualified, informed and independent to oversee the company's direction. In general, we are reluctant to recommend the removal of incumbent directors, or the election of dissident nominees, unless certain critical issues are evident. We typically focus on the issues raised by a dissident shareholder, but we may also consider a board's or investor's track record, in the context of broader corporate governance and shareholder activism trends. We are more likely to seriously consider a campaign initiated by a long-term shareholder of the company or by an investor who has made a substantial economic commitment to the company.

From the outset, we emphasize the unique nature of this situation, where vacancies on TPL's board of three trustees -- and the shareholder elections required to fill them -- occur only upon the death, resignation or disqualification of the incumbent trustees. Following the recent death of TPL's former chairman of trustees, Maurice Meyer III, whose father and grandfather also each served as trustees of TPL, a group of dissident shareholders, who collectively own more than 25% of the outstanding shares of the Trust, the vast majority of which have been held by Horizon Kinetics for 25 years, have proposed an alternative nominee to serve as a trustee of TPL, in opposition to the board's nominee. Notably, the board's nominee, a retired four-star Air Force general who also has S&P 1000 corporate board experience, has committed to resign from the TPL board following a three-year term, at which point he would stand for re-election if re-nominated by the other trustees. Meanwhile, the Dissidents' nominee, who through his investment firm has owned TPL shares for 15 years, has not committed to a limited term; yet, he would advocate for a conversion of the Trust into a C-Corp, which would usher in an expanded board of presumably five to nine directors and annual shareholder elections of all directors.

In this case, we believe the Dissidents must: (i) make a compelling case that the board either has mismanaged or failed to properly oversee the company's performance and direction, or suffers from serious governance concerns; and (ii) nominate a qualified trustee candidate, free from significant conflicts, who can be expected to proactively address investors' concerns and oversee the execution of a plan more effectively than the board's nominee, in a manner which is consistent with the interests of all shareholders, in order to improve the performance or governance of the Trust.

### Total Shareholder Returns

We generally believe that total shareholder return ("TSR") serves as a reasonable summary indicator of a company's historical performance, prospects and stated strategy, with due reference to the influence of various extrinsic factors beyond the control of management or the board. In order to establish a proper context, we believe any TSR analysis should be conducted on a relative basis compared against industry benchmarks and appropriate peer groups across a range of relevant measurement periods.

In the case of TPL, we would first note that there are few, if any, comparable entities or other relevant benchmarks to measure TPL's relative performance. While there are other publicly-traded oil royalty trusts, which like TPL produce from and gradually deplete their royalty income-producing properties without asset replacement until their exhaustion, TPL's assets are unmatched in size, location and oil-rich nature as compared to any other publicly-traded oil royalty trust, the largest of which has a market capitalization that is roughly one-tenth of TPL's market cap. Additionally, as TPL investors are likely aware, oil royalty trusts have key distinctions compared to E&P operators, most notably the lack of significant capital expenditures required to find and develop oil and gas reserves, and limited if any operating costs, giving royalty trusts high operating margins and cash flow yields and the ability to pay out significant distributions to shareholders. Indeed, from an investment perspective, these features can often make oil royalty trusts more appealing than E&P companies, with limited exposure to oil and gas downturns but potentially significant upside exposure, depending on the location and nature of assets.

In terms of benchmarks then for evaluating TPL's historical TSR performance, we've included: (i) a group of five oil royalty trusts with market caps of between $100 million and $700 million; (ii) a group of nine E&P companies, being the most active operators in the Permian Basin, each having produced more than 100 thousand barrels of oil equivalent ("BOE") per day from the region in 2018, excluding Chevron, Exxon Mobil and Royal Dutch Shell; (iii) the broader S&P 1500 Oil & Gas E&P Index; and (iv) the S&P 500 Index. We have chosen March 15, 2019 as the "unaffected" date through which to measure trailing returns. That's the last trading day prior to the Dissidents' nomination of its trustee nominee. As shown in the table below, we've included returns for the one, two, three, five and 10 years through March 15, 2019.

## TOTAL SHAREHOLDER RETURNS

| Through March 15, 2019 [1] | 1 YR | 2 YR | 3 YR | 5 YR | 10 YR |
|---|---|---|---|---|---|
| **Texas Pacific Land Trust (TPL)** | 40% | 169% | 410% | 475% | 3,856% |
| Oil Royalty Trusts [2] | 13% | 36% | 74% | -24% | 49% |
| *TPL Deviation* | *27%* | *133%* | *336%* | *499%* | *3,807%* |
| Permian-Focused E&P Operators [3] | -16% | -21% | 0% | -16% | 251% |
| *TPL Deviation* | *56%* | *189%* | *410%* | *490%* | *3,606%* |
| S&P 1500 Exploration & Production Index | -7% | -13% | 6% | -43% | 28% |
| *TPL Deviation* | *47%* | *181%* | *404%* | *517%* | *3,828%* |
| S&P 500 Index (Total Return) | 4% | 22% | 46% | 65% | 350% |
| *TPL Deviation* | *36%* | *147%* | *364%* | *410%* | *3,506%* |

*Source: S&P Capital IQ. Notes: (1) Last trading day before Dissidents' trustee nomination; (2) Equal-weighted average returns of Sabine Royalty, BP Prudhoe Bay Royalty, Permian Basin Royalty, San Juan Basin Royalty and SandRidge Permian trusts; and (3) Equal-weighted average returns of Occidental, Concho, Pioneer, Diamondback, EOG, Apache, Cimarex, Parsley and Anadarko, each of which produced more than 100 thousand BOE/day from the Permian Basin in 2018 (excludes Chevron, Exxon Mobil and Royal Dutch Shell).*

With due reference to the comparability of the returns shown in our analysis, there's no arguing that TPL has generated substantial returns for shareholders across all periods presented, both on an absolute basis and particularly when compared to the returns of other oil royalty trusts, Permian-focused E&P operators and the broader equity market as a whole. Notably, over the last five years, while other oil royalty trusts and E&P companies have generated negative returns, on average, for investors, TPL returned a whopping 475% for its shareholders in price appreciation and dividends. During this campaign, the Trust has been quick to credit the current trustees and management for TPL's outsized returns, and they no doubt deserve some amount of credit for effectively overseeing and managing the Trust's valuable land holdings in a manner that has delivered significant returns for shareholders.

Having said that, compared to the shareholder returns delivered by say, Amazon.com or Apple (which TPL boasts having bested over these time periods), due to the fundamental differences in the nature of their respective assets, businesses, markets and the roles of their management teams and boards, we're inclined to give measurably less credit to TPL's general agents and trustees than we would to Amazon.com's or Apple's management team. Indeed, we largely agree with the Dissidents' analogy that being dealt a royal flush doesn't make one a good poker player. Like the Dissidents, we would give much of the credit for TPL's returns to the E&P operators and related companies that have spent billions on developing new oil and gas extraction technologies and building and operating the drilling rigs. To illustrate this point further, we have compared TPL's total shareholder returns over the same periods to drilling and production activity in the Permian Basin, both on TPL's land and throughout the region.

## TOTAL SHAREHOLDER RETURNS VS GROWTH IN PERMIAN BASIN

| Through March 15, 2019 [1] | 1 YR | 2 YR | 3 YR | 5 YR | 10 YR |
|---|---|---|---|---|---|
| **Texas Pacific Land Trust (TPL)** | **40%** | **169%** | **410%** | **475%** | **3,856%** |
| TPL Royalty Total Production [2] | 100% | 191% | 341% | 746% | 1,600% |
| *TPL TSR Deviation* | *-60%* | *-23%* | *68%* | *-271%* | *2,256%* |
| Permian Daily Total Production [3] | 132% | 163% | 184% | 257% | 357% |
| *TPL TSR Deviation* | *-92%* | *6%* | *226%* | *218%* | *3,499%* |
| Permian Rig Count [4] | 110% | 158% | 278% | 98% | 293% |
| *TPL TSR Deviation* | *-70%* | *10%* | *132%* | *377%* | *3,563%* |

*Source: S&P Capital IQ, TPL annual reports, U.S. Energy Information Administration. Notes: (1) Last trading day before Dissidents' trustee nomination; (2) Growth in annual total oil and gas production in BOE subject to TPL royalty interests, through 2018, last reported period; (3) Growth in average daily total oil and gas production in BOE throughout Permian region, through February 2019, last reported month prior to Dissidents' trustee nomination; and (4) Growth in number of drilling rigs throughout Permian region, through February 2019.*

As the Dissidents point out, TPL's 475% total return over the last five years actually trails the 746% five-year growth in annual total oil and gas production that is subject to TPL's royalty interests. Looking at the three-year period, we see that TPL has returned more than 5x, which approximates the 4.4x growth in production subject to its royalty interests, which in turn exceeds the 2.8x growth in total production across the Permian Basin and the 3.8x growth in drilling rigs across the region. Yet, over the trailing one- and two-year periods, corresponding to TPL's build out of its water business and the hiring of additional operational personnel, we note that TPL's total returns have lagged the continued strong growth in oil and gas production on its land and throughout the Permian Basin.

While we recognize that these are not necessarily "apples-to-apples" comparisons and there may be a timing lag, we believe this analysis adds useful context for TPL investors in assessing the Trust's historical performance, beyond the headline return figures touted by the Trust during this campaign.

### Strategy and Performance

Beyond TSR analysis, we believe the Dissidents make some valid points with respect to TPL's recent financial performance that are worthy of continued monitoring by shareholders. In particular, the Dissidents note that the Trust's variable expenses have increased dramatically in recent periods, albeit off a small base as a liquidating business trust with historically minimal need for full-time employees or operating personnel. At the same time, since 2017 as the Trust has built a new operating segment encompassing the water business, requiring some reinvestment of capital into the business, total capital returns in the form of dividends and share repurchases have declined as a percentage of revenue and cash flow. As shown in the table below, while revenue has grown significantly since the end of 2016, so have SG&A expenses, which went from offsetting 5% or less of revenue between 2014 and 2016 to absorbing 9% of revenue in 2018. Over the same period, annual operating cash flow more than doubled in each of 2017 and 2017, yet cash flow yield declined marginally. Perhaps most concerning for shareholders, total capital returns have not grown nearly has fast as revenue and cash flow in recent years, with the Trust's payout ratio dropping from roughly 65% to 85% between 2014 and 2016 to roughly 35% in the last 15 months.

**SELECT FINANCIAL RESULTS**

| ($ millions) | 2014 | 2015 | 2016 | 2017 | 2018 | 1Q 2019 |
|---|---|---|---|---|---|---|
| **Total revenue** | $55 | $78 | $66 | $154 | $300 | $191 |
| YoY change | 25% | 42% | -16% | 135% | 94% | 219% |
| **SG&A expenses** | $2 | $3 | $3 | $9 | $26 | $10 |
| YoY change | -18% | 28% | 20% | 175% | 190% | 177% |
| **% of revenue** | 4% | 3% | 5% | 6% | 9% | 5% |
| **Operating cash flow** | $39 | $50 | $41 | $94 | $192 | $162 |
| YoY change | 29% | 28% | -17% | 129% | 104% | 280% |
| **% of revenue** | 70% | 63% | 62% | 61% | 64% | 85% |
| **Total capital returns** [1] | $25 | $31 | $36 | $45 | $70 | $51 |
| YoY change | 0% | 23% | 14% | 26% | 56% | 33% |
| **% of revenue** | 46% | 40% | 54% | 29% | 23% | 27% |
| **% of cash flow** | 65% | 63% | 87% | 48% | 37% | 31% |

Source: S&P Capital IQ, TPL annual reports. Notes: (1) Includes dividends and share repurchases.

Importantly, we don't fault the Trust's board and management team for establishing a water business and investing in what it considers to be a complementary business to the Trust's oil and gas royalty income business, particularly if the general agents and trustees have a reasonable basis to expect the TPWR business to be a key driver of future growth and source of shareholder-value creation going forward. However, as the Dissidents argue, we believe the Trust should continue to evaluate the water business opportunity within an appropriate capital allocation framework, particularly mindful that the ongoing purpose of the Trust is to maximize distributions and value for shareholders. To the extent that such an analysis has been performed by the board and management of the Trust, we would expect some level of transparent disclosure to shareholders with respect to the expected investment, return and time horizon associated with the undertaking.

We believe shareholders may continue to support the Trust in these efforts at this time, but the situation bares monitoring, in our view, and could give rise to an eventual need to spin off or restructure the Trust's involvement in the segment, or else end up being another reason for the Trust to convert into a C-Corp.

### Corporate Governance

From a governance perspective, TPL maintains a structure that conflicts with several of our general policies, including lifelong terms, an insufficient board size, insufficient committee membership and the lack of a financial expert. Indeed, the Trust's current structure is devoid of several of the fundamental, basic tenets of what nearly any institutional investor would consider good corporate governance in today's capital markets.

To recap just a few of these basic policies, Glass Lewis believes that: (i) shareholders should be afforded the opportunity to elect board members on a regular basis, preferably all board members annually; (ii) a board should be small enough to foster good working relationships and to ensure efficiency in the decision-making process, and large enough to ensure diversity in skill sets and professional experience, with five members almost always being an absolute minimum for an effective and properly functioning board; and (iii) a board should be comprised of basic committees, including nominating and corporate governance, audit and compensation committees, with a sufficient number of independent members to serve on these committees.

Following the resignation of Mr. Meyer and the vacancy giving rise to this year's special meeting, we note that the board currently lacks a chair or presiding director, which we expect the board to appoint as soon as is practicable. Similarly, there are currently only two members on the audit committee. We believe that the audit committee should have a minimum of three members to perform its function to shareholder satisfaction. As such, we expect the trustee who fills the board vacancy will also be appointed to the audit committee. Notably, the audit committee has not, to our knowledge, appointed an audit committee financial expert as defined by the SEC. A financial expert is essential in providing the committee with expert advice and guidance as it relates to the oversight of accounting and financial reporting. We believe this is a serious omission for which the board should be held accountable to rectify. Moreover, we note that we generally believe that the chairman of the nominating and corporate governance committee bears responsibility for maintaining a board with sufficient membership to best fulfill its fiduciary duties and protect the interests of shareholders.

# RECOMMENDATION

In conclusion, we note the highly unique structure of TPL, established as a privately-held liquidating business trust in the late 1880s with the sole purpose of executing an orderly liquidation of its vast land holdings in Texas, in a manner that would maximize value for unitholders. Roughly 130 years later, the Trust remains in existence and its remaining land holdings happen to be located in one of the most prolific oil and gas basins in the world, with the technology finally available to extract and monetize the substantial natural resources endowed to that region. During the last five and 10 years, under the stewardship of TPL's current and former trustees and general agents, TPL shareholders have benefited tremendously from the Trust's inheritance of unmatched assets and the recent boom in oil and gas exploration and production in the Permian Basin.

In light of the Trust's recent performance and operational-related actions, as well as its current governance structure, particularly in the context of a modern corporate governance environment, we strongly encourage the board of trustees, regardless of its composition following this year's special meeting, to consider overhauling the structure of the Trust in order to adopt several fundamental tenets of corporate governance lacking at TPL, through a C-Corp conversion or other possible remedies. Among others, such reforms would include regular shareholder meetings and elections of directors, an expanded board comprised of a sufficient number of members to ensure diversity in thought, perspective, skill set and professional experience, as well as standard board committees which are common to most companies with billion-dollar market capitalizations, together with board members who are appropriately independent and qualified to serve on such committees. We believe a reformed governance structure is likely overdue at this point in light of the size and nature of the entity that TPL has evolved into in the last 130 years since its founding, particularly given TPL's growth and development over the last five years and its strategic and operational plans going forward.

That said, despite the numerous valid governance concerns that underpin much of the Dissidents' campaign, along with what we consider to be some fair critiques of TPL's performance, the upcoming shareholder vote should not be construed as a referendum on whether the Trust should immediately pursue a C-Corp conversion, in our opinion. Rather, we believe this proxy contest, like most others, comes down to which nominee is better suited to serve on the board and more likely to represent and advocate for the best long-term interests and rights of all shareholders. With due acknowledgement to Mr. Oliver's familiarity with TPL, the region in which TPL's land is located and the oil and gas royalty business, upon a full and objective review of the arguments put forward by the Dissidents and the Trust, we ultimately see a stronger case for shareholders to support the election of General Cook. While he may lack expertise in the various business activities presently occurring on TPL's land, in our view, General Cook has much broader and more impressive experience as a board member, including service on large public and private company boards, as well as a proven track record of advocating for and practicing good corporate governance, which we believe makes him the better choice for TPL shareholders at this time.

To be sure, we recognize the need for additional industry, capital allocation, financial and ancillary expertise on the TPL board, some of which General Cook also brings, and broader board membership generally. Still, we ultimately buy in to the notion that General Cook is capable and willing to act as an agent of change on the TPL board, including in response to any concerns and demands expressed across TPL's shareholder base -- including most of those vocalized by the Dissidents during this campaign. Indeed, if elected, General Cook states that he is committed to evaluating the Trust's governance structure to ensure that it is optimal for maximizing long-term shareholder value, including assessing the appropriate timing for a potential C-Corp conversion. General Cook also intends to advocate for enhanced engagement with and disclosures to shareholders. Notably, he also recognizes the importance of annual elections of directors, which he led the implementation of at Crane as chair of its nominating and governance committee. We also appreciate his views with respect to the appropriate role of trustees/directors versus managers and his ability to contribute on the TPL board despite his lack of ground-level experience of TPL's business. Finally, his commitment to serve a limited three-year term, as opposed to the lifetime appointment allowed for under the Trust's declaration, with the possibility of standing for re-election by shareholders at that time, emboldens his candidacy and should give shareholders greater comfort in supporting his election to the board, in our view.

Accordingly, we recommend that shareholders use the BLUE proxy card to vote **FOR** nominee Cook.

# APPENDIX

Questions or comments about this report, GL policies, methodologies or data? Contact your client service representative or go to www.glasslewis.com/issuer/ for information and contact directions.

## ▪▪ DISCLOSURES

© 2019 Glass, Lewis & Co., and/or its affiliates. All Rights Reserved.

This report is intended to provide research, data and analysis of proxy voting issues and, therefore, should not be relied upon as investment advice. Glass Lewis analyzes the issues presented for shareholder vote and makes recommendations as to how Glass Lewis believes institutional shareholders should vote their proxies, without commenting on the investment merits of the securities issued by the subject companies. Therefore, none of Glass Lewis' proxy vote recommendations should be construed as a recommendation to invest in, purchase, or sell any securities or other property. Moreover, Glass Lewis' proxy vote recommendations must be construed solely as statements of opinion, and not as statements of fact, and may be revised based on additional information or any other reason at any time.

The information contained in this report is based on publicly available information. While Glass Lewis exercises reasonable care to ensure that all information included in this report is accurate and is obtained from sources believed to be reliable, no representations or warranties express or implied, are made as to the accuracy or completeness of any information included herein. In addition, Glass Lewis shall not be liable for any losses or damages arising from or in connection with the information contained herein or the use or inability to use any such information.

Glass Lewis expects its subscribers possess sufficient experience and knowledge to make their own decisions entirely independent of any information contained in this report. Subscribers are ultimately and solely responsible for making their own voting decisions. This Glass Lewis report is intended to serve as a complementary source of information and analysis for subscribers in making their own voting decisions and therefore should not be relied on by subscribers as the sole determinant in making voting decisions.

All information contained in this report is protected by law, including but not limited to, copyright law, and none of such information may be copied or otherwise reproduced, repackaged, further transmitted, transferred, disseminated, redistributed or resold, or stored for subsequent use for any such purpose, in whole or in part, in any form or manner or by any means whatsoever, by any person without Glass Lewis' express prior written consent.

Glass Lewis recommends all clients carefully and periodically evaluate, among other things, Glass Lewis' research philosophy, approach, methodologies and conflict management, avoidance and disclosure policies and procedures. For information on Glass Lewis' policies and procedures including treatment of conflicts of interest, please visit: http://www.glasslewis.com/conflict-of-interest/.

## ▪▪ LEAD ANALYSTS

| M&A and Contests: | Governance: |
| --- | --- |
| Mark Grothe, CFA | Andrew Debnar |

# EXHIBIT F

# TEXAS PACIFIC LAND TRUST

# TRUSTEE QUESTIONNAIRE

| NAME: |
| --- |
|  |

## Purpose of this Questionnaire

This Questionnaire collects information required by Texas Pacific Land Trust (the "Trust") in connection with its preparation of the Proxy Statement (the "Proxy Statement") for the Trust's Special Meeting of Holders of Sub-share Certificates (the "Special Meeting"). It also requests information required for the Board of Trustees (the "Board") to determine compliance with NYSE independence standards and the financial expert requirements of the Securities and Exchange Commission (the "SEC").

Please be sure to read each question carefully. Please check the boxes "Yes" or "No" and write in your answers in the Explanation Areas provided for each question, as applicable. If the answer to any question is "None" or "Not Applicable," please so state. If additional space is required, please attach additional sheets. After you have returned this Questionnaire, if you learn of any information that would change any response in this Questionnaire, please inform the person listed below of such change. Both you and the Trust may be held responsible for misstatements or omissions in the Proxy Statement.

If you have any questions regarding completing this Questionnaire, please contact Karyn Fulton by email KFulton@KelleyDrye.com or by phone at (212) 808-7559.

## GENERAL INSTRUCTIONS

- Please answer every question, indicating "No" or "Not Applicable," where appropriate. Do not leave blanks. Please carefully review the information provided for you and make any necessary changes.

- Give answers as of the date you complete this Questionnaire unless otherwise specified.

- If you need more space, please attach more sheets as necessary, but add your name and signature to each.

- Certain terms used in this Questionnaire (including "Affiliate", "Associate", "beneficial ownership", "Family Member" and "Immediate Family Member") are defined in the attached Appendix A. Please review these definitions carefully to ensure that that your responses are accurate and complete.

- All references to the last fiscal year refer to the fiscal year beginning January 1, 2018, and ending December 31, 2018.

- In order to ensure compliance with the continuing NYSE director independence requirements, please keep Karyn Fulton up-to-date on a continuous basis throughout the year of any changes to your information provided in this Questionnaire.

- **Please return your completed and signed Questionnaire.** Your signature is required on the last page.  Please promptly notify Karyn Fulton at KFulton@KelleyDrye.com if developments occur that alter any of your responses prior to the Special Meeting, and promptly send any necessary revisions to Karyn Fulton.

# TABLE OF CONTENTS

1.        PERSONAL DATA ................................................................................................1
2.        PAST EXPERIENCE AND POSITION WITH THE TRUST ...............................5
3.        INTERLOCKS AND OTHER INVOLVEMENTS ...............................................8
4.        RELATIONSHIP WITH THE TRUST ...............................................................11
5.        LEGAL PROCEEDINGS ...................................................................................16
6.        COMPENSATION ..............................................................................................26
7.        INTEREST IN THE TRUST ...............................................................................35
8.        INTEREST IN TRANSACTIONS .......................................................................43
9.        INSIDER TRADING ...........................................................................................50
10.       AUDIT COMMITTEE MEMBERS ...................................................................51
11.       COMPENSATION COMMITTEE MEMBERS .................................................55
12.       MISCELLANEOUS ...........................................................................................57

APPENDIX A: DEFINITIONS

AFFIDAVIT

1.      **PERSONAL DATA**

      1.1      Full Name: _____

      1.2      Age:_____   Date of Birth:_____

      1.3      Residence Address:_____

      _____

      _____

      Primary telephone:_____

      Email:_____

      1.4      Business Address (if not "care of" the Trust):

      _____

      _____

      Business telephone:_____

      1.5      Please provide the requested information for all colleges and universities that you have attended or where you have pursued graduate or post-graduate studies, whether or not a degree was awarded.  Please indicate if each any college or university took disciplinary actions against you, including, but not limited to, issued warnings, placed you on probation, granted a leave of absence, advised you to withdraw, suspended you or expelled you.  If any such disciplinary action was taken, please provide details below. Please also indicate all honorary degrees received.

| Degree | Field of Study | Year Awarded | Name of Institution | Disciplinary Action |
|--------|----------------|--------------|---------------------|---------------------|
|        |                |              |                     |                     |
|        |                |              |                     |                     |
|        |                |              |                     |                     |
|        |                |              |                     |                     |
|        |                |              |                     |                     |
|        |                |              |                     |                     |

      1.6      Are you a member, officer or fellow, or do you otherwise belong to any industry, trade or professional organizations?

      No ☐ Yes ☐

If "Yes," please list all industry, trade or professional organizations for which you are a member, officer or fellow or to which you otherwise belong.

| Organization | Role |
|---|---|
| | |
| | |
| | |

       1.7    Do you have any honors or awards bestowed by industry, trade or professional organizations since January 1, 2014?

       No ☐ Yes ☐

If "Yes," please list all honors or awards bestowed by industry, trade or professional organizations since January 1, 2014.

| Organization | Award |
|---|---|
| | |
| | |
| | |

       1.8    Do you have any industry, trade or professional certifications (e.g., certified public accountant)?

       No ☐ Yes ☐

If "Yes," please list all industry, trade or professional certifications, and if applicable, the license number and/or expiration date for any such certifications.

| Certification | License Number | Expiration Date |
|---|---|---|
| | | |
| | | |
| | | |

       1.9    Director or Trustee Experience

If you are a trustee or nominee for trustee, please describe any relevant qualifications, experience, attributes or skills that you have had that would qualify you to serve as a trustee of the Trust.  Please note that this information can include any specific past experience that could be useful to the Trust, such as previous directorships or employment with companies in the same industry as the Trust or specific areas of expertise, such as accounting, finance, risk assessment skills or experience with compensation, and this information can

extend beyond the past five years.

**Explanation Area for Question 1.9**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

       1.10    Have you ever been enjoined or otherwise prohibited from serving, or asked to resign or not to stand for reelection, as a director of any company or other entity?

       No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 1.10**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

       1.11    Are you aware of any services or products of any company for which you or any of your Affiliates or Associates serve as director or officer that could be regarded as competitive with those of the Trust or its subsidiaries or Affiliates?

       No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 1.11**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

1.12    Do you or does any Affiliate or Associate of yours have any interest, direct or indirect, by security holdings or otherwise, in any matters to be acted upon at the Special Meeting, other than you potentially being a trustee nominee?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 1.12**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

1.13    Is it proposed that you be selected as a trustee or officer of the Trust pursuant to any arrangement or understanding between you and any other person(s) (except the trustees and officers of the Trust acting solely in that capacity)?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 1.13**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

1.14    Have you ever been, formally or informally, the subject of any allegations of sexual harassment, sexual misconduct or any other unethical conduct?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 1.14**

|  |
|--|
|  |
|  |
|  |
|  |
|  |

|  |
|--|
|  |

1.15    Is there any undisclosed fact about you, your past conduct or your background that, if it became public, would be embarrassing or otherwise negatively reflect upon you or any institution on whose board you are sitting?

No ☐ Yes ☐

If "Yes," please describe in detail.

**Explanation Area for Question 1.15**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

2.    **PAST EXPERIENCE AND POSITION WITH THE TRUST**

2.1    List your present principal occupation or employment and all of your principal occupations and employment during the past five years, including but not limited to any executive officer position.  In each case, state the name and principal business of any entity or other organization for which you work or have worked; give a brief explanation of the nature of your responsibilities in each such prior position and, if such corporation or organization was a parent or subsidiary of, or affiliated with, the Trust, describe the nature of the business relationship.  Also include any public issuer of which you currently serve or have served as a director, your term of office and the time during which you have held such directorship.

| Description of Positions Held or Presently Hold (Including Job Title and Nature of Responsibilities) | Name of Entity | Nature of Business | Nature of Any Affiliation of Entity to Texas Pacific Land Trust | Time Period (Month and Year) | |
|---|---|---|---|---|---|
|  |  |  |  | From | To |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

2.2     If not disclosed above, list all <u>current</u> offices and positions with the Trust and with any parent, subsidiary, Affiliate or joint venture of the Trust that you hold, the date(s) you took office and your term(s) of position or office.

| Office or Position | Time Period (Month and Year) | |
|---|---|---|
| | From | To |
| | | |
| | | |
| | | |

2.3     If not disclosed above, list all <u>past</u> offices and positions with the Trust and with any parent, subsidiary, Affiliate or joint venture of the Trust.  (Please list in reverse chronological order and give dates.)

| Office or Position | Time Period (Month and Year) | |
|---|---|---|
| | From | To |
| | | |
| | | |
| | | |

2.4     Other than your potential nomination as a trustee or appointment as an officer of the Trust, do you have any personal, professional, economic, business or other involvement or connection (past or current) to any existing member of the Board or anyone that you know is being nominated to the Board?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 2.4**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

2.5     Are you now or have you during the Trust's 2018 fiscal year been a member, employee or Associate of, or of counsel to, any law firm that the Trust has retained at any time during the Trust's last three fiscal years, or which the Trust proposes to retain during the Trust's 2019 fiscal year?

No ☐ Yes ☐

If "Yes," please state the name of the firm and the nature of your affiliation with it.  The aggregate dollar amount of all payments made by the Trust to the firm in the Trust's last fiscal year should be stated if the amount exceeds 5% of the law firm's gross revenues for its last fiscal year.

**Explanation Area for Question 2.5**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

2.6     Are you a partner or executive officer of any investment banking firm that has performed services for the Trust during the Trust's 2018 fiscal year or that the Trust proposes to retain during the Trust's 2019 fiscal year?

No ☐ Yes ☐

If "Yes," please state the name of each firm and the nature of your affiliation with it.  The amount of compensation should be stated if the amount exceeds 5% of the investment banking firm's consolidated gross revenues for that firm's last fiscal year.

**Explanation Area for Question 2.6**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

2.7     Do you have any business or personal relationship with any compensation consultant, legal counsel or any other adviser that has performed services during the Trust's 2018 fiscal year or that the Trust or the Compensation Committee proposes to retain during the Trust's 2019 fiscal year for the Trust, the Compensation Committee or the firm that employs any such adviser, other than as already disclosed in response to the Questions in this Section 2.

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 2.7**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

2.8     Are you an investor in any fund, other than broad market or index funds, that you know owns shares of the Trust?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 2.8**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

3.     **INTERLOCKS AND OTHER INVOLVEMENTS**

3.1     Are you currently, or have you been in the last five years, a director or executive officer, or have you been publicly or privately nominated, <u>proposed or selected to become a director</u>, of any publicly held company or any investment company registered under the Investment Company Act of 1940 (other than the Trust)?  Please add additional sheets as necessary.

|  | _____ (Name of Entity) | _____ (Name of Entity) | _____ (Name of Entity) |
|---|---|---|---|
| Position(s) held: |  |  |  |
| Term of Service (Month and Year of Start and End Dates) |  |  |  |  |  |  |

| | | | |
|---|---|---|---|
| Does the entity have a compensation committee (or other board committee performing equivalent functions) or did it have one at any time during the past fiscal year? | No ☐ Yes ☐ | No ☐ Yes ☐ | No ☐ Yes ☐ |
| Do you serve or have you served on that entity's compensation committee (or other board committee performing equivalent functions) now or at any time during the past fiscal year? | No ☐ Yes ☐ | No ☐ Yes ☐ | No ☐ Yes ☐ |
| Which person or entity nominated or proposed you for such service, if applicable | | | |
| Have any directors or executive officers of that entity served on the Trust's board of trustees or compensation committee during the past fiscal year? | No ☐ Yes ☐ | No ☐ Yes ☐ | No ☐ Yes ☐ |

3.2    Do you hold a position with any other entity (including companies, partnerships, trusts, charitable organizations, etc.), besides the Trust in which you are a director, trustee, partner, or officer, regardless of the ownership in that entity?

No ☐ Yes ☐

If "Yes," please list your title and position with any other entity (including companies, partnerships, trusts, etc.), besides the Trust, in which you are a director, trustee, partner, or officer, regardless of the ownership in that company and your term of service.

| Entity Name | Office or Position | Time Period (Month and Year) | |
|---|---|---|---|
| | | From | To |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

3.3    Are there any entities (includes companies, partnerships, trusts, etc.) of which you hold 1.0% or more of the voting securities or otherwise significantly influence?

No ☐ Yes ☐

If "Yes," please provide the names and descriptions of such entities (includes companies, partnerships, trusts, etc.) of which you hold 1.0% or more of the voting securities or otherwise significantly influence.

| Entity Name | Description of Entity |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

      3.4    Do you control, directly or indirectly, any entities (includes companies, partnerships, trusts, charitable organizations, etc.)?

      No ☐ Yes ☐

If "Yes," please provide the names and descriptions of such entities (includes companies, partnerships, trusts, charitable organizations etc.).

| Entity Name | Description of Entity |
|---|---|
|  |  |
|  |  |
|  |  |

      3.5    During the current or the past three fiscal years, did you or any Immediate Family Member serve as a director, trustee, advisory board member, executive officer, or other similar position of any charitable organization?

      No ☐ Yes ☐

If "Yes," please indicate below (i) the name of the charitable organization, (ii) the name of the person and the relationship to you, (iii) the position held with the charitable organization and (iv) whether you are aware of any contributions made by the Trust to the charitable organization, specifying the dollar amount of any such contributions.  Also describe briefly below any transaction involving payment by the Trust (in excess of $1 million or 2% of either the Trust's or the recipient's revenues) to any organization (charitable or for-profit) or cause on your behalf, your benefit, at your direction, or of which you are an executive officer, director, or greater than 10% shareholder.

| Charitable Organization | Person and Relationship | Position with the Charitable Organization | Trust Contribution to Charitable Organization |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |

**Explanation Area for Question 3.5**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

> 3.6     Do you have a Family Member that is an individual who is, or at any time during the past three years was, employed by the Trust as an executive officer?

> No ☐ Yes ☐

If "Yes," identify the individual, his or her executive office and the term of service in such office.

| Name | Office | Time Period (Month and Year) | |
|---|---|---|---|
|  |  | From | To |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

4.     **RELATIONSHIP WITH THE TRUST**

> 4.1     Are you, or at any time during the past five fiscal years have you been, an Extended Family Member of any person who is, or was during the past five fiscal years, a trustee, director, executive officer, nominee for trustee or executive officer of the Trust or any of the Trust's parents, subsidiaries, or Affiliates?

> No ☐ Yes ☐

If "Yes," please describe below such family relationships and the Family Member's relationship with the Trust.

**Explanation Area for Question 4.1**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

4.2     To further assist the Trust in properly identifying related parties and its relationships and transactions with related parties, please identify below any Affiliates of any of your Immediate Family Members.  Please list the name of the Affiliate, the name of the Immediate Family Member and identify how the Immediate Family Member is affiliated.

| Family Member | Affiliate | Description of Affiliation |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

4.3     If you are a trustee of the Trust, list any committees of the Board of Trustees of which you are a member and state any committee chairs you hold.

**Explanation Area for Question 4.3**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

**If you are a trustee of the Trust, answer Questions 4.4–4.8:**

4.4     During any 12-month period within the three years preceding December 31, 2018 and continuing through the date hereof, have you or a Family Member had a direct or indirect interest in any transactions or series of similar transactions, or any currently proposed transaction, to which the Trust or any of its subsidiaries was or is to be party, or do you now have a relationship with a trustee-related company which had or proposes to enter into any such transaction, such transaction or series of transactions being in excess of $120,000?

**Instructions to Question 4.4:** *The amount involved in a transaction is to be computed without regard to the amount of profit or loss involved in the transaction. In computing the amount involved in the transaction or series of transactions, include all periodic installments in the case of any lease or other agreement providing for periodic payments or installments.*

*In answering this question, please include: (1) any compensation given in connection with consulting or personal services contracts, (2) any political contributions and (3) all loans and payments made by the Trust to you or any of your Family Members. Direct compensation for employment, fees received for service as a trustee and normal contributions or benefits under tax-qualified benefit plans of the Trust and/or its subsidiaries should not be reported under this Question.*

No ☐ Yes ☐

If you answered "Yes," please describe the transaction below as required in the instructions preceding this Question and include the following in your response to the extent applicable: (i) the name of the trustee-related company; (ii) the nature of your affiliation with it; (iii) the relationship or proposed relationship between the trustee-related company and the Trust and/or its subsidiaries; and (iv) the dollar amount or percentage of revenues of the business done or proposed to be done between the trustee-related company and the Trust and/or its subsidiaries.

**Explanation Area for Question 4.4**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

4.5     Have you or a Family Member, within the past five years, accepted any compensation from the Trust in excess of $120,000 during any period of 12 consecutive months other than: (i) compensation for board or board committee service, (ii) compensation paid to a Family Member who is an employee (other than an executive officer) of the Trust and (ii) benefits under a tax-qualified retirement plan, or non-discretionary compensation?

No ☐ Yes ☐

If you answered "Yes," please describe in detail, including naming the individual who has received such compensation, a description of the type of compensation and the amount received.

**Explanation Area for Question 4.5**

|  |
|--|
|  |
|  |
|  |

-13-

| |
|---|
| |
| |
| |
| |

4.6     Are you or a Family Member a current partner of the Trust's outside auditor?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 4.6**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

4.7     Have you or a Family Member been a partner or employee of the Trust's outside auditor and worked on the Trust's outside audit at any time within the past three fiscal years?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 4.7**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

4.8     Have you or a Family Member been, within the past three fiscal years, employed as an executive officer of any entity? If so, did you or any of the Trust's executive officers at the same time serve on that entity's compensation committee?

No ☐ Yes ☐

If "Yes," please identify the persons and companies, stating the nature of any family relationships.

| Person | Name of Other Entity | Nature of Familiar Relationship | Trust Executive Officers on Compensation |
|---|---|---|---|

-14-

| | | | Committee of Other Entity |
|---|---|---|---|
| | | | |
| | | | |

4.9     Do you have a close relationship with any member of the audit engagement team of the Trust's outside auditor or have you vacationed with a member of the audit engagement team?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 4.9**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

4.10     If you are (1) a trustee of the Trust or (2) in a financial oversight role in management, does the Trust's outside auditor provide tax services to you or any Immediate Family Member?

No ☐ Yes ☐ N/A ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 4.10**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

4.11     Are you aware of any other relationship not described above between yourself or an Immediate Family Member (directly or as a partner, shareholder, director or officer of any entity or organization which has a relationship with the Trust) and the Trust or the management of the Trust about which you believe the Board should be informed in making its determination whether you have a material relationship with the Trust?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 4.11**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

5.    **LEGAL PROCEEDINGS**

**Instructions to Section 5:**  *For purposes of computing the 10-year period referred to in this section, the date of a reportable event in bankruptcy is the date of filing for uncontested petitions or the date upon which approval of a contested petition became final and the date of a reportable event for legal proceedings is the date on which the final order, judgment or decree was entered, or the date on which any rights of appeal from preliminary orders, judgments or decrees have lapsed.*

5.1    Within the last 10 years, has a petition under the U.S. Bankruptcy Code or any state insolvency law been filed by or against (a) you, (b) any partnership of which you were a general partner when the petition was filed or within two years before the time of such filing or (c) any corporation or business association of which you were an executive officer at or within two years before the time of such filing?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.1**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

5.2    Within the last 10 years, has a court appointed a receiver, fiscal agent or similar officer for your business or property, or the business or property of any partnership, corporation or business association referred to in Question 5.1?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.2**

|  |
|---|
|  |
|  |

|  |
|---|
|  |
|  |
|  |
|  |

5.3     Have you been convicted in any criminal proceeding (including convictions for fraud) or are you the subject of any pending criminal proceeding (including for fraud)? You may exclude traffic violations and other minor offenses.

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.3**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

5.4     Have you been found by any court of competent jurisdiction in a civil action, by the SEC or by the Commodities Futures Trading Commission (the "CFTC"), in a judgment or finding not subsequently reversed, suspended or vacated, to have violated any federal or state securities laws or any federal commodities laws?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.4**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

5.5     Within the last 10 years, have you been the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any court or any federal or state authority, permanently or temporarily enjoining you from or otherwise limiting your involvement in:

(a)     acting as a futures commission merchant, introducing broker, commodity trading adviser, commodity pool operator, floor broker, leverage transaction merchant, any other

-17-

person regulated by the CFTC, or an associated person of any of the foregoing, or as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or insurance company, or engaging in, or continuing any conduct or practice in connection with, such activity?

        (b)    engaging in any type of business practice?

        (c)    engaging in any activity in connection with the purchase or sale of securities or commodity or any other business or engagement?

        No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.5**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

        5.6    Within the last 10 years, have you been the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any federal or state authority barring, suspending or otherwise limiting for more than 60 days your right to participate in the purchase or sale of securities or to be associated with Persons engaged in any such activity?

        No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.6**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

        5.7    Within the last 10 years, have you been the subject of, or a party to, any Federal or State judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated:

        (a)    relating to an alleged violation of any federal or state securities or commodities law or regulation;

        (b)    relating to an alleged violation of any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction,

-18-

order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order;

(c)      relating to an alleged violation of any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity;

(d)      relating to an alleged violation of any law or regulation prohibiting fraudulent, manipulative or deceptive conduct;

(e)      relating to an alleged breach of fiduciary duties by you;

(f)      that: (1) suspended or revoked your registration as a broker, dealer, municipal securities dealer or investment adviser; (2) limits or limited your activities, functions or operations as a broker, dealer, municipal securities dealer or investment adviser; (3) barred you from being associated with any entity; or (4) bars or barred you from participating in any penny stock offering; or

(g)      that directed you to cease and desist from committing or causing a violation or future violation of: (1) any anti-fraud provisions of the federal securities laws; or (2) any provision of Section 5 of the Securities Act of 1933?

No ☐ Yes ☐

If you answered "Yes," please describe in detail and include whether such order restrains or enjoins, or has previously restrained or enjoined you from engaging or continuing to engage in any conduct, practice or work in relation with (1) a regulated entity, (2) the business of securities, insurance, banking, or investment or (3) a savings association or credit union.

**Explanation Area for Question 5.7**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

5.8      Within the last 10 years, have you been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any "self-regulatory organization" such as the New York Stock Exchange (NYSE), the Nasdaq Stock Market or the Financial Industry Regulatory Authority, any registered entity (as defined in the Commodity Exchange Act), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member, including being suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.8**

|  |
|--|

| |
|---|
| |
| |
| |
| |
| |
| |
| |

5.9     State whether you or any Associate has an interest adverse to that of the Trust or any of its subsidiaries or are a party adverse to the Trust or any of its subsidiaries in any legal proceedings, including proceedings to require the Trust to indemnify the officer or trustee for damages that is pending or was pending at any time since January 1, 2017.

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.9**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

5.10     **Legal Proceedings and Investigations**

Do you know of any pending or contemplated legal, regulatory or administrative proceeding or investigation by any governmental authority and bankruptcy, receivership or similar proceedings (including but not limited to antitrust, price-fixing, securities, tax, environmental, copyright or patent litigation) to which the Trust or any subsidiary of the Trust, any Associate of yours, any trustee, officer or Affiliate of the Trust or any owned of record of more than 5% of any class of voting securities of the Trust, or any Associate or Family Member of any such trustee, officer or security holder, are or may be a party or of which any such Person's property (or property of others in which the Trust or any subsidiary has or claims rights) is or may be subject?

No ☐ Yes ☐

If you answered "Yes," please describe in detail, including the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties, a description of the factual basis alleged to underlie the proceeding and the relief sought.

**Explanation Area for Question 5.10**

| |
|---|
| |
| |
| |

| |
|---|
| |
| |
| |
| |
| |

5.11    To the best of your knowledge, has any promoter or control Person of the Trust been involved in any proceeding or subject to any order of any of the types described above in this Section 5?

**Instructions to Question 5.11:**  *For purposes of this question, a "promoter" includes a Person who alone or with others participated in founding or organizing the Trust or who received 10% or more of our stock in connection with the founding or organizing of the Trust for services or property and a "control person" is one who directly or indirectly controls the Trust.*

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.11**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

5.12    If any event listed in this Section 5 has occurred within the prior 10 years, but you believe that (a) such event is not material to an evaluation of your ability or integrity and that the Proxy Statement should accordingly omit any description of such event; or (b) there are mitigating circumstances that the Trust may wish to explain in the Proxy Statement, then please state the reasons for your belief below.

**Explanation Area for Question 5.12**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

5.13    If any event similar to any of those listed above in this Section 5 occurred more than 10 years ago, but would be so material to an evaluation of your ability or integrity that it should nonetheless be disclosed in the Proxy Statement, please describe below.

-21-

**Explanation Area for Question 5.13**

| |
|---|
| |
| |
| |
| |
| |
| |
| |

5.14    Are you subject to any (a) US Postal Service false representation order entered within the past five years or (b) temporary restraining order or preliminary injunction relating to conduct alleged by the US Postal Service that constitutes a scheme or device for obtaining money or property through the mail by means of false representations?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.14**

| |
|---|
| |
| |
| |
| |
| |
| |
| |

5.15    **Foreign Corrupt Practices Act**

Do you have knowledge or reason to believe that any officer, trustee, partner or employee of the Trust or any of its subsidiaries has or may have engaged, directly or indirectly, in, at any time since the founding of the Trust:

(a)    any bribes or kickbacks to government officials or their relatives, or any other payments to such Persons, whether or not legal, to obtain or retain business or to receive favorable treatment with regard to business?

(b)    any bribes or kickbacks to Persons other than government officials, or to relatives of such Persons, or any other payments to such Persons or their relatives, whether or not legal, to obtain or retain business or to receive favorable treatment with regard to business?

(c)    any contributions, whether or not legal, made to any political party, political candidate or holder of governmental office?

(d)    any bank accounts, funds or pools of funds created or maintained without being reflected on the corporate books of account, or as to which the receipts and disbursements therefrom have not been reflected on such books?

-22-

(e)     any receipts or disbursements, the actual nature of which has been "disguised" or intentionally misrecorded on the corporate books of account?

(f)     any fees paid to consultants or commercial agents that exceeded the reasonable value of the services purported to have been rendered?

(g)     any payments or reimbursements made to personnel of the Trust for the purposes of enabling them to expend time or to make contributions or payments of the kind or for the purpose referred to in subparts (a)–(f) above?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.15**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

5.16     Are you involved or potentially involved in, or do you have knowledge of, any of the following matters: (a) the disbursement or receipt of funds of the Trust or any of its Affiliates outside the normal system of accountability; (b) payments or contributions by or to the Trust or any of its trustees, Executive Officers or Affiliates, employees or agents, whether direct or indirect, to or from any foreign or domestic governments, political parties, officials, employees or agents thereof, whether or not legal, to obtain or retain business or to receive favorable treatment with regard to business; (c) the improper or inaccurate recording of payments and receipts on the books of the Trust or any of its Affiliates; (d) any bank accounts, funds or pools of funds created or maintained by the Trust or any of its Affiliates without being reflected on the books of the Trust or any of its Affiliates; or (e) fees paid by the Trust or any of its Affiliates to consultants, contractors or agents that exceeded the reasonable value of the services purported to have been rendered?

No ☐ Yes ☐

If you answered "Yes," please fully describe the disbursement, payment or contribution, improper or inaccurate recording, accounts or funds and fees paid, including the source, date, amount, and recipient of such payment or contribution.

**Explanation Area for Question 5.16**

|  |
|---|
|  |
|  |
|  |

|  |
|  |
|  |
|  |
|  |
|  |

### 5.17    Certain Transactions and Dealings with Iran

Under Section 219 of the Iran Threat Reduction and Syria Human Rights Act of 2012, the Trust must provide disclosures regarding the following:

Have you or any of your Affiliates, directly or indirectly, or do you have any information indicating that the Trust, any subsidiary or any Affiliate of the Trust, or any co-joint venturor of the Trust or of any subsidiary or Affiliate of the Trust has:

(i)        knowingly made or is making any investment that would contribute to the enhancement of Iran's ability to develop petroleum resources;

(ii)       knowingly sold, leased or provided, or is selling, leasing or providing, to Iran goods, services, technology, information or support that would facilitate the maintenance or expansion of Iran's domestic production of refined petroleum products, including assistance with respect to the construction, modernization or repair of petroleum refineries;

(iii)      knowingly sold or provided, or is selling or providing, to Iran goods, services, technology, information or support that could contribute to the enhancement of Iran's ability to import refined petroleum products, including underwriting or entering into a contract to provide insurance or reinsurance for the sale, lease or provisions of such goods, services, technology, information or support, financing or brokering any such sale, lease or provision or providing of ships or shipping services to deliver refined petroleum products to Iran;

(iv)      knowingly exported, transferred or otherwise provided, or is exporting, transferring or otherwise providing, to Iran goods, services, technology or other items that would contribute to the ability of Iran to acquire or develop chemical, biological or nuclear weapons or related technologies, destabilizing numbers and types of advanced conventional weapons or missiles or advanced conventional weapons designed or modified to deliver a nuclear weapon;

(v)       knowingly been or is engaged in any activity facilitating the efforts of the Government of Iran or Iran's Revolutionary Guard Corps or an agent or Affiliate thereof:  (A) to acquire or develop weapons of mass destruction or delivery systems therefor; or (B) to provide support for organizations designated as foreign terrorist organizations under Section 219(a) of the Immigration and Nationality Act, as amended, or for acts of international terrorism (as defined in the Iran Sanctions Act of 1996, as amended);

(vi)      knowingly been or is engaged in any activity facilitating the activities of a person subject to financial sanctions pursuant to any resolution of, or agreed to by, the United Nations Security Council that imposes sanctions on Iran;

(vii)     knowingly been or is engaged in:  (A) money laundering; or (B) any activity facilitating efforts by the Central Bank of Iran or any other Iranian financial institution, in each case, to carry out any activity described in clause (v) or (vi) above;

(viii)    knowingly been or is engaged in any activity facilitating a transaction or transactions, or providing significant financial services for, or any transaction with or benefitting, Iran's Revolutionary Guard Corps or any of its agents or Affiliates or a financial institution whose

-24-

property or interests in property are blocked pursuant to the International Emergency Economic Powers Act in connection with Iran's proliferation of weapons of mass destruction, other military capabilities or delivery systems therefor or Iran's support of international terrorism;

(ix)    knowingly been or is engaged in the transfer, or has facilitated or is facilitating the transfer, of:  (A) goods or technologies to commit serious human rights abuses against the people of Iran, including firearms, ammunition, rubber bullets, police batons, pepper or chemical sprays, stun grenades, electroshock weapons, tear gas, water cannons, or surveillance technology; or (B) any hardware, software, telecommunications equipment, or any other technology that could be used to restrict the free flow of unbiased information in Iran or to disrupt, monitor or otherwise restrict speech of the people of Iran, which transfer is made to Iran, any entity organized under the laws of Iran or otherwise subject to the jurisdiction of the Government of Iran or any national of Iran for use in or with respect to Iran;

(x)    knowingly provided or is providing services, including services relating to hardware, software and specialized information, or professional consulting, engineering and support services with respect to the goods or technologies described in clause (ix)(B) above after such goods or technologies are transferred to Iran;

(xi)    knowingly engaged or is engaging in any transaction or dealing with: (A) any person whose property and interests in property are blocked pursuant to Executive Order 13224 or 13382 of the President of the United States (the list of persons currently subject to such blocks is available at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx); (B) the Islamic Republic of Iran; (C) the Government of Iran, any political subdivision, agency or instrumentality thereof; (D) any entity owned or controlled directly or indirectly by the Islamic Republic of Iran, the Government of Iran or any political subdivision, agency or instrumentality thereof; or (E) any person that is or may be acting or purporting to act, directly or indirectly, for the Islamic Republic of Iran, the Government of Iran, any political subdivision, agency or instrumentality thereof or any entity owned or controlled, directly or indirectly, by the Islamic Republic of Iran, the Government of Iran, or any political subdivision, agency or instrumentality thereof; or

(xii)    knowingly engaged in any transactions with the Iranian government or any political subdivision or agency or any entity owned or controlled by the Iranian government without specific authorization from a U.S. federal department or agency or with any persons or entities whose assets are frozen pursuant to executive orders for their involvement with weapons of mass destruction or terrorism?

No ☐ Yes ☐

If you answered "Yes," please identify each person engaged in each such activity as to which you have information and describe the nature and extent of such activity, the gross revenues and net profits, if any, attributable to such activity and whether the person engaged in such activity intends to continue such activity, the date or dates on which such activity took place, and note if such activity is ongoing.

**Explanation Area for Question 5.17**

| |
|---|
| |
| |
| |
| |
| |

|  |
|--|
|  |
|  |

5.18    Do you have knowledge, or any reason to believe, that the Trust or any of its subsidiaries has or may have engaged, directly or indirectly, in any contributions, whether or not legal, made to any political party, political candidate or holder of public office?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 5.18**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

6.    **COMPENSATION**

**Instructions to Section 6:**  *For purposes of this section, it is not necessary to list cash compensation you received as salary, bonus, or trustee's fees.*

6.1    State the compensation received, and expected to be received from the Trust, any of its subsidiaries or joint ventures, or from any other party, for services rendered to the Trust during the fiscal year ended December 31, 2018, pursuant to any special arrangements with the Trust or any of its subsidiaries or joint ventures (*e.g.*, consulting, advisory, or other compensatory fee).   State separately the amount of all such compensation received in the fiscal year ended December 31, 2018, for services rendered in any prior fiscal year.

| Description of Compensation and Related Terms and Conditions | Dollar Value |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

6.2    Describe and state the amount (based on the aggregate incremental cost to the Trust) of any other cash or noncash benefits, not included in the answer to Question 6.1, you received during the fiscal year ended December 31, 2018.  This may include (but is not limited to) perquisites or other personal benefits, securities or property, such as:

- home repairs and improvements;
- housing and living expenses (including domestic services) provided at your principal or vacation residence;

-26-

- the personal use of Trust property such as automobiles, airplanes, yachts, apartments or vacation houses;
- personal travel expenses, including commuting expenses;
- personal entertainment and related expenses;
- personal tax or financial advice;
- security provided at a personal residence or during personal travel;
- payment of life or other insurance premiums for coverage of Person or property unrelated to the business of the Trust;
- legal, accounting and other professional fees for matters unrelated to the business of the Trust;
- benefits from third parties, such as favorable loans and benefits from suppliers, if the Trust compensated, directly or indirectly, the bank or supplier for providing the loan or services to management;
- all "gross-ups" or other amounts reimbursed during the fiscal year ended December 31, 2018, for payment of your taxes;
- the use of corporate staff for personal purposes;
- relocation expenses;
- memberships in country clubs or other social or recreational clubs not used exclusively for business entertainment activities;
- dollar value of any charitable donations made by the Trust in your name;
- amount paid or accrued to you pursuant to a plan or arrangement in connection with resignation, retirement, or any other termination; and
- amount paid or accrued to you pursuant to a plan or arrangement in connection with a change in control of the Trust.

**Explanation Area for Question 6.2**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

**Executive officers should answer Questions 6.3–6.9, trustees and trustee nominees should answer only Question 6.99.**

6.3    During the Trust's 2018 fiscal year, did the Trust match any of your charitable gifts?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.3**

| Charitable Organization | Amounts Matched by the Trust |
|---|---|
|  |  |
|  |  |

6.4     Since January 1, 2018, have you, or an Immediate Family Member, received products or services from the Trust?

No ☐ Yes ☐

If "Yes," please indicate whether all of the products and services were provided in the ordinary course of the Trust's business and on substantially the same terms as those prevailing at the time for comparable products or services provided to unaffiliated third parties?

**Explanation Area for Question 6.4**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

6.5     Did you have any role in determining or recommending the amount or form of executive or trustee compensation?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.5**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

6.6     Describe any written or unwritten compensatory plan or arrangement (other than the Trust's stock option plans) with the Trust or its subsidiaries, including payments or other benefits to be received from the Trust, if such plan or arrangement results or will result from (a) your resignation, retirement or any other termination of employment with the Trust, (b) a change of control of the Trust

-28-

or (c) a change in your responsibilities.  Include the amount to be received by you in each such circumstance.  Note any tax reimbursement or gross-up provisions. Also note any conditions or obligations applicable to the receipt of the payments or benefits.

**Explanation Area for Question 6.6**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

      6.7     Please describe any pension plan, annuity contract, defined benefit plan, actuarial plan or other similar agreement you have with the Trust or any of its subsidiaries.

**Explanation Area for Question 6.7**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

      6.8     List the dollar value of any Trust contributions during the last fiscal year to any plan that provides for the deferral of compensation on a basis that is not tax-qualified. Also list the balance of your account as of the end of the last fiscal year and the dollar amounts of (a) any contributions you made, (b) aggregate interest or other earnings accrued and (c) any withdrawals or distributions relating to such plan during the last fiscal year.

**Explanation Area for Question 6.8**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

6.9     Did you receive payment or other personal compensation or benefit since the beginning of the prior fiscal year from any party other than the Trust?

(a)      for services to the Trust?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.9(a)**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

(b)      pursuant to a transaction between the Trust or a subsidiary and such a party?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.9(b)**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

(c)      by reason of your position as an executive officer of the Trust?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.9(c)**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |

6.10   List any employment contracts between you and the Trust (executive officers may exclude those already listed in response to Question 6.6 above) and describe the key terms and conditions below.

**Explanation Area for Question 6.10**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

**Answer Questions 6.11 and 6.12 only if you are a trustee:**

6.11   Have you received any payment for your services as trustee or a member of a committee pursuant to an arrangement not applicable to all trustees or similarly situated committee members, respectively?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.11**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

6.12   Since January 1, 2018, has any compensation (including securities, property or personal benefits) been distributed to you, directly or indirectly, or accrued for your account, by any person or entity other than the Trust (i) for services rendered or relating to the Trust, (ii) pursuant to a transaction between the Trust and such person or entity or (iii) on account of your position as a trustee, nominee or executive officer of the Trust?

No ☐ Yes ☐

If "Yes," please describe below all material terms of the agreement, arrangement or understanding and name the other person(s) that are parties to this agreement, arrangement or understanding, including the details of any compensation provided.

-31-

**Explanation Area for Question 6.12**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

6.13    Are any payments (other than those payments of which the Trust is aware) proposed to be made in the future to you or for your benefit, directly or indirectly pursuant to any existing contract, plan or arrangement, by any person, in connection with or related to your candidacy or service as a trustee or executive officer of the Trust?

No ☐ Yes ☐

If "Yes," please describe below all material terms of the agreement, arrangement or understanding and name the other person(s) that are parties to this agreement, arrangement or understanding, including the details of any compensation provided.

**Explanation Area for Question 6.13**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

6.14    Other than as indicated in your response to Question 6.6, is there any contract, agreement, plan or arrangement, whether written or unwritten, that provides for payment(s) or the provision of other benefits, including perquisites and health care benefits, at, following, or in connection with (i) any termination, including without limitation resignation, severance, retirement or other termination (including constructive termination) of your employment with the Trust, (ii) a change in control of the Trust or (iii) a change in your responsibilities?

No ☐ Yes ☐

If "Yes," please describe below all material terms of the agreement, arrangement or understanding and name the other person(s) that are parties to this agreement, arrangement or understanding, including the details of any compensation provided.

**Explanation Area for Question 6.14**

-32-

| |
|---|
| |
| |
| |
| |
| |
| |
| |

6.15    Have you (or any of your Associates or any Immediate Family Members) received, either directly or indirectly including through any subsidiary, any credit or personal loan from the Trust?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.15**

| |
|---|
| |
| |
| |
| |
| |
| |
| |

6.16    If you answered "Yes" to Question 6.15, have there been any material modifications to the line of credit or loan(s)?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.16**

| |
|---|
| |
| |
| |
| |
| |
| |
| |

6.17    Has the Trust or any other person on its behalf paid any insurance premiums for your benefit and, if so, is there any arrangement or understanding, formal or informal, that you have or will receive or be allocated an interest in any cash surrender value under the insurance policy? List the dollar value of any life insurance premiums paid by, or on behalf of, the Trust during the fiscal year ended December 31, 2018, with respect such life insurance for your benefit.

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.17**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

      6.18    Are you a participant in any profit sharing, thrift, or similar plan of the Trust or any of its subsidiaries?

      No ☐ Yes ☐   If you answered "Yes," please describe the plan below.

**Explanation Area for Question 6.18**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

      6.19    Have you received any of the following during the Trust's 2018 fiscal year: amounts reimbursed during the fiscal year for the payment of taxes?

      No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.19**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

6.20    If you have purchased securities of the Trust during the Trust's 2018 fiscal year, was there a difference between the dollar value you paid and the fair market value of such securities on the date of purchase?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 6.20**

|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

**Answer Question 6.21 only if you are trustee of the Trust.**

6.21    In the last fiscal year, did the Trust make any payments or promises of payments in your name pursuant to trustee legacy programs or similar charitable award programs?

No ☐ Yes ☐

If "Yes," disclose the dollar amounts paid or payable by the Trust under the program and other terms of each program in detail.

**Explanation Area for Question 6.21**

|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

7.    **INTEREST IN THE TRUST**

**Instructions to Section 7:**    *"Beneficial ownership" generally means <u>having</u> or <u>sharing</u> voting power or investment/dispositive power with respect to the security, e.g., shares held by a spouse, minor child, or other member of your household, an adult child whom you support at college or whose permanent address is the same as yours, or shares held by a trust, corporation, partnership, or other entity over which you have or share control. The fact that a security is not registered in your name does not preclude you from being a beneficial owner of that security. In addition, more than one Person may be the beneficial owner of the same*

-35-

*shares of stock if the Persons involved share voting or investment power. (Find a more detailed discussion of "beneficial ownership" in Appendix A.)*

7.1    Indicate the class and the number of shares of equity securities of the Trust or any of the Trust's subsidiaries or joint ventures (other than options granted under the Trust's stock option plans, if any) beneficially owned, directly or indirectly, by you or your Affiliates. Please also include your and your Affiliates' ownership in derivatives, market contracts or agreements you or your Affiliates have made to borrow or lend shares for any reason.

| Number of Shares and Class Beneficially Owned | Number of Shares Registered in Your Name | Number of Shares Owned of Record of which You Disclaim Beneficial Ownership |
|---|---|---|
|  |  |  |

7.2    State the nature of your beneficial ownership:

| Shares as to which You have Sole Voting Power | Shares as to which You Share Voting Power (and Name of Person or Entity with Whom Shared) | Shares as to Which You Have Sole Investment Power | Shares as to Which You Share Investment Power (and Name of Person or Entity with Whom Shared) |
|---|---|---|---|
|  |  |  |  |

7.3    Do you have the right to acquire beneficial ownership of Trust stock pursuant to the exercise of an option, warrant, other right or other derivative or instrument, through conversion of a security, or pursuant to the power to revoke a trust, discretionary account, or similar arrangement?

No ☐ Yes ☐

If you answered "Yes," please list below the number of shares and the nature of your right to acquire and the intended method of holding if acquired.

| Number of Shares | Nature of Your Right to Acquire the Shares | Intended method of Holding if Acquired |
|---|---|---|
|  |  |  |

7.4    With respect to the securities listed in Questions 7.1 and 7.3 of which you disclaim beneficial ownership, describe:

| Name of Beneficial Owner | Relationship of Such Person to You | Number of Shares Beneficially Owned | Basis for the Disclaimer |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

7.5    Are any shares you beneficially own pledged as security (include any shares in a margin account regardless of whether or not there has been margin activity or borrowings taken place in the account)?  If so, indicate the number of shares pledged as security in each class:

| Class of Shares | Number of Shares Pledged as Security |
|---|---|
|  |  |
|  |  |
|  |  |

7.6    Are any shares of Trust equity securities held by:

(a)    your spouse?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.
_____ shares of _____ Stock held by _____
                            *(class)*                              *(name)*

(b)    your minor children?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.
_____ shares of _____ Stock held by _____
                            *(class)*                              *(name)*

(c)    other Persons living with you who are relatives of yours or your spouse?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.
_____ shares of _____ Stock held by _____
                            *(class)*                              *(name)*

(d)    a trust for the benefit of any such Persons?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.
_____ shares of _____ Stock held by _____
                            *(class)*                              *(name)*

7.7     Are any shares of Trust equity securities held by:

(a)     you (or your spouse) as custodian for a minor under a Uniform Transfers to Minors Act or as a legal guardian for a minor?

No ☐ Yes ☐ If you answered "Yes," please describe in detail.

_____ shares of _____ Stock held by _____
                            *(class)*                                    *(name)*

(b)     you as trustee?

No ☐ Yes ☐ If you answered "Yes," please describe in detail.

_____ shares of _____ Stock held by _____
                            *(class)*                                    *(name)*

(c)     you as an executor or administrator of an estate?

No ☐ Yes ☐ If you answered "Yes," please describe in detail.

_____ shares of _____ Stock held by _____
                            *(class)*                                    *(name)*

7.8     Do you have the right (pursuant to conversion rights, exercise of options, warrants or similar rights, or termination or revocation of a trust or other discretionary account) to acquire beneficial ownership of any securities of the Trust?

No ☐ Yes ☐

If "Yes," indicate the type of right, the number of shares of such security covered by such right, whether the right is presently exercisable or, if not, when the right becomes exercisable.

| Type of Right | Type of Security (e.g., common stock) | Number of Shares of Common Stock Covered | Time that Right Becomes Exercisable |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

7.9     Are you aware of any change of control of the Trust since the beginning of the Trust's last full fiscal year?

**Instructions to Question 7.9:** *The term "control" means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of the Trust, whether through the ownership of voting securities, by contract or otherwise.*

No ☐ Yes ☐

If "Yes," please state the following information about such change in control: (i) name of the Person or Persons acquiring such control of the Trust, (ii) the amount and source of the consideration used by such Person or

-38-

Persons, (iii) the basis of such control, (iv) the date and description of the transactions that resulted in a change of control, (v) the percentage of the voting securities of the Trust now beneficially owned, directly or indirectly, by the Person or Persons who acquired control, (vi) the identity of the Person or Persons from whom control was assumed, (vii) the terms of any loans or pledges obtained by the new control group for the purposes of acquiring control and (viii) the names of any lenders or pledges involved in such change of control.

**Explanation Area for Question 7.9**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

       7.10    Are you aware of any agreements or arrangements, including but not limited to any contract, voting trust or pledge of Trust securities that might at a subsequent date result in a change of control of the Trust?

      No ☐ Yes ☐

If "Yes," please describe such arrangements, including, to the extent known, the following information: the name of the person(s) involved; the basis of the control (e.g., stock ownership, voting trust, etc.); the percentage of stock now beneficially owned; and the identity of the person(s) from whom control was assumed.

**Explanation Area for Question 7.10**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

       7.11    Do you or any of your designees hold any financial instruments (including prepaid variable forward contracts, equity swaps, collars, and exchange funds) with the design to hedge or offset any decrease in the market value of Trust equity securities held directly or indirectly?

      No ☐ Yes ☐   If "Yes," please describe in detail.

**Explanation Area for Question 7.11**

|  |
|---|
|  |

|  |
|---|
|  |
|  |
|  |
|  |
|  |

7.12    Are any of the securities of the Trust that you or a member of your immediate family beneficially own subject to any pledge, proxy, voting trust, voting agreement or arrangement, option, warrant, or any other agreement or arrangement that may affect your power to vote the shares or could require you to dispose of the shares?

**Instructions to Question 7.12:**  *The term "arrangement" means any plan, contract, authorization or understanding, whether or not set forth in a formal document.*

No ☐ Yes ☐    If "Yes," please describe in detail.

**Explanation Area for Question 7.12**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

7.13    Have you or any of your Affiliates acted or agreed to act together with any other person, persons or entities as a partnership, limited partnership, syndicate or other group for the purpose of acquiring, voting, holding or disposing of shares or options, rights or warrants to purchase shares of capital stock of the Trust?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 7.13**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

7.14    Do you or any entity in which you serve as an officer, partner, director or substantial shareholder currently control or beneficially own more than 1% of any securities of the Trust?

No ☐ Yes ☐    If you answered "Yes," list below the number of shares below.

**Explanation Area for Question 7.14**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

7.15    Do you know of any person (including a natural person, corporation, partnership or other organization or any group of persons that have agreed to act together for the purpose of acquiring, holding, voting or disposing of the Trust stock) who as of the date of this Questionnaire, had, or had the right to acquire beneficial ownership of more than 1% of the Trust's stock?

**Instructions to Question 7.15:** *Two or more Persons acting as a partnership, limited partnership, syndicate or other group for the purpose of acquiring, holding, voting or disposing of securities will be considered a "group."*

No ☐ Yes ☐

If you answered "Yes," please state below, to the extent that you know, the name and address of each such person and the number of shares beneficially owned by each such person.  If the shares are held by a voting trust or similar arrangement, include the duration of the agreement, if known.

| Person having, or having a right to acquire, Beneficial Ownership of More than 1% of Trust Stock | Address | Number of Shares Beneficially Owned | If Held by Voting Agreement or Similar Arrangement, the Duration of the Agreement |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

7.16    Are you aware of any voting trust or similar agreement or arrangement under which more than 5% of the Trust's outstanding securities are held or are to be held?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 7.16**

|  |
|--|
|  |

-41-

| |
|---|
| |
| |
| |
| |
| |
| |
| |

7.17    Do you or any of your Affiliates participate in investment decisions made by any corporation, partnership, limited liability company or any other business or investment entity, or by any nonprofit organization, with respect to the Trust's securities?

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 7.17**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

7.18    For securities of the Trust or any of its subsidiaries, to the best of your knowledge, is any trustee, nominee for trustee or executive officer of the Trust also the beneficial owner of any of the same securities, whether individually, through relatives, through voting or investment power or through a right to acquire such securities?

No ☐ Yes ☐

If you answered "Yes," please disclose the names of such persons and, if known, their ownership of securities of the Trust.

| Person(s) having Mutually Owned Securities of the Trust | Type of Mutually Owned Security | Number of Mutually Owned Securities |
|---|---|---|
| | | |
| | | |
| | | |

8.      **INTEREST IN TRANSACTIONS**

**Note on Section 8:** *This section requests certain information about transactions involving you and/or certain Persons with whom you have a family or business relationship, on one side, and the Trust, or any parent of subsidiary of the Trust, on the other.*

8.1    Please complete the following with respect to all of your Associates and Immediate Family Members:

| Full Name | Employer | Mark if Executive Officer or Director of Employer | List Any Entities Such Associate or Immediate Family Member Controls or Significantly Influences |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

8.2    Are you, or at any time during the Trust's 2018 fiscal year have you been, an executive officer of, or owned directly or indirectly more than a 10% equity interest in, any firm, corporation or other business or professional entity (including any non-profit organization) that made payments to the Trust or its subsidiaries during the Trust's 2018 fiscal year, or that proposes to make payments in the Trust's 2019 fiscal year?

No ☐ Yes ☐

If you answered "Yes," please state below the name of the entity, the nature of your affiliation with it and the relationship between the entity and the Trust and its subsidiaries.  The aggregate dollar amount of all payments made to the Trust and its subsidiaries in the Trust's 2018 fiscal year or proposed to be made in the Trust's 2019 fiscal year should be stated if they exceed (i) 5% of the other entity's consolidated gross revenues for its last full fiscal year or (ii) $15,000,000.

**Explanation Area for Question 8.2**

| |
|---|
| |
| |
| |
| |

| |
|---|
| |
| |
| |
| |

8.3     Are you, or at any time during the Trust's 2018 fiscal year have you been, an executive officer or employee of, or owned directly or indirectly more than a 10% equity interest in, any firm, corporation or other business or professional entity (including any non-profit organization) to which the Trust or its subsidiaries (i) made payments to during the Trust's 2018 fiscal year, (ii) was indebted to at the end of the Trust's 2018 fiscal year, or (iii) proposes to make payments during the Trust's 2019 fiscal year?

No ☐ Yes ☐

If you answered "Yes," please state the:

- name of the entity, the nature of your affiliation with it and the relationship between the entity and the Trust and its subsidiaries;
- (a) aggregate dollar amount of all payments made by the Trust and its subsidiaries in the Trust's 2018 fiscal year or proposed to be made during the Trust's 2019 fiscal year if they exceed (i) 5% of the other entity's consolidated gross revenues for its last full fiscal year or (ii) $15,000,000, and (b) the aggregate amount of the indebtedness should be stated if it was in excess of $15,000,000;
- date payments were received; and
- nature of any goods or services provided.

**Explanation Area for Question 8.3**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |

**Note on Question 8.4:** *Before answering, please read the instructions for this question. In answering this question, you do not need to give information involving compensation from the Trust if it was described in your responses to Section 6, above.*

8.4     Other than as described in your response to Questions 8.2 and 8.3, do you know of any transaction or series of transactions entered into or performed, or currently proposed to be entered into, since the beginning of the Trust's last fiscal year (January 1, 2018) to which the Trust or any of its subsidiaries was or is to be a participant and in which any of the following individuals had or will have a direct or indirect interest:

(a)     you;
(b)     any other trustee (or nominee) of the Trust or executive officer of the Trust;

-44-

(c)      any security holder who owns of record or is the beneficial owner of more than 5% of any class of the Trust's voting securities;

(d)      any Immediate Family Member of any of the foregoing individuals; or

(e)      any entity (publicly held, private, or governmental, for-profit or non-profit) of which any of the foregoing individuals is a general partner, a 10% or more investor, a director, a trustee or an officer.

No ☐ Yes ☐

If you answered "Yes," please describe the transaction, including the name of the individual, his or her relationship to the Trust, the nature of his or her interest in the transaction, the amount of such transaction and, if practicable, the amount of such interest. Also include any additional information you think would be important to investors.

**Explanation Area for Question 8.4**

|   |
|---|
|   |
|   |
|   |
|   |
|   |
|   |
|   |
|   |
|   |
|   |
|   |
|   |
|   |
|   |
|   |

8.5      The following is designed to elicit disclosure of any other relationship of a business, family, or personal nature that could be deemed to affect your independent judgment on matters affecting the Trust.

Do you believe that you or any Associates of yours have or have during the Trust's last five fiscal years any other relationship with the Trust, any trustees of the Trust or Trust management that is substantially similar in nature and scope to those relationships described above or that may be deemed material by stockholders or that should otherwise be disclosed in the Proxy Statement, including the existence of any contract with the Trust or its subsidiaries that is or was to be performed in whole or in part during the last five years, which is not described above.

No ☐ Yes ☐

If "Yes," please describe in detail.

**Instructions to Question 8.5:**

-45-

*A "transaction" includes any financial transaction, arrangement or relationship, including any indebtedness or guarantee of indebtedness, or any series of similar transactions, arrangements or relationship.*

**Calculations for Periodic Payments.** *In the case of a lease or other transaction involving periodic payments, calculate the "amount involved" as the aggregate of all periodic payments due on or after the beginning of the Trust's last fiscal year, including any required or optional payments due during or at the conclusion of the transaction.*

**Calculations for Indebtedness Transactions.** *In the case of an indebtedness transaction, calculate the "amount involved" as the largest aggregate amount of all indebtedness outstanding at any time since the beginning of the Trust's last fiscal year and all amounts of interest payable on it during the last fiscal year. You may exclude from such calculation and need not disclose amounts due for the ordinary purchase of goods and services subject to usual trade terms, for ordinary business travel and expense payments, and for other transactions in the ordinary course of business.*

**Reporting Threshold.** *Unless you are a trustee of the Trust listed as "independent" in the proxy statement, you need not report transactions in which:*

> (i) *the rates or charges involved in the transaction are determined by competitive bids, or the transaction involves the rendering of services as a common or contract carrier, or a public utility, at rates or charges fixed in conformity with law or governmental authority;*

> (ii) *the transaction involves services as a bank depository of funds, transfer agent, registrar, trustee under a trust indenture or similar services; or*

> (iii) *the interest of the specified Person arises solely from the ownership of securities of the Trust and the specified Person receives no extra or special benefit not shared on a pro rata basis by all holders of the same class of securities.*

**"Independent" Trustees.** *If you are a trustee of the Trust listed as "independent" in the proxy statement, __you must give information for all transactions notwithstanding Items (i)–(iii) above__.*

**Explanation Area for Question 8.5**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

8.6     The NYSE imposes various requirements relating to director independence.  In order for you to be determined to be independent, the Board of Trustees must make a determination that you have no relationship which, in the Board's opinion, would interfere with the exercise of independent

judgment in carrying out the responsibilities of a trustee.  In order to assist the Board in making this determination, please describe below all relationships that could conceivably be thought to bear on your independence from the Trust, any of the Trust's subsidiaries or any of the executive officers or trustees of the Trust or its subsidiaries.

Relationships that should be described include commercial, industrial, banking, consulting, legal, accounting, charitable and familial relationships.  You should describe not only relationships that involve you directly but also relationships of which you are aware that involve any of your Family Members or any organization with which you are affiliated as a partner, greater than 5% stockholder, director, trustee, officer or otherwise.  While there is no limit on the types of relationship that could be thought to be relevant to the independence inquiry, relationships that have thought to be relevant in other contexts include (i) being affiliated with an organization (for-profit or charitable) that depends on the Trust or any of its executive officers or trustees for a significant portion of its revenues, (ii) having a lengthy personal or financial relationship with any of the Trust's executive officers or trustees or (iii) having a Family Member in either of these categories?

No ☐ Yes ☐    If "Yes," please describe the relationship in detail.

**Explanation Area for Question 8.6**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

8.7    Do you have any interest in or other relationship with any stockholder that has filed a Schedule 13D within the past three years, or is reasonably expected to file a Schedule 13D, with respect to the Trust?

No ☐ Yes ☐    If "Yes," please describe the interest or relationship in detail.

**Explanation Area for Question 8.7**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

-47-

8.8     In the last three fiscal years, has any Family Member, directly or indirectly, received any remuneration from the Trust or any parent or subsidiary of the Trust for services in any capacity?

No ☐ Yes ☐

If "Yes," furnish the name of the Family Member, the nature of the family relationship, and, unless such person has also completed a Questionnaire, details of the remuneration.

**Explanation Area for Question 8.8**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

8.9     In the last three fiscal years, did you or any Family Member receive any other types of personal benefits directly from the Trust or any subsidiary or through third parties for purposes unrelated to job performance?

No ☐ Yes ☐

If you answered "Yes," please indicate which of the following benefits were received, and provide a description of each benefit received, identify its recipient, and state the Trust's aggregate cost below.

- Housing or other living expenses (including mortgage and rental payments or the cost of domestic servants).
- Personal loans including extensions of credit and renewals (including the arrangement of a loan from a third party).
- Personal use of a "Trust furnished" automobile or other motor vehicle (includes commuting to and from home).
- Personal use of a "Trust furnished" airplane.
- Personal use of a "Trust furnished" boat or yacht.
- Personal use of a "Trust furnished" apartment, motel/hotel room or suite, hunting or fishing lodge or vacation home.
- Personal use of other "Trust furnished" property.
- Personal vacation or travel expenses.
- Personal entertainment and related expenses.
- Personal legal, accounting, or other professional services for matters unrelated to the Trust.
- Personal use of the staff or employees of the Trust.

- Membership in a country club or other social or recreational club (does not include civic or service clubs).
- The ability to obtain benefits from third parties because the Trust directly or indirectly compensates the third party for the benefit or discount.  (For example, did any supplier, customer, or other party with whom the Trust does or intends to do business (including banks, attorneys, and accountants) provide you or any member of your family with any benefits (e.g., product discounts, free or reduced-rate services, or low-interest loans)?)
- Other personal benefits not listed above.

**Explanation Area for Question 8.9**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

8.10    Did you or any Family Member acquire any property from the Trust during the 2018 fiscal year pursuant to any agreement, plan, or arrangement, whether or not set forth in any written document?

No ☐ Yes ☐    If you answered "Yes," please complete this table.

**Instructions for Question 8.10**: *Fair market value should be determined as of the date either of the following events occurs, or if both occur, the later event: (i) you exercise an election under the agreement, plan or arrangement or (ii) you become entitled without further contingencies to retain the property.*

| Description of Property | Circumstance of Acquisition | Differences Between Fair Market Value and Acquisition Price |
|--|--|--|
|  |  |  |
|  |  |  |

8.11    In the last three fiscal years, have you or any Family Member who is or was a partner in, or a controlling stockholder or an officer of any organization that made to or received from the Trust payments for property or services (other than payments arising solely from investment in the Trust's securities and payments under non-discretionary charitable contribution matching programs) in the current fiscal year or in any of the past three fiscal years that exceeded (i) $1 million or (ii) 2% of such other entity's consolidated gross revenues for that year?

-49-

No ☐ Yes ☐    If you answered "Yes," please provide details below, including name of Family Member if applicable, title of officer or employment position, name of other entity, and amount and period of payment and nature of property or services provided or received.

**Explanation Area for Question 8.11**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

8.12    Do you serve on the audit committee of any public company?

No ☐ Yes ☐

If "Yes," provide the names of the companies for which you serve on the audit committee below.

**Explanation Area for Question 8.12**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

9.    **INSIDER TRADING**

**Notes on Section 9:**  *For purposes of Questions under this Section 9 only, the term "beneficial ownership" has a different meaning than elsewhere in this Questionnaire.  In addition to Trust securities held by you directly, you will be considered the beneficial owner of Trust securities if you have the opportunity to profit or share in any profit, directly or indirectly, from a transaction in that security.*

9.1    During the past two fiscal years, have you or any other person had any transactions in Trust securities of which you are deemed the beneficial owner, which have not been properly reported under Section 16 of the Securities Exchange Act of 1934, as amended?

No ☐ Yes ☐

9.2    Have you filed any late Form 3, Form 4, or Form 5 reports in the last five years?

No ☐ Yes ☐

If "Yes," please identify below the late report filed and describe the transaction type and date to which the report related.

| Report | Transaction Type | Date |
|--------|------------------|------|
|        |                  |      |

9.3    Are you, or any member of your immediate family, a trustee of a trust that holds Trust securities?

No ☐ Yes ☐

If "Yes," has the trust had any transactions in Trust securities that have not been reported on Form 4?

No ☐ Yes ☐

If "Yes," please provide details below, including type of trust, relationship you or any member of your immediate family has to the trust, type and date of transaction and number of shares acquired/disposed of.

| Type of Trust | Relationship to the Trust | Type and Date of Transaction | Number of Shares Acquired or Disposed Of |
|---------------|---------------------------|------------------------------|-------------------------------------------|
|               |                           |                              |                                           |

10.    **AUDIT COMMITTEE MEMBERS**

**If you are a member of the Audit Committee of the Trust, or were at any time during the last fiscal year, answer the Questions in this Section 10.**

10.1    Have you accepted directly or indirectly any consulting, advisory or other compensatory fee from the Trust or any of its subsidiaries or joint ventures? In answering this question, you do not need to include receipt of any fixed payments under any retirement plans for prior service with the Trust (provided that the payments were not contingent in any way on continued service).

**Instructions to Question 10.1:** *For purposes of this question, "indirect" acceptance of any consulting, advisory or other compensatory fee includes acceptance of such a fee by a spouse, a minor child or stepchild or a child or stepchild sharing a home with you or by an entity in which you are a partner, member or executive officer (except limited partners and non-managing members) and which provides accounting, consulting, legal, investment banking or financial advisory services to the Trust or any subsidiary of the Trust.*

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 10.1**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

10.2   Other than in your capacity as a member of the audit committee, the board of trustees or any other committee of the board of trustees, are you an affiliated person of the Trust or any of its subsidiaries?

**Instructions to Question 10.2:** *For the purposes of this question, an "affiliated person" is any officer, employee, or 10% stockholder of the Trust or any other Person that directly, or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the Trust.*

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 10.2**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

10.3   Have you participated in the preparation of the financial statements of the Trust or any current subsidiary of the Trust at any time during the past three fiscal years (other than reviewing any such financial statements in your capacity as a trustee or Audit Committee member)?

-52-

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 10.3**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

10.4    Are you able to read and understand fundamental financial statements, including a Trust's balance sheet, income statement, and cash flow statement?

No ☐ Yes ☐

10.5    To assess whether you may be considered an "Audit Committee Financial Expert," by certain regulatory authorities, please indicate whether you satisfy the following criteria.

(a)    Do you have an understanding of generally accepted accounting principles and financial statements?

No ☐ Yes ☐

(b)    Do you have the ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves?

No ☐ Yes ☐

(c)    Do you have experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the Trust's financial statements, or experience actively supervising one or more Persons engaged in such activities?

No ☐ Yes ☐   If you answered "Yes," please describe.

**Explanation Area for Question 10.5(c)**

|  |
|--|
|  |
|  |
|  |
|  |

| |
|---|
| |
| |
| |
| |

       (d)    Do you have an understanding of internal control over financial reporting?

No ☐ Yes ☐

       (e)    Do you have an understanding of audit committee functions?

No ☐ Yes ☐

       (f)    Did you acquire the attributes listed in Questions 10.5(a) through 10.5(e) above through (answer "Yes" to all that apply):

       (i)    education and experience as a principal financial officer, principal accounting officer, controller, public accountant or auditor or experience in one or more positions that involve the performance of similar functions;

No ☐ Yes ☐

       (ii)    experience actively supervising a principal financial officer, principal accounting officer, controller, public accountant, auditor or Person performing similar functions;

No ☐ Yes ☐

       (iii)    experience overseeing or assessing the performance of companies or public accountants with respect to the preparation, auditing or evaluation of financial statements; or

No ☐ Yes ☐

       (iv)    other relevant experience?

No ☐ Yes ☐

If you answered "Yes" to any of the above, please describe, including detail on (i) any MBA degree obtained, (ii) a description of the level of your financial and accounting education, including whether you have earned an advance degree in finance or accounting, and (iii) your past and current memberships on audit committees. If you answered "Yes" to 10.5(f)(ii) or 10.5(f)(iii), please provide the name of the entity, the positions in which you served, and the dates.  Please note that CEO and COO positions may fall into this category.

**Explanation Area for Question 10.5(f)**

| |
|---|
| |
| |
| |

|  |
|--|
|  |
|  |
|  |
|  |
|  |

10.6    Are you are or have you been, a certified public accountant, or the equivalent, in good standing?

No ☐ Yes ☐

If you answered "Yes," please provide the length of time that you actively have practiced as a certified public accountant, or the equivalent, including the name of the organization at which you practiced and your position and dates of employment.

**Explanation Area for Question 10.6**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

10.7    Please state below whether you have served as a principal financial officer, controller or principal accounting officer of an entity, and if so, the name of the entity, the positions in which you served, and the dates.

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

| Company | Office or Position | Time Period (Month and Year) | |
|---------|--------------------|------------------------------|--|
|         |                    | From | To |
|         |                    |      |    |
|         |                    |      |    |
|         |                    |      |    |

11.    **COMPENSATION COMMITTEE MEMBERS**

**If you are a member of the Compensation Committee of the Trust, or were at any time during the last fiscal year, answer the Questions in this Section 11.**

11.1    Other than in your capacity as a member of the compensation committee, the board of trustees or any other committee of the board of trustees, are you an affiliated person of the Trust or any of its subsidiaries?

**Instructions to Question 11.1:** *For the purposes of this question, an "affiliated person" is any officer, employee, or 10% stockholder of the Trust or any other person that directly, or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the Trust.*

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 11.1**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

11.2    Have you received or do you expect to receive any consulting, advisory or other compensatory fees from the Trust or any of its subsidiaries or joint ventures, either directly or indirectly? In answering this question, you do not need to include receipt of any fixed payments under any retirement plans for prior service with the Trust (provided that the payments were not contingent in any way on continued service), trustee fees or committee fees.

**Instructions to Question 11.2:** *For purposes of this question, "indirect" acceptance of any consulting, advisory or other compensatory fee includes acceptance of such a fee by a spouse, a minor child or stepchild or a child or stepchild sharing a home with you or by an entity in which you are a partner, member or executive officer (except limited partners and non-managing members) and which provides accounting, consulting, legal, investment banking or financial advisory services to the Trust or any subsidiary of the Trust.*

No ☐ Yes ☐    If you answered "Yes," please describe in detail.

**Explanation Area for Question 11.2**

|  |
|--|
|  |
|  |
|  |
|  |
|  |
|  |
|  |

-56-

|  |
|  |

11.3     The board of trustees of the Trust must consider your sources of compensation in determining your independence and eligibility to serve as a member of the compensation committee. This includes consideration of whether you receive compensation from any person or entity that would impair your ability to make independent judgments about the Trust's executive compensation.  For this purpose, please identify any sources of your compensation (other than any compensation identified in response to any other question in this Questionnaire) that could impair your ability to make independent judgments about the Trust's executive compensation.  Please note that this does not require you to identify the amounts paid in compensation.

**Explanation Area for Question 11.3**

|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

12.     **MISCELLANEOUS**

12.1     **Attendance and Committee Service of Trustees**

If you are a trustee, please state the number of meetings (both regular and special) held by the board of trustees and by board committees of which you are a member during the Trust's most recent fiscal year.  State separately the number of such meetings that you attended.  Identify the committees on which you serve and state any committee chairs you hold.

(a)     <u>Attendance at Board Meetings</u>.  During the last fiscal year, I attended _____ meeting(s) of the Board of Trustees, out of a total of _____ meetings held.

(b)     <u>Committees</u>.

|  | I am or was a Member during the last fiscal year | Number of Meetings Held | Number of Meetings Attended |
|---|---|---|---|
| (i)  Audit |  |  |  |
| (ii)  Nominating, Compensation and Governance |  |  |  |

### 12.2   Indemnification

Is there any agreement or arrangement pursuant to which you are insured or indemnified in any manner against any liability which you might incur as a controlling Person, officer or trustee of the Trust or its subsidiaries or Affiliates other than (i) as provided by law, (ii) in the Trust's Declaration of Trust or the Bylaws of its subsidiaries, as applicable, or (iii) under the Trust's standard Directors & Officers insurance maintained by the Trust?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 12.2**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

12.3   If you are an executive officer or member of the Compensation Committee, do you have any business or personal relationship with the Compensation Committee's compensation consultant, legal counsel, or other adviser or the entity employing such person(s)?

No ☐ Yes ☐   If you answered "Yes," please describe in detail.

**Explanation Area for Question 12.3**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |

| |
|---|
| |
| |
| |

12.4    Please describe briefly below any other facts that you believe may be material to a reasonable investor's evaluation of the ability and integrity of the management of the Trust, including existing trustees or nominees for trustee, which have not otherwise been disclosed in your answers to this Questionnaire or the materials proposed to be submitted to the SEC which you have reviewed.

**Explanation Area for Question 12.4**

| |
|---|
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

# APPENDIX A

## DEFINITIONS

**Affiliate.**  An "Affiliate" of, or person "affiliated" with, a specified person is a person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the person specified.

**Associate.**  The term "Associate", used to indicate a relationship with any person, means:

> (a)     any corporation or organization (other than the Trust or any of its subsidiaries) of which such person is an officer or partner or is, directly or indirectly, the beneficial owner of 10% or more of any class of equity securities;

> (b)     any trust or other estate in which such person has a substantial beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity; and

> (c)     any relative or spouse of such person, or any relative of such spouse, who has the same home as such person or who is a trustee or officer of the Trust or any of its subsidiaries.

**Beneficial Ownership.**  You are considered a "beneficial owner" of a security of the Trust if you, your spouse, or any member of your immediate family or household owns such security, whether directly or indirectly (i.e., through Trust plans, trusts, estates, holding companies, partnership, limited partnership or syndicates, or through any other groups of which you, your spouse, or any member of your immediate family or household is a member that were formed for the purpose of acquiring, holding or disposing of such security).

You should also consider that a person or entity beneficially owns shares of Trust stock if such person or entity directly or indirectly, has or shares voting power (i.e., the power to vote or direct the voting) or investment power (i.e., the power to dispose or direct the disposition) of such stock, whether through any contract, arrangement, understanding, relationship or otherwise.

A person or entity is also deemed to have voting or investment power with respect to shares of Trust if such person or entity has the right to acquire either of such powers at any time within the next 60 days through the exercise of any option, warrant, right or conversion privilege or pursuant to the power to revoke a trust, a discretionary account or similar arrangement or pursuant to the automatic termination of a trust, discretionary account or similar arrangement.  Because voting power or investment power may be held jointly by two or more persons, the same shares of Trust stock may be beneficially owned by more than one person.  (For example, if you hold shares as trustee for the benefit of your minor child, both you and your child may be deemed to be beneficial owners of such shares.)

An analysis of all relevant facts and circumstances in a particular situation is essential in order to identify each Person possessing the requisite voting power or investment power.  The fact that a security is not registered in your name does not preclude you from being a beneficial owner of that security.  In addition, more than one Person may be the beneficial owner of the same share of stock if the Persons involved share voting or investment power.  For example, two trustees, each of whom has the power to vote stock held in a trust, will each be deemed to be the beneficial owner of that stock.

All securities of the same class beneficially owned, regardless of the form that such beneficial ownership takes, are aggregated in calculating the number of shares beneficially owned by you.  Thus, a trustee of several trusts that holds securities of the same issuer would have to aggregate the number of shares held in each trust with respect to which such trustee has either voting power or investment power, or both.

**Executive Officer.** The term "executive officer" with respect to an entity means its president, any vice president in charge of a principal business unit, division or function (such as sales, administration or finance), and any other officer who performs a policymaking function or any other person who performs similar policymaking functions for the entity.  Officers of an entity's subsidiaries may be deemed executive officers of the entity if they perform such policymaking functions for the entity.

**Extended Family Member.** The term "Extended Family Member" means a Person with whom you share any relationship by blood, marriage, or adoption, not more remote than first cousin.

**Family Member.**  The term "Family Member" means a person's spouse, parents, children and siblings, whether by blood, marriage or adoption, or anyone residing in such person's home.

**Immediate Family Member**.  The term "Immediate Family Member" includes a person's spouse, parents, stepparent, children, stepchild, siblings, mothers and fathers-in-law, sons and daughters-in-law, brothers and sisters-in-law, and anyone (other than a tenant or domestic employees) who shares such person's home.

**Person.**  The term "Person" includes an individual, a corporation, a partnership, an association, a joint-stock company, a trust, an unincorporated organization, a not-for-profit entity or a government or political subdivision thereof.

**Transaction.** The term "transaction" includes, but is not limited to, any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships.

# AFFIDAVIT

I understand that this information is furnished to the Trust for use in connection with the Proxy Statement to be filed by the Trust with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended. The information set forth above is supplied by me in response to the requests of the Trust and such information is true and accurate to the best of my information and belief.

I will promptly notify the Trust, in writing, of any changes in such information that may occur subsequent hereto and prior to the filing of the definitive Proxy Statement, and will furnish supplementary information as may be appropriate. I understand and agree that this Questionnaire, as completed by me, and my further communications regarding the matters contemplated herein, will be relied upon by the Trust and counsel to the Trust in connection with the preparation of the Proxy Statement.

I understand that material misstatements or the omission of material facts in the Proxy Statement may give rise to civil and criminal liabilities to the Trust. I will notify you and the Trust of any such misstatement of a material fact in the Proxy Statement or any amendment thereto, and of the omission of any material fact necessary to make the statements contained therein not misleading, as soon as practicable after a copy of the Proxy Statement or any such amendment thereto has been provided to me.

As a Trustee nominee, I further represent and warrant to the Trust that:

1. I am not and will not become a party to: (1) any agreement, arrangement or understanding which, and have not given any commitment or assurance to, any Person as to how I, if elected as a Trustee, will act or vote on any issue or question (a "Voting Commitment") that has not been disclosed in this Questionnaire, or (2) any Voting Commitment that could limit or interfere with my ability to comply, if elected as a Trustee, with my fiduciary duties under applicable law;

2. I am not and will not become a party to any agreement, arrangement or understanding with any Person other than the Trust with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a Trustee that has not been disclosed in this Questionnaire;

3. If elected as a Trustee of the Trust, I, in my individual capacity and on behalf of (1) any Person on whose behalf my nomination is being made, and (2) my Affiliates, would be in compliance with, and will comply with, all applicable corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines of the Trust;

4. If elected as a Trustee of the Trust, my election would not violate any policies, codes of ethics, manuals, contracts or other arrangements of any company, business or organization in which I am presently an executive, officer, partner, employee or director to the extent that consent of any such organization is required, evidence of such consent is attached hereto; and

5. I irrevocably consent to accept the nomination, to being named as a nominee in any Proxy Statement and to serve as a Trustee if elected.

IN WITNESS WHEREOF, the undersigned hereby certifies that the foregoing answers to each of the foregoing questions are accurate and complete and acknowledges that any material misrepresentation will be grounds for the chairperson of the Trust's Special Meeting of Holders of Sub-share Certificates of Proprietary Interest to not place his or her name in nomination; the undersigned agrees to resign as Trustee if elected if the undersigned violates these representation and warranties or has provided an answer containing a material misrepresentation in this Questionnaire.

Dated: _____, 2019          Signature: _____

Name: _____

# EXHIBIT G

# TEXAS PACIFIC LAND TRUST

1700 Pacific Avenue
Suite 2770
Dallas, Texas 75201
_____

TRUSTEES:
JOHN R. NORRIS III
DAVID E. BARRY

Telephone (214) 969-5530

OFFICERS:
TYLER GLOVER
ROBERT J. PACKER

May 16, 2019

Eric L. Oliver
SoftVest L.P.
400 Pine Street, Suite 1010
Abilene, Texas  79601

Dear Mr. Oliver:

We are writing to you in our capacity as trustees of Texas Pacific Land Trust (the "**_Trust_**").

As fiduciaries of the Trust and pursuant to the Trust's Declaration of Trust, we have a duty to inquire into your background, interests and potential conflicts with respect to your potential service as a trustee.  Accordingly, on March 28, 2019, we sent you a standard questionnaire intended to explore these topics.  The other trustee nominees fully completed the same questionnaire, but you refused to answer even a single question.  In an effort to discharge our duties and to secure a fully-informed shareholder vote, we want to give you every opportunity to provide the requested disclosure.  We ask that you reconsider your position and return a completed and executed copy of the enclosed questionnaire.

Over the past several weeks, we have received certain information about your background, interests and potential conflicts that raise concerns regarding your candidacy.  By providing truthful and fulsome responses to the questionnaire, you have the opportunity to put those concerns to rest and to provide shareholders with the information necessary for an informed vote.  Conversely, your continued refusal to provide this information would deprive shareholders of information that is plainly material to your candidacy and would disqualify you from serving as a trustee.

Please respond to the questionnaire and certify the accuracy of your responses.  In connection with your completion of the questionnaire, we draw your attention in particular to questions 1.9, 1.13, 1.15, 2.1, 2.8, 3.1, 3.2, 3.3, 3.4 and 4.2 and ask that you ensure that you have addressed the following concerns:

1.  In the quarterly and annual reports of AMEN Properties, LLC ("**_AMEN_**"), you are described as serving on the board of the "First National Bank of Midland."  We have been unable to confirm that any such bank exists.  **A shareholder of AMEN pointed this out to you in a letter as early as 2012 (the letter is attached hereto as <ins>Exhibit A</ins>) and asked you to explain also several other contradictions in your resume.  Please provide an explanation of these discrepancies.**

2.  According to your video released on April 16, 2019, former General Agent and Chief Executive Officer Roy Thomas entrusted you over ten years ago with confidential surface maps of the Trust.  **Please address whether you have used that confidential information to acquire any assets, trade any securities (or options), or pursue any commercial or financial ventures, whether personally or through any entity under your direction.**

3.  In its governing documents, AMEN committed to donate 10% of its earnings to Christian charitable organizations. It appears that beginning as early as 2015, AMEN stopped making these donations and instead began paying a "tithing" dividend to its shareholders with no obligation to make a donation. Based on AMEN's public disclosures, it appears that you and your family members are among the largest shareholders of AMEN and that there was no shareholder vote to change the governing documents of AMEN. **Please provide an explanation of the apparent discrepancy with respect to the AMEN governing documents as well as an explanation of this apparent conflict of interest.**

4.  Santa Monica Partners, a 0.2% shareholder of the Trust, acquired its shares immediately after you launched the proxy contest and issued a Schedule 13D (required only by shareholders owning 5% or more) in support of your candidacy. As described in our investor presentation dated April 25, 2019, Santa Monica has a longstanding relationship with Horizon Kinetics and its co-founder Murray Stahl.[1] As a consequence, it appears that Santa Monica may be an undisclosed member of your group and a hidden participant in your proxy solicitation, in violation of Regulation 13D and Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended. **Please provide an explanation of this relationship and why the relationship with Santa Monica was not disclosed.**

5.  Universal Guaranty Life Insurance Company ("**UGLIC**"), a holder of 39,000 shares of the Trust, issued a press release in "enthusiastic support" of you. As described in our investor presentation dated April 25, 2019, UGLIC has a longstanding relationship with you.[2] We also learned that you were an 8.2% shareholder of UGLIC as recently as 2016. As a consequence, we have reason to believe that UGLIC is an undisclosed member of your group and a hidden participant in your proxy solicitation, in violation of Regulation 13D and Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended. **Please provide an explanation of this relationship and why the relationship with UGLIC was not disclosed.**

6.  During your tenure as AMEN's Chair and CEO, your investment firm SoftVest provided AMEN a preferred promissory note that financed a royalty acquisition in late 2007. **Please explain what efforts were taken to ensure that this related party transaction was negotiated on an arms-length basis such that it did not constitute unlawful self-dealing.**

7.  We have reason to believe that your group has engaged in undisclosed proxy solicitation using various online sources, including forums, paid investment discussion websites and blogs. **Please explain whether your group, or others at your group's direction or in consultation with it, have engaged in such undisclosed proxy solicitation in connection with your candidacy.**

8.  We have reason to believe that your group and your affiliates and associates, directly and indirectly, own a significant number of oil and gas interests, at least some of which are located in the Permian Basin through various entities, including AMEN, SoftVest and affiliated entities. **Please describe those interests and explain whether they do business with or compete with the Trust, or are in a position to profit from the activities of the Trust.**

---

[1] Lawrence J. Goldstein, the principal of Santa Monica, is a member of the Board of Directors of FRMO Corp., a company that trades on the OTC Market under the symbol FRMO. Horizon Kinetics LLC co-founders Murray Stahl and Steve Bregman founded FRMO and Mr. Stahl serves as CEO and Chairman, while Mr. Bregman is President, CFO and Director of FRMO. Horizon Kinetics LLC co-founders Murray Stahl and Steve Bregman founded FRMO and Mr. Stahl serves as CEO and Chairman, while Mr. Bregman is President, CFO and Director of FROM.

[2] Jesse T. Correll has been Chairman and CEO of Universal Guaranty Life Insurance Company since 2000. Correll was a member of the Board of Directors of AMEN Properties, Inc. from December 2008 until at least September 2010 (specific date unknown). Correll is also connected to SFF Royalty, LLC, through his involvement with Universal Guaranty Life Insurance Company, which is a member of SFF Royalty, from 2010 through at least 2014. SFF Royalty, LLC is an entity through which AMEN owns oil and gas interests.

9.  We have reason to believe that your family members, including your brother and sons, own a significant number of oil and gas interests, at least some of which are located in the Permian Basin through various entities. **Please describe those interests and explain whether they do business with or compete with the Trust, or are in a position to profit from the activities of the Trust.**

     We look forward to receiving from you the information that is requested by no later than **5:00 p.m. Central Time on May 20, 2019**.  This letter is being sent on behalf of the Trust while expressly reserving, and without waiving, any and all rights and defenses that the Trust may have with respect to this matter.

     We would have preferred to send you this letter privately.  However, the decision of your group to publicize our prior confidential settlement outreach (and alter the text of our communication in your purported "reprint") made it clear that we cannot expect to communicate with you privately.  Therefore, we are making this letter public.

Very truly yours,

By:  /s/ *JOHN R. NORRIS III*
       Name:   John R. Norris III
       Title:    Co-Chairman

By:  /s/ *DAVID E. BARRY*
       Name:   David E. Barry
       Title:    Co-Chairman

**EXHIBIT A**

Wednesday, 26 December 2012

Mr. Eric L. Oliver, Chairman
AMEN Properties
Post Office Box 835451
Richardson, Texas 75083-5451

Dear Mr. Oliver,

As a shareholder, I was recently reviewing AMEN Properties'
2011 Annual Report. I was most particularly interested in
the biographies of the members of the board of directors as
I am a relatively new shareholder and I wanted to familiar-
ize myself with the backgrounds of each of the directors.

My primary occupation is in the oil & gas division of the
trust department at a large national bank. So, when I saw
that you were a member of the board of directors at the First
National Bank of Midland, I went to look at FNB Midland's
webpage to see what your duties at that bank were. This is
where I discovered some discrepancies that I wish to bring
to your attention and to which I would like your response.

First, I discovered that, according to the Federal Deposit
Insurance Corporation, the First National Bank of Midland
(FDIC#: 35028) ceased to exist when it changed its name to
FirstCapital Bank of Texas, N.A. on 1 July 2010. This in
of itself is not a concern, but your official biography in
the reports of AMEN Properties continues to refer to the
name of the bank as the First National Bank of Midland.
Since currently a bank with such a name does not exist, this
could lead to some confusion.

Second, I looked at the members of the board of directors of
FirstCapital Bank of Texas, N.A. It does not appear that you
are a director of this bank, so I am confused as to why your
official biography would state otherwise.

Third, your official biography states that you are president

of SoftSearch Investment, Inc. of Abilene. I was able to
locate a now defunct business of that name in Abilene as
well as a currently active business by the name of SoftSearch
Investment, L.P. at the same address. Due to the limited
information that is publicly available on SoftSearch Invest-
ment, L.P., I was not able to verify your position as
president there. Could you help me to understand the dis-
crepancy between the names of SoftSearch Investment, Inc.
and SoftSearch Investment, L.P. in yourofficial biography?
Also, could you please confirm that you are currently pres-
ident of SoftSearch Investment, L.P.?

Fourthm your AMEN Properties biography goes on to state that
you are a member of the board of directors of Love and Care
Ministries in Abilene. However, when I reviewed the website
of Love and Care Ministries, I was unable to find your name
as a board member there. Again, there seems to be a dis-
crepancy here between your AMEN Properties biography and what
the organization itself reports to the public. Please help
me to understand this additional discrepancy.

Finally, I am including with this letter printouts of the
various webpages I have mentioned in this letter as well as
a printout of your official biography as it appears in AMEN
Properties 2011 Annual Report.

Thank you for your time. Please address your written response
to me at the address appearing in the footer of the first page
of this letter.


Sincerely,



# EXHIBIT H

| | |
|---|---|
| **From:** | Liekefett, Kai H.E. |
| **Sent:** | Thursday, May 16, 2019 8:45 PM |
| **To:** | Gallardo, Eduardo |
| **Cc:** | Gregory, Holly; Liekefett, Kai H.E.; TPL Sidley Team |
| **Subject:** | Texas Pacific Land Trust ./. Eric Oliver et al |
| **Attachments:** | attachment 1.pdf |

Eduardo,

We are representing Texas Pacific Land Trust.  We understand that Gibson Dunn may be involved in representing Eric L. Oliver, SoftVest Advisors LLC, Horizon Kinetics LLC, Tessler Family Limited Partnership and/or certain affiliates in connection with their investment and proxy contest against Texas Pacific Land Trust.

As your firm is probably aware, attached is a letter that was sent by our client to Mr. Oliver this evening.  We hope to receive the requested information as soon as possible so that there is no delay.  Please let us know if you can speak in the morning.

We look forward to hearing from you promptly.

Kai

**KAI HAAKON E. LIEKEFETT**
Partner

**SIDLEY AUSTIN LLP**
787 Seventh Avenue (at 51st St)
New York, NY 10019
+1 212 839 8744 (office)
+1 646 256 8315 (cell)
kliekefett@sidley.com
www.sidley.com

Secretary: Bridgette Charles, +1 212 839 6072, bcharles@sidley.com



# TEXAS PACIFIC LAND TRUST

1700 Pacific Avenue
Suite 2770
Dallas, Texas 75201
_____

TRUSTEES:                                                                                                          OFFICERS:
JOHN R. NORRIS III                          Telephone (214) 969-5530                          TYLER GLOVER
DAVID E. BARRY                                                                                              ROBERT J. PACKER

May 16, 2019

Eric L. Oliver
SoftVest L.P.
400 Pine Street, Suite 1010
Abilene, Texas  79601

Dear Mr. Oliver:

We are writing to you in our capacity as trustees of Texas Pacific Land Trust (the "***Trust***").

As fiduciaries of the Trust and pursuant to the Trust's Declaration of Trust, we have a duty to inquire into your background, interests and potential conflicts with respect to your potential service as a trustee.  Accordingly, on March 28, 2019, we sent you a standard questionnaire intended to explore these topics.  The other trustee nominees fully completed the same questionnaire, but you refused to answer even a single question.  In an effort to discharge our duties and to secure a fully-informed shareholder vote, we want to give you every opportunity to provide the requested disclosure.  We ask that you reconsider your position and return a completed and executed copy of the enclosed questionnaire.

Over the past several weeks, we have received certain information about your background, interests and potential conflicts that raise concerns regarding your candidacy.  By providing truthful and fulsome responses to the questionnaire, you have the opportunity to put those concerns to rest and to provide shareholders with the information necessary for an informed vote.  Conversely, your continued refusal to provide this information would deprive shareholders of information that is plainly material to your candidacy and would disqualify you from serving as a trustee.

Please respond to the questionnaire and certify the accuracy of your responses.  In connection with your completion of the questionnaire, we draw your attention in particular to questions 1.9, 1.13, 1.15, 2.1, 2.8, 3.1, 3.2, 3.3, 3.4 and 4.2 and ask that you ensure that you have addressed the following concerns:

1.  In the quarterly and annual reports of AMEN Properties, LLC ("***AMEN***"), you are described as serving on the board of the "First National Bank of Midland."  We have been unable to confirm that any such bank exists.  **A shareholder of AMEN pointed this out to you in a letter as early as 2012 (the letter is attached hereto as <u>Exhibit A</u>) and asked you to explain also several other contradictions in your resume.  Please provide an explanation of these discrepancies.**

2.  According to your video released on April 16, 2019, former General Agent and Chief Executive Officer Roy Thomas entrusted you over ten years ago with confidential surface maps of the Trust.  **Please address whether you have used that confidential information to acquire any assets, trade any securities (or options), or pursue any commercial or financial ventures, whether personally or through any entity under your direction.**

3.  In its governing documents, AMEN committed to donate 10% of its earnings to Christian charitable organizations. It appears that beginning as early as 2015, AMEN stopped making these donations and instead began paying a "tithing" dividend to its shareholders with no obligation to make a donation. Based on AMEN's public disclosures, it appears that you and your family members are among the largest shareholders of AMEN and that there was no shareholder vote to change the governing documents of AMEN. **Please provide an explanation of the apparent discrepancy with respect to the AMEN governing documents as well as an explanation of this apparent conflict of interest.**

4.  Santa Monica Partners, a 0.2% shareholder of the Trust, acquired its shares immediately after you launched the proxy contest and issued a Schedule 13D (required only by shareholders owning 5% or more) in support of your candidacy. As described in our investor presentation dated April 25, 2019, Santa Monica has a longstanding relationship with Horizon Kinetics and its co-founder Murray Stahl.[1] As a consequence, it appears that Santa Monica may be an undisclosed member of your group and a hidden participant in your proxy solicitation, in violation of Regulation 13D and Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended. **Please provide an explanation of this relationship and why the relationship with Santa Monica was not disclosed.**

5.  Universal Guaranty Life Insurance Company ("**UGLIC**"), a holder of 39,000 shares of the Trust, issued a press release in "enthusiastic support" of you. As described in our investor presentation dated April 25, 2019, UGLIC has a longstanding relationship with you.[2] We also learned that you were an 8.2% shareholder of UGLIC as recently as 2016. As a consequence, we have reason to believe that UGLIC is an undisclosed member of your group and a hidden participant in your proxy solicitation, in violation of Regulation 13D and Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended. **Please provide an explanation of this relationship and why the relationship with UGLIC was not disclosed.**

6.  During your tenure as AMEN's Chair and CEO, your investment firm SoftVest provided AMEN a preferred promissory note that financed a royalty acquisition in late 2007. **Please explain what efforts were taken to ensure that this related party transaction was negotiated on an arms-length basis such that it did not constitute unlawful self-dealing.**

7.  We have reason to believe that your group has engaged in undisclosed proxy solicitation using various online sources, including forums, paid investment discussion websites and blogs. **Please explain whether your group, or others at your group's direction or in consultation with it, have engaged in such undisclosed proxy solicitation in connection with your candidacy.**

8.  We have reason to believe that your group and your affiliates and associates, directly and indirectly, own a significant number of oil and gas interests, at least some of which are located in the Permian Basin through various entities, including AMEN, SoftVest and affiliated entities. **Please describe those interests and explain whether they do business with or compete with the Trust, or are in a position to profit from the activities of the Trust.**

---

[1] Lawrence J. Goldstein, the principal of Santa Monica, is a member of the Board of Directors of FRMO Corp., a company that trades on the OTC Market under the symbol FRMO. Horizon Kinetics LLC co-founders Murray Stahl and Steve Bregman founded FRMO and Mr. Stahl serves as CEO and Chairman, while Mr. Bregman is President, CFO and Director of FRMO. Horizon Kinetics LLC co-founders Murray Stahl and Steve Bregman founded FRMO and Mr. Stahl serves as CEO and Chairman, while Mr. Bregman is President, CFO and Director of FROM.

[2] Jesse T. Correll has been Chairman and CEO of Universal Guaranty Life Insurance Company since 2000. Correll was a member of the Board of Directors of AMEN Properties, Inc. from December 2008 until at least September 2010 (specific date unknown). Correll is also connected to SFF Royalty, LLC, through his involvement with Universal Guaranty Life Insurance Company, which is a member of SFF Royalty, from 2010 through at least 2014. SFF Royalty, LLC is an entity through which AMEN owns oil and gas interests.

9.  We have reason to believe that your family members, including your brother and sons, own a significant number of oil and gas interests, at least some of which are located in the Permian Basin through various entities. **Please describe those interests and explain whether they do business with or compete with the Trust, or are in a position to profit from the activities of the Trust.**

We look forward to receiving from you the information that is requested by no later than **5:00 p.m. Central Time on May 20, 2019**.  This letter is being sent on behalf of the Trust while expressly reserving, and without waiving, any and all rights and defenses that the Trust may have with respect to this matter.

We would have preferred to send you this letter privately.  However, the decision of your group to publicize our prior confidential settlement outreach (and alter the text of our communication in your purported "reprint") made it clear that we cannot expect to communicate with you privately.  Therefore, we are making this letter public.

Very truly yours,


By:   /s/ *JOHN R. NORRIS III*
   Name: John R. Norris III
   Title: Co-Chairman


By:   /s/ *DAVID E. BARRY*
   Name: David E. Barry
   Title: Co-Chairman

**EXHIBIT A**

Wednesday, 26 December 2012

Mr. Eric L. Oliver, Chairman
AMEN Properties
Post Office Box 835451
Richardson, Texas 75083-5451

Dear Mr. Oliver,

As a shareholder, I was recently reviewing AMEN Properties'
2011 Annual Report. I was most particularly interested in
the biographies of the members of the board of directors as
I am a relatively new shareholder and I wanted to familiar-
ize myself with the backgrounds of each of the directors.

My primary occupation is in the oil & gas division of the
trust department at a large national bank. So, when I saw
that you were a member of the board of directors at the First
National Bank of Midland, I went to look at FNB Midland's
webpage to see what your duties at that bank were. This is
where I discovered some discrepancies that I wish to bring
to your attention and to which I would like your response.

First, I discovered that, according to the Federal Deposit
Insurance Corporation, the First National Bank of Midland
(FDIC#: 35028) ceased to exist when it changed its name to
FirstCapital Bank of Texas, N.A. on 1 July 2010. This in
of itself is not a concern, but your official biography in
the reports of AMEN Properties continues to refer to the
name of the bank as the First National Bank of Midland.
Since currently a bank with such a name does not exist, this
could lead to some confusion.

Second, I looked at the members of the board of directors of
FirstCapital Bank of Texas, N.A. It does not appear that you
are a director of this bank, so I am confused as to why your
official biography would state otherwise.

Third, your official biography states that you are president

of SoftSearch Investment, Inc. of Abilene. I was able to
locate a now defunct business of that name in Abilene as
well as a currently active business by the name of SoftSearch
Investment, L.P. at the same address. Due to the limited
information that is publicly available on SoftSearch Invest-
ment, L.P., I was not able to verify your position as
president there. Could you help me to understand the dis-
crepancy between the names of SoftSearch Investment, Inc.
and SoftSearch Investment, L.P. in yourofficial biography?
Also, could you please confirm that you are currently pres-
ident of SoftSearch Investment, L.P.?

Fourthm your AMEN Properties biography goes on to state that
you are a member of the board of directors of Love and Care
Ministries in Abilene. However, when I reviewed the website
of Love and Care Ministries, I was unable to find your name
as a board member there. Again, there seems to be a dis-
crepancy here between your AMEN Properties biography and what
the organization itself reports to the public. Please help
me to understand this additional discrepancy.

Finally, I am including with this letter printouts of the
various webpages I have mentioned in this letter as well as
a printout of your official biography as it appears in AMEN
Properties 2011 Annual Report.

Thank you for your time. Please address your written response
to me at the address appearing in the footer of the first page
of this letter.


Sincerely,



# EXHIBIT I

# Investor Group Comments On Latest Actions Of Trustees Of Texas Pacific Land Trust To Obstruct Shareholder Democracy

Look Forward To Shareholder Vote on New Trustee Tomorrow, May 22, 2019

---

NEWS PROVIDED BY

**SoftVest L.P., Horizon Kinetics LLC and ART-FGT Family Partners →**

May 21, 2019, 19:19 ET

---

DALLAS, May 21, 2019 /PRNewswire/ -- SoftVest, L.P., Horizon Kinetics LLC and ART-FGT Family Partners, which collectively beneficially own over 25% of the outstanding shares of Texas Pacific Land Trust (NYSE: TPL) (the "Trust" or "TPL"), issued today the following statement to TPL investors:

Fellow TPL investors:

Like many of you, we are at a loss to explain the actions taken by the incumbent Trustees this afternoon on any above-board or bona fide basis. Not only did they file a meritless lawsuit against Eric Oliver, but they used it as a pretense to try to cancel tomorrow's special meeting of shareholders.  In furtherance of full transparency, we have already publicly filed with the SEC a copy of the Trustees' disclosure complaint so shareholders can review it on their own, and come to their own conclusions before the meeting tomorrow.

Think about what is going on:  after spending over two months and millions of dollars in shareholders' money to protect their lifetime tenures as trustees, David Barry and John Norris want to avoid – apparently by any measure – counting shareholders' votes; this from fiduciaries whose essential responsibility is to act on behalf of shareholders.  In our view, the trustees and their advisors simply have no shame, or certainly do not have a sufficient measure of it to inhibit such behavior.

Fortunately, Broadridge has decided, following our public dissemination of this action, to reverse the Trustees' directive to withhold shareholders' proxies– proving the disinfecting power of the bright light of day – and we are now in possession of the votes delivered by shareholders through Broadridge.  With those in hand, we will proceed to attend the special meeting scheduled tomorrow morning in Dallas.

As we have previously stated, in our view without a shareholder vote the incumbent Trustees simply do not have the power or authority to delay or cancel the special meeting or a vote on the trustee proposal. We will see this matter through tomorrow, and invite those shareholders who are in Dallas or who had already made travel arrangements to join us and cast their vote on this important matter.

**Important Information**

SoftVest, L.P. has filed a definitive proxy statement with the United States Securities and Exchange Commission (SEC) in connection with the solicitation of proxies for a special meeting of holders of the sub-share certificates of proprietary interests for the election of a new trustee of TPL. Investors are strongly advised to read the proxy statement because it contains important information. Investors may obtain a free copy of the proxy statement from the SEC's website at www.sec.gov, or by contacting D.F. King, SoftVest LP's proxy solicitor, by phone (212-269-5550) or e-mail (TPL@dfking.com).

SOURCE SoftVest L.P., Horizon Kinetics LLC and ART-FGT Family Partners

# EXHIBIT J

Deals

# Texas Land Bank Fight Turns Ugly as Dissident Nominee Sued

By David Caleb Mutua and Scott Deveau
May 21, 2019, 5:19 PM CDT
*Updated on May 22, 2019, 9:23 AM CDT*

▶ Eric Oliver says dissident investor group has the votes to win

▶ Group seeks changes to corporate structure, more disclosure

Texas Pacific Land Trust postponed a special shareholders meeting and sued the activist investor vying for a trustee job, the latest twist in an increasingly acrimonious proxy battle.

The meeting, previously scheduled for June 6, has been called off until further notice to give investors "the opportunity to cast a fully informed vote,'' Trustee David E. Barry said Tuesday in a statement_____.

The company also filed a lawsuit in federal court in Dallas against Eric Oliver, the dissident nominee, accusing him of violating securities laws related to the proxy contest and secretly working with other parties including Santa Monica Partners and Universal Guaranty Life Insurance Co.

Oliver, who runs hedge fund SoftVest LP, said the claims in the lawsuit are without merit, and Santa Monica Partners and Universal Guaranty didn't need to register as part of the dissident group.

"I would say if they had the votes they needed, they would be holding the meeting," Oliver said in an interview, adding that the group has sufficient votes to win the trustee seat, based on preliminary tallies.



## Texas Pacific's Land Holdings
The trust earns gas and oil royalties from 887,698 acres of **unsold land**

Note: including the disclaimers in the supplemental proxy statement.

Sources: Texas Pacific Land Trust, U.S. Energy Information Administration

Texas Pacific is a previously obscure land bank created out of a railroad bankruptcy more than a century ago. Its shares have surged in recent years, giving it a market capitalization of $6.6 billion, as land in West Texas becomes sought-after by shale drillers and firms seeking fresh water for use in fracking. The dissident investors, including the trust's largest shareholder -- Horizon Kinetics -- are pushing for a change in its corporate structure and more disclosure about its operations.

Santa Monica confirmed its support for Oliver in an April filing but isn't working with the dissident shareholders, its president, Lawrence J. Goldstein, said in an interview. "I have nothing to do with Mr. Oliver," he said. No one immediately returned a message left with Universal Guaranty seeking comment.

Barry, and fellow trustee John Norris, said in a letter to shareholders     Wednesday the purpose of the suit was not to delay the vote but to allow shareholders to be "fully and accurately informed." They said they would set the vote once the litigation was resolved by the court or by Oliver providing the necessary disclosures.

"Let us be clear: although the Trust believes that Mr. Oliver is the wrong choice to become TPL's next Trustee, in no way is it our goal to prevent shareholders from having their say," the pair said. "At this time, we do not know when the meeting will take place."

The trust faces an uphill battle to win the necessary support for its own trustee candidate despite winning the backing of two prominent shareholder advisory firms, Institutional Shareholder Services Inc. and Glass Lewis & Co. The dissident investors hold more than 25% of the outstanding shares in the company, creating a hurdle for Texas Pacific to win the necessary support for its nominee.

That challenge has been compounded by a large retail investor base, which would need to be corralled as well for the trust to prevail. A representative for the dissident investors wasn't immediately available for comment.

The company had already delayed the vote from May 22 to June 6 after it said it needed additional time prepare and mail supplemental proxy material upon the request of regulators.

*– With assistance by David Glovin*

*(Updates with trustee comments starting in eighth paragraph.)*

**In this article**

TPL
**TEXAS PAC LAND**
829.17 USD ▼ -21.03 -2.47%

77449Z
**INSTITUTIONAL SHAREHOLDER SE**
Private Company

Case 3:19-cv-01224-B   Document 15   Filed 05/22/19   Page 194 of 197   PageID 401

Terms of Service
Trademarks Privacy Policy
©2019 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices    Contact Us Help

# EXHIBIT K

# Investor Group Comments On Results Of Special Meeting Of Texas Pacific Land Trust

Eric Oliver elected as Trustee of Texas Pacific Land Trust

---

NEWS PROVIDED BY

**SoftVest, L.P., Horizon Kinetics LLC and ART-FGT Family Partners →**

May 22, 2019, 15:12 ET

---

DALLAS, May 22, 2019 /PRNewswire/ -- SoftVest, L.P., Horizon Kinetics LLC and ART-FGT Family Partners, which collectively beneficially own over 25% of the outstanding shares of Texas Pacific Land Trust (NYSE: TPL), announced that Eric Oliver was elected trustee of TPL at the special meeting of shareholders held this morning in Dallas, Texas.

Out of the 7,756,156 shares outstanding on the record date, a total of 3,660,812 shares voted for the election of Eric Oliver (including shares voted through Broadridge).  We have been advised by Broadridge that a total of 1,994,267 shares were voted in favor of the election of General Donald Cook.

Although TPL's representatives present at the meeting noted that they did not recognize the validity of the special meeting, we hope and expect, in light of the overwhelming support in favor of the election of Eric Oliver, that David Barry and John Norris will welcome Eric Oliver as a fellow trustee and work with him collaboratively to create value for all shareholders.  It is time to move forward.

We thank all shareholders who came to the special meeting and travelled from all over the United States and abroad, including London, Canada, The Bahamas, California, Cincinnati and Boston.

SOURCE SoftVest, L.P., Horizon Kinetics LLC and ART-FGT Family Partners